# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JASON DANIEL HEAP<br>and THE HUMANIST SOCIETY,<br><br>Plaintiffs,<br><br>v.<br><br>HON. ASHTON B. CARTER,[1]<br>HON. RAYMOND E. MABUS, JR.,<br>VICE ADMIRAL WILLIAM F. MORAN,<br>REAR ADMIRAL MARK L. TIDD,<br>REAR ADMIRAL ANNIE B. ANDREWS,<br>REAR ADMIRAL MARGARET G. KIBBEN,<br>HON. JESSICA L. GARFOLA WRIGHT,<br>REAR ADMIRAL BRENT W. SCOTT,<br>MAJOR GEN. HOWARD D. STENDAHL,<br>BRIGADIER GEN. BOBBY V. PAGE,<br>MAJOR GEN. DONALD L. RUTHERFORD,<br>BRIGADIER GEN. CHARLES R. BAILEY,<br>REAR ADMIRAL DANIEL L. GARD,<br>REAR ADMIRAL GREGORY C. HORN,<br>THE UNITED STATES NAVY,<br>THE UNITED STATES DEPARTMENT OF<br>DEFENSE, and John and Jane Does # 1-40,<br><br>Defendants. | Case No.: 1:14-CV-1490-JCC-TCB<br><br>**PLAINTIFFS' OPPOSITION TO ALL DEFENDANTS' MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT**<br><br>Electronically Filed |

---

[1] Ashton B. Carter became United States Secretary of Defense on February 17, 2015. Pursuant to Federal Rule of Civil Procedure 25(d), Ashton B. Carter should be substituted for Charles T. Hagel in this lawsuit.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

SUMMARY OF THE ALLEGATIONS ............................................................. 2
    A.    The Plaintiffs ............................................................................... 2
    B.    The Navy and DoD's Policy and Practice of Discrimination Against
        Humanists .................................................................................... 2
    C.    The Navy Chaplaincy ................................................................. 2
    D.    Defendants Reject Plaintiffs' Application Because They Are Humanists ............. 3

STATEMENT OF DISPUTED MATERIAL FACTS ......................................... 4

ARGUMENT ...................................................................................................... 10

I.    THIS COURT HAS JURISDICTION TO DECIDE PLAINTIFFS' CLAIMS
    ARISING UNDER THE FEDERAL RELIGIOUS FREEDOM RESTORATION
    ACT AND UNITED STATES CONSTITUTION .......................................... 10
    A.    Plaintiffs' Claims Under RFRA and the United States Constitution Are
        Justiciable .................................................................................... 10
        1.    Judicially Administrable Standards Govern Plaintiffs' Claims ............... 10
        2.    The Issue of Religious Discrimination is Not Entrusted to the
            Political Branches ................................................................. 11
        3.    Dismissal is Not Appropriate Due to the Relief Requested .................... 14
    B.    The Humanist Society Has Standing to Sue and its Claims are Ripe ................. 15
        1.    The Humanist Society has Standing to Sue for its own Injuries .............. 15
            a.    The Society May Sue Defendants For Rejecting Plaintiffs'
                Application Because of Discrimination Against The
                Society ........................................................................... 16
            b.    The Society May Sue Because Defendants' Discrimination
                Frustrates The Society's Organizational Purposes ...................... 17
            c.    The Society Alleges Concrete Plans to Endorse Specialist
                Joe Farkas in December of 2017 ......................................... 19
            d.    The Society's Injury is Not "Self – Inflicted" ........................... 19
            e.    Defendants Misstate The Society's Organizational Mission ........ 21
        2.    The Humanist Society May Sue on Behalf of its Members in the
            Navy .................................................................................. 22
        3.    The Humanist Society May Sue on Behalf of Humanist Non-
            Members .............................................................................. 24
    C.    The Humanist Society's Claims are Ripe .................................. 24

II.    THE MOTIONS TO DISMISS UNDER RULE 12(B)(6) SHOULD BE DENIED ........ 27
    A.    The Complaint Plausibly Alleges Defendants Denied Plaintiffs'
        Applications Because Plaintiffs are Humanists ........................... 27

i

# TABLE OF CONTENTS

Page

1.  The Complaint Alleges Defendants Denied Plaintiffs' Application Based on a Discriminatory Policy............................................................. 28
2.  The Complaint Alleges Direct Evidence of Intentional Discrimination................................................................................................. 29
3.  The Allegations State a Prima Facie Case of Intentional Discrimination................................................................................................. 30
    a.  Membership in Protected Class and Participation in Protected Activity ............................................................................... 31
    b.  Dr. Heap and The Humanist Society Meet Defendants' Criteria .................................................................................................... 32
    c.  Acceptance of Similar Non-Humanist Applicants....................... 32
4.  Plaintiffs Allege Additional Facts Permitting the Inference Defendants Rejected their Applications Because they are Humanists ............................................................................................... 33
    a.  The Historical Background of Defendants' Decision to Reject Plaintiffs' Application Reveals a Discriminatory Purpose................................................................................................. 33
    b.  The Specific Sequence of Events Leading Up to Rejection of Plaintiffs' Application Evidences Discriminatory Intent ......... 34
    c.  Defendants' Substantive Departures from Chaplain Corps Recruitment Regulations................................................................ 36
    d.  Contemporary Statements by Navy and AFCB Defendants Show Intentional Discrimination .................................................. 36
5.  The Allegations Are Sufficient as to Each Defendant ............................. 37
B.  Discrimination Against Dr. Heap and The Humanist Society Because They Are Humanists Violates the Establishment and Equal Protection Clauses ...................................................................................................... 39
C.  Plaintiffs Plausibly Allege Violations of the Free Exercise Clause and Religious Freedom Restoration Act........................................................ 39
    1.  Defendants' Intentional Discrimination Violates the Free Exercise Clause.............................................................................................. 39
    2.  Defendants' Exclusion of Humanists Violates RFRA.............................. 43
D.  Excluding Plaintiffs From the Chaplaincy Because of Their Humanist Affiliation and Viewpoint Violates the Speech and Association Clauses of the First Amendment................................................................................. 46
    1.  Denying Plaintiffs' Applications Because of Their Humanist Affiliation Unconstitutionally Conditions Public Employment on Their First Amendment Freedoms of Association.................................... 46
    2.  Rejecting Plaintiffs' Application Because of Their Humanist Viewpoint Violates the Speech Clause ................................................... 47
        a.  Dr. Heap's Intended Speech as Navy Chaplain is Protected by the First Amendment.................................................................. 47

# TABLE OF CONTENTS

Page

          b.     Viewpoint-Based Exclusion of Dr. Heap and The Humanist Society Because They are Humanists Violates the Speech Clause ............................................................................... 50

    3.     Excluding Humanists from the Chaplaincy Violates Humanist Service Members' Speech Clause Rights ................................ 51

E.    The Ecclesiastical Endorsement Requirements of DoDI 1304.28, Facially and As Applied to Dr. Heap, Violate the No Religious Test Clause ................... 51

F.    This Court May Award Damages to Remedy the Individual Defendants' Intentional Discrimination ........................................................... 54

    1.     Damages May Be Awarded in Actions By Civilians Whose Injuries Were Not Incurred During Service ................................ 54

    2.     Absence of a Remedy Under Title VII Does Not Preclude *Bivens* Relief ........................................................................................ 58

    3.     The APA Does Not Preempt Dr. Heap's *Bivens* Claims ............ 60

    4.     The "First Amendment Context" Is Not a "Special Factor" ............. 61

    5.     Defendants Have Not Shown *Bivens* Is Precluded ................... 62

G.    The Individual Capacity Defendants Are Not Entitled To Qualified Immunity ....................................................................................... 64

    1.     Humanism Is a Religion Under Clearly Established Law ............. 65

          a.     The Supreme Court Has Expressly Recognized Humanism as a Religion ............................................................... 65

          b.     The Individual Defendants Fail to Show that Humanism's Status as a Religion Is Not Clearly Established ............................. 68

          c.     Many of Plaintiffs' Claims—Including Under the Establishment Clause—Do Not Depend on Whether Humanism Is a Religion ................................................. 70

    2.     RFRA Creates a Cause of Action Against the Individual Capacity Defendants ................................................................................ 71

III.    DEFENDANTS' PREMATURE SUMMARY JUDGMENT MOTION MUST BE DENIED ...................................................................................... 74

    A.    The Motion for Summary Judgment Must be Denied as Premature ................... 74

    B.    Genuine, Triable Issues of Material Fact Preclude Summary Judgment ............. 77

CONCLUSION ..................................................................................... 80

# TABLE OF AUTHORITIES

Page

**CASES**

*Abasiekong v. City of Shelby,*
  744 F.2d 1055 (4th Cir. 1984) ..................................................................... 30

*ACLU v. City of St. Charles,*
  794 F.2d 265 (7th Cir. 1986) ....................................................................... 66

*Adair v. England,*
  183 F. Supp.2d 31 (D.D.C. 2002) ......................................................... *passim*

*Adams v. Trustees of the Univ. of N.C.-Wilmington,*
  640 F.3d 550 (4th Cir. 2011) ....................................................................... 49

*Allee v. Medrano,*
  416 U.S. 802 (1974) ..................................................................................... 25

*Am. Humanist Ass'n v. United States,*
  No. 3:14-cv-00565-HA, 2014 WL 5500495 (D. Or. Oct. 30, 2014) ......... 62, 64, 66

*Anderson v. Laird,*
  316 F. Supp. 1081 (D.D.C. 1970), *rev'd on other grounds*, 466 F.2d 283 (D.C.
  Cir. 1972) ..................................................................................................... 53

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ..................................................................................... 74

*Anderson v. Town of South Boston,*
  No. 4:10CV004, 2010 WL 2836125 (W.D. Va. July 10, 2010) ................... 77

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................... 28, 31

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) ................................................................... 39

*Barrows v. Jackson,*
  346 U.S. 249 (1953) ..................................................................................... 24

*Baz v. Walters,*
  782 F.2d 701 (7th Cir. 1986) ....................................................................... 50

*Bd of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,*
  512 U.S. 687 (1994) ..................................................................................... 42

## TABLE OF AUTHORITIES

Page

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)...................................................................28

*Bethel World Outreach Ministries v. Montgomery Cnty*,
   706 F.3d 548 (4th Cir. 2013) ....................................................44

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*,
   403 U.S. 388 (1971)........................................................... *passim*

*Bogan v. Roomstore, Inc.*,
   No. 3:09-cv-705, 2010 WL 370306 (E.D. Va. Jan. 29, 2010).................................31

*Bonner v. Outlaw*,
   552 F.3d 673 (8th Cir. 2009) ....................................................38

*Bontkowski v. Smith*,
   305 F.3d 757 (7th Cir. 2002) ...............................................14, 15

*Booth v. Maryland*,
   327 F.3d 377 (4th Cir. 2003) ...............................................28, 43

*Bostic v. Schaefer*,
   760 F.3d 352 (4th Cir. 2014) ....................................................15

*Bragdon v. Abbott*,
   524 U.S. 624 (1998).................................................................71

*Brooks v. United States*,
   337 U.S. 49 (1949)...................................................................55

*Brown. United States* v. *Stanley*,
   483 U.S. 669 (1987)........................................................... *passim*

*Brown v. City of Oneonta, New York*,
   221 F.3d 329 (2d Cir. 2000).......................................................28

*Brown v. Glines*,
   444 U.S. 348 (1980)............................................................12, 48

*Brown v. GSA*,
   425 U.S. 820 (1976).................................................................61

*Brown v. Polk Cnty.*,
   61 F.3d 650 (8th Cir. 1995) ...............................................49, 50

# TABLE OF AUTHORITIES

Page

*Brownson v. Bogenschutz,*
    966 F. Supp. 795 (E.D. Wis. 1997) ................................................................................73

*Bryant v. Secretary of the Army,*
    862 F. Supp. 574 (D.D.C. 1994) ...............................................................................47, 51

*Bryant Woods Inn, Inc. v. Howard Cnty.,*
    124 F.3d 597 (4th Cir. 1997) ....................................................................................24, 51

*Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014) ..............................................................................................43, 45

*Bush v. Lucas,*
    462 U.S. 367 (1983) ........................................................................................................62

*Butz v. Economou,*
    438 U.S. 478 (1978) ..................................................................................................54, 64

*Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.,*
    771 F.3d 201 (4th Cir. 2014) ..........................................................................................64

*Carlson v. Green,*
    446 U.S. 14 (1980) .......................................................................................58, 61, 63, 64

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ........................................................................................................77

*Cent'l Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc.,*
    236 F.3d 629 (11th Cir. 2000) ..................................................................................20, 21

*Chappell v. Wallace,*
    462 U.S. 296 (1983) ..................................................................................................54, 55

*Charles v. Front Royal Vol. Fire & Rescue Dept., Inc.,*
    21 F. Supp.3d 620, 629 (W.D. Va. 2014) .......................................................................14

*Chess v. Widmar,*
    635 F.2d 1310 (8th Cir. 1980) ........................................................................................66

*Chesser v. Rivas,*
    No. 13-cv-00456-JPG, 2013 WL 2634798 (S.D. Ill. June 12, 2013) ......................................62

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ....................................................................................10, 31, 39, 43

# TABLE OF AUTHORITIES

Page

*Ciocca v. Rumsfeld,*
720 F.3d 505 (4th Cir. 2013) ................................................. 57

*Citizens for Better Forestry v. United States Dep't of Agric.,*
632 F. Supp.2d 968 (N.D. Cal. 2009) ..................................... 19

*City of New Orleans v. Dukes,*
427 U.S. 297 (1976) ................................................. 10, 31, 39

*Clatterbuck v. City of Charlottesville,*
708 F.3d 549 (4th Cir. 2013) ........................................ 16, 19, 32

*Collin v. Rector & Bd. of Visitors of Univ. of Va.,*
873 F. Supp. 1008 (W.D.Va. 1995) ......................................... 38

*Comm. for Pub. Ed. & Religious Liberty v. Nyquist,*
413 U.S. 756 (1973) ............................................................... 42

*Cooksey v. Futrell,*
721 F.3d 226 (4th Cir. 2013) ........................................ 16, 25, 26

*Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.,*
473 U.S. 788 (1985) ................................................. 48, 50, 51, 70

*Corp. of Presiding Bishop of Church of Jesus Christ Latter-day Saints v. Amos,*
483 U.S. 327 (1987) ........................................................ 22, 45

*Corr. Svcs. Corp. v. Malesko,*
534 U.S. 61 (2001) ................................................................. 64

*Crawford v. Cushman,*
531 F.2d 1114 (2d Cir. 1976) ........................................... 13, 15

*Crockett v. Sorenson,*
568 F. Supp. 1422 (W.D. Va. 1983) ...................................... 66

*Cruz v. Beto,*
405 U.S. 319 (1972) ............................................................... 51

*Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk,*
758 F.3d 869 (7th Cir. 2014) ........................................... 66, 70

*Davis v. Passman,*
442 U.S. 228 (1979) ....................................................... *passim*

# TABLE OF AUTHORITIES

Page

*Demers v. Austin*,
746 F.3d 402 (9th Cir. 2014) ...............................................................49

*Dettmer v. Landon*,
799 F.2d 929 (4th Cir. 1986) ..............................................67, 68, 69

*Diamond v. Colonial Life & Acc. Ins. Co.*,
416 F.3d 310 (4th Cir. 2005) ...............................................................30

*Diaz-Bernal v. Myers*,
758 F. Supp. 2d 106 (D. Conn. 2010) ..............................................60, 63

*Dillard v. Brown*,
652 F.2d 316 (3d Cir. 1981)...............................................12, 13, 55, 61

*Doll v. Brown*,
75 F.3d 1200 (7th Cir. 1996) ...............................................................15

*Durden v. United States*,
736 F.3d 296 (4th Cir. 2013) ...............................................................16

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ...............................................................27

*Elmaghrahy v. Ashcroft*,
No. 04 cv 1809 JG SMG, 2005 WL 2375202 (E.D.N.Y. Sept. 27, 2005).............................73

*Elrod v. Burns*,
427 U.S. 347 (1976).......................................................................11, 46

*Emergency Coal. to Defend Educ. Travel v. United States Dept. of Treasury*,
498 F. Supp.2d 150 (D.D.C. 2007) .......................................................19

*Emory v. Sec'y of Navy*,
819 F.2d 291 (D.C. Cir. 1987) ...............................................................13

*Epperson v. State of Ark.*,
393 U.S. 97 (1968).........................................................................70

*Fair Emp't Council of Greater Wash. v. BMC Mkting Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ..........................................................20, 21

*Fellowship of Humanity v. Alameda Cnty.*,
315 P.2d 394 (Cal. Dist. Ct. App. 1957).................................................68

# TABLE OF AUTHORITIES

Page

*Ferrill v. Parker Grp, Inc.*.
    168 F.3d 468 (11th Cir. 1999) ...................................................38

*Flattery v. Sw. Va. Fertility Center, LLC*,
    No. 7:08cv00256, 2009 WL 49995 (W.D. Va. Jan. 7, 2009) ..................76

*Flower v. United States*,
    407 U.S. 197 (1972)..................................................................47

*Floyd v. City of New York*,
    959 F. Supp. 2d 540 (S.D.N.Y. 2013) ......................................38

*Francis v. Keane*,
    888 F. Supp. 568 (S.D.N.Y. 1995)...........................................43

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
    204 F.3d 149 (4th Cir. 2000) ..........................................22, 23

*Fund Democracy, LLC v. S.E.C.*,
    278 F.3d 21 (D.C. Cir. 2002)...................................................23

*Furlong v. Shalala*,
    156 F.3d 384 (2d Cir. 1998)....................................................60

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006).................................................................49

*Glines v. Wade*,
    586 F.2d 675 (9th Cir. 1980) ..................................................12

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
    721 F.3d 264 (4th Cir. 2013) ..................................................74

*Greater Houston Chapter of the ACLU v. Eckels*,
    589 F. Supp. 222 (S.D. Tex. 1984) ........................................66

*Grove, McGinley v. Houston*,
    361 F.3d 1328 (11th Cir. 2004) ..............................................69

*Grove v. Mead Sch. Dist. No. 354*,
    753 F.2d 1528 (9th Cir. 1985) ................................................69

*Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*,
    No. S-10-2414, 2012 WL 1131387 (E.D. Cal. Mar. 29, 2012) ........60, 63

## TABLE OF AUTHORITIES

Page

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..................................................................................64

*Harrods Ltd. v. Sixty Internet Domain Names,*
    302 F.3d 214 (4th Cir. 2002) .............................................74, 75, 76, 77

*Hartman v. Moore,*
    547 U.S. 250 (2006)............................................................................30, 61

*Hartmann v. California Dep't of Corr. & Rehab.,*
    707 F.3d 1114 (9th Cir. 2013) .................................................................42

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982).............................................................17, 18, 19, 20

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010).............................................................38, 75

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944)..................................................................................15

*Henderson v. Kennedy,*
    253 F.3d 12 (D.C. Cir. 2001) ...........................................................44, 45

*Henry v. Purnell,*
    501 F.3d 374 (4th Cir. 2007) ...................................................................68

*Hernandez v. C.I.R.,*
    490 U.S. 680 (1989)............................................................................21, 45

*Hill v. Lockheed Martin Logistics Mgmt., Inc.,*
    354 F.3d 277 (4th Cir. 2004) ...........................................................32, 33

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015).........................................................................43, 44

*Hooker v. Weathers,*
    990 F.2d 913 (6th Cir. 1993) ...................................................................20

*Hope v. Pelzer,*
    536 U.S. 730 (2002)............................................................................64, 69

*Hosana-Tabor Evangelical Lutheran Church & School v. EEOC,*
    132 S. Ct. 694 (2012)...............................................................................32

# TABLE OF AUTHORITIES

Page

*Howard v. United States,*
864 F. Supp. 1019 (D. Co. 1994) ............................................................... 66

*I.N.S. v. Delgado,*
466 U.S. 210 (1984) ....................................................................................... 25

*Indian Towing Co. v. United States,*
350 U.S. 61 (1955) ......................................................................................... 55

*Int'l Bottled Water Ass'n v. Eco Canteen, Inc.,*
2010 WL 3719313 (W.D.N.C. Sept. 17, 2010) ......................................... 23

*Int'l Broth. of Teamsters v. United States,*
431 U.S. 324 (1977) ....................................................................................... 30

*Jackson v. Tate,*
648 F.3d 729 (9th Cir. 2011) ................................................... 55, 56, 57, 63

*Jama v. U.S.I.N.S.,*
343 F. Supp. 2d 338 (D.N.J. 2004) ..................................................... 72, 73

*Jones v. Barry,*
33 Fed. App'x 967 (10th Cir. Apr. 25, 2002) ............................................ 72

*Kalka v. Hawk,*
215 F.3d 90 (D.C. Cir. 2000) ................................................... 68, 69, 70

*Katcoff v. Marsh,*
755 F.2d 223 (2d Cir. 1985) ................................................... 41, 45, 48, 63

*Kaufman v. McCaughtry,*
419 F.3d 678 (7th Cir. 2005) ....................................................................... 66

*Kennebeck v. Napolitano,*
No. 1:13cv88, 2013 WL 3368960 (E.D. Va. July 3, 2013) ..................... 76

*Kensington Vol. Fire Dep't v. Montgomery Cnty.,*
684 F.3d 462 (4th Cir. 2012) ....................................................................... 27

*Kentucky v. Graham,*
473 U.S. 159 (1985) ....................................................................................... 71

*Kerns v. United States,*
585 F.3d 187 (4th Cir. 2009) ................................................................. 16, 17

# TABLE OF AUTHORITIES

Page

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
 385 U.S. 589 (1967).............................................................................49

*Kikwebati v. Strayer Univ. Corp.*,
 No. 2:14-cv-203, 2014 WL 7692396 (E.D. Va. Oct. 21, 2014) ............................................27

*King v. S&S Foods, LLC*
 No. 6:14-CV-00014, 2014 WL 6609115 (W.D. Va. Nov. 20, 2014) ....................................76

*Kreis v. Sec'y of Air Force*,
 866 F.2d 1508 (D.C. Cir. 1989)..................................................................13, 14

*Lane v. Holder*,
 703 F.3d 668 (4th Cir. 2012) ......................................................................20

*Larsen v. Valente*,
 456 U.S. 228 (1982)..........................................................................10, 31, 39

*Lebron v. Rumsfeld*,
 670 F.3d 540 (4th Cir. 2012) ......................................................................74

*Lee v. Weisman*,
 505 U.S. 577 (1992)..............................................................................70

*Lemon v. Kurtzman*,
 403 U.S. 602 (1971)..............................................................................53

*Lepp v. Gonzales*,
 No. C-05-0566 VRW, 2005 WL 1867723 (N.D. Cal. Aug. 2, 2005)....................................73

*Lewis v. Smith*,
 855 F.2d 736 (11th Cir. 1988) ......................................................................38

*Libertarian Party of Va. v. Judd*,
 718 F.3d 308 (4th Cir. 2013) ......................................................................16

*Lipsett v. Univ. of Puerto Rico*,
 864 F.2d 881 (1st Cir. 1988).........................................................................59

*Listecki v. Official Comm. of Unsecured Creditors*,
 780 F.3d 731 (7th Cir. 2015) ......................................................................71

*Lister v. Def. Logistics Agency*,
 482 F.Supp. 2d 1003 (S.D. Ohio 2007) .........................................................47, 48, 49, 51

# TABLE OF AUTHORITIES

Page

*Lovelace v. Lee*,
    472 F.3d 174 (4th Cir. 2006) .................................................40

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................15, 19

*M.N.C. of Hinesville, Inc. v. United States. Dep't of Defense*,
    791 F.2d 1466 (11th Cir. 1986) ............................................47

*Mack v. O'Leary*,
    80 F.3d 1175 (7th Cir. 1996) ................................................73

*Mahoney v. Doe*,
    642 F.3d 1112 (D.C. Cir. 2011)............................................44, 45

*Makky v. Chertoff*,
    541 F.3d 205 (3d Cir. 2008).................................................11

*Massenburg v. Adams*,
    No. 3:08-cv-106, 2010 WL 1279087 (E.D. Va. Mar. 31, 2010)...........................38

*Matthews v. Novant Health, Inc.*,
    No. 3:09-cv-494, 2010 WL 2131559 (W.D. N.C. April 29, 2010).........................31

*McCray v. Maryland Dept. of Transp, Maryland Transit Admin.*,
    741 F.3d 480 (4th Cir. 2014) ................................................75, 76

*McCreary Cnty. v. ACLU of Ky.*,
    545 U.S. 844 (2005)...............................................................70

*McDaniel v. Paty*,
    435 U.S. 618 (1978)...............................................................39, 40, 41, 42

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...............................................................11, 30, 32

*McGowan v. Scoggins*,
    890 F.2d 120 (9th Cir. 1989) ................................................56, 63

*Mendelsohn v. Sprint/United Mgmt. Co.*,
    587 F. Supp. 2d 1201 (D. Kan. 2008).................................37

*Merritt v. Old Dominion Freight Line, Inc.*,
    601 F.3d 289 (4th Cir. 2010) ................................................77

# TABLE OF AUTHORITIES

Page

*Meyers v. Baltimore Cnty.*,
  713 F.3d 723 (4th Cir. 2013) ...................................................................64

*Middlebrooks v. Leavitt*,
  525 F.3d 341 (4th Cir. 2008) .............................................................57, 59

*Miller v. U.S. Dept. of Agric. Farm Svcs. Agency*,
  143 F.3d 1413 (11th Cir. 1998) ..............................................................61

*Milwaukee Police Ass'n v. Bd. of Fire & Police Com'rs*,
  708 F.3d 921 (7th Cir. 2013) ..................................................................25

*Monroe v. City of Charlottesville*,
  471 F. Supp. 2d 657 (W.D. Va. 2007) ....................................................28

*Moore v. Glickman*,
  113 F.3d 988 (9th Cir. 1997) ..................................................................61

*Moseke v. Miller & Smith, Inc.*,
  202 F. Supp.2d 492 (E.D. Va. 2002) ......................................................20

*Nat'l Advertising Co. v. City of Miami*,
  402 F.3d 1335 (11th Cir. 2005) ..............................................................24

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ..............................................................21

*Navab-Safavi v. Broadcasting Bd. of Governors*,
  650 F. Supp. 2d 40 (D.D.C. 2009) .................................................. *passim*

*Newdow v. U.S. Cong.*,
  313 F.3d 500 (9th Cir. 2002) ..................................................................66

*Nixon v. United States*,
  506 U.S. 224 (1993)................................................................................10

*O'Hare Truck Svc., Inc. v. City of Northlake*,
  518 U.S. 712 (1996)................................................................................46

*Orloff v. Willoughby*,
  73 S. Ct. 534 (1953)................................................................11, 12, 13, 14

*Padilla v. Yoo*,
  633 F. Supp. 2d 1005 (N.D. Cal. 2009) ..................................................73

# TABLE OF AUTHORITIES

Page

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)......................................................................................26

*Panagacos v. Towery*,
    782 F. Supp. 2d 1183 (W.D. Wash. 2011)...............................................62

*Parker v. Levy*,
    417 U.S. 733 (1974)................................................................................48, 49

*Peloza v. Capistrano Unified Sch. Dist.*,
    37 F.3d 517 (9th Cir. 1994) ......................................................................69

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979)................................................................................38, 75

*Pickering v. Bd. of Educ of Tp. High Sch. Dist. 205*,
    391 U.S. 563 (1968)................................................................................43, 49

*Raby v. Livingston*,
    600 F.3d 552 (5th Cir. 2010) ....................................................................74

*Raeman v. Cnty of Ontario*,
    No. 12-cv-6009 CJS, 2013 WL 956758 (W.D. N. Y. Mar. 12, 2013)....................76

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) .........................................................................20

*Ramer v. Saxby*,
    522 F.2d 695 (D.C. Cir. 1975)..................................................................61

*Ray Commcns, Inc. v. Clear Channel Commcns, Inc.*,
    673 F.3d 294 (4th Cir. 2012) ..............................................................78, 79

*Reed v. Franke*,
    297 F.2d 17 (4th Cir. 1961) ......................................................................13

*Reed v. Salazar*,
    744 F. Supp.2d 98 (D.D.C. 2010).............................................................19

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)................................................................................77, 78

*Reichle v. Howards*,
    132 S. Ct. 2088 (2012).............................................................................62

# TABLE OF AUTHORITIES

Page

*Remmers v. Brewer,*
  494 F.2d 1277 (8th Cir. 1974) ................................................................66

*Rinaldi v. CCX, Inc.,*
  No. 3:11-cv-457-GCM-DCK, 2013 WL 1121265 (W.D.N.C. Feb. 20, 2013)......................76

*Rogers v. Pendleton,*
  249 F.3d 279 (4th Cir. 2001) ..........................................................64, 66

*Roman Catholic Archdiocese of Atlanta v. Sebelius,*
  No. 1:12-cv-03489-WSD, 2014 WL 1256373 (N.D. Ga. Mar. 26, 2014)...............44

*Roman Catholic Diocese of Rockville Centre, N.Y. v. Inc. Vill. of Old Westbury,*
  No. 09 CV 5195, 2011 WL 666252 (E.D.N.Y. Feb. 14, 2011) ..............................71

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
  515 U.S. 819 (1995)....................................................................47

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC,*
  713 F.3d 175 (4th Cir. 2013) ......................................................21, 22

*Saenz v. Roe,*
  526 U.S. 489 (1999)....................................................................53

*Sch. Dist. of Abington Tp., Pa. v. Schempp,*
  374 U.S. 203 (1963) (Brennan, J., concurring)..............................41, 48

*Scott v. Greenville Cnty,*
  716 F.2d 1409 (4th Cir. 1983) .....................................................16

*Sherbert v. Verner,*
  374 U.S.398 (1963)...............................................................40, 43

*Singleton v. Wulff,*
  428 U.S. 106 (1976)...................................................................24

*Sky Ad, Inc. v. McClure,*
  951 F.2d 1146 (9th Cir.1991) .....................................................61

*Smith v. United States Navy,*
  573 F. Supp. 1361 (S.D. Fla. 1983) ..........................................13, 72

*Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'n of Va. Dep't of Motor Vehicles,*
  288 F.3d 610 (4th Cir. 2002) ......................................................47

# TABLE OF AUTHORITIES

Page

*Spann v. Colonial Vill., Inc.*,
  899 F.2d 24 (D.C. Cir. 1990) ................................................ 17

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ................................................ 30

*Stafford v. Briggs*,
  444 U.S. 527 (1980) ................................................ 48, 74

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ................................................ 73

*Super Tire Eng'g Co. v. McCorkle*,
  416 U.S. 115 (1974) ................................................ 25

*Sutton v. Providence St. Joseph Med. Ctr.*,
  192 F.3d 826 (9th Cir. 1999) ................................................ 71

*Swierkiewicz v. Sorema, N.A.*,
  534 U.S. 506 (2002) ................................................ 10, 33

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................ 27

*Texas Dep't of Cmty. Affairs v. Burdine*,
  450 U.S. 254 (1981) ................................................ 77

*Texas Monthly v. Bullock*,
  489 U.S. 1 (1989) ................................................ 53

*Theriault v. Silber*,
  547 F.2d 1279 (5th Cir. 1977) ................................................ 66

*Thomas v. Review Bd. of Indiana Employment Sec. Div.*,
  450 U.S. 707 (1981) ................................................ 40, 41

*Tobey v. Jones*,
  706 F.3d 379 (4th Cir. 2013) ................................................ 31

*Torcaso v. Watkins*,
  367 U.S. 488 (1961) ................................................ *passim*

*Turkmen v. Ashcroft*,
  915 F. Supp. 2d 314 (E.D.N.Y. 2013) ................................................ 62

# TABLE OF AUTHORITIES

Page

*Ullmann v. United States*,
  350 U.S. 422 (1956).................................................................53

*United States v. Brown*,
  348 U.S. 110 (1954).............................................................55, 63

*United States v. Canals-Jimenez*,
  943 F.2d 1284 (11th Cir. 1991) ................................................72

*United States v. Lee*,
  106 U.S. 196 (1882)..................................................................64

*United States v. Lettiere*,
  640 F.3d 1271 (9th Cir. 2011) ..................................................73

*United States v. Seeger*,
  380 U.S. 163 (1965)...............................................65, 66, 67, 68

*United States v. Town of Garner, North Carolina*,
  720 F. Supp. 2d 721 (E.D.N.C. 2010)......................................26

*United States v. Ward*,
  989 F.2d 1015 (9th Cir. 1993) ..................................................66

*Veitch v. England*,
  No. Civ.A 00-2982, 2005 WL 762099 (D.D.C. April 4, 2005)............13

*Vill. Of Arlington Heights v. Metro. Housing Development Corp.*,
  429 U.S. 252 (1977)........................................................*passim*

*Vill. of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) ..................................................20

*Wallace v. Jaffree*,
  472 U.S. 38 (1985)....................................................................46

*Walz v. Tax Comm'n of City of New York*,
  397 U.S. 664 (1970) (Harlan, J., concurring) ..........................65

*Warch v. Ohio Cas. Ins. Co.*,
  435 F.3d 510 (4th Cir. 2006) ....................................................29

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) ....................................................72

# TABLE OF AUTHORITIES

Page

*Wash. Legal Found. v. Leavitt,*
477 F. Supp. 2d 202 (D.D.C. 2007) ........................................................... 23

*Welsh v. United States,*
398 U.S. 333 (1970) ...................................................................... 65, 66

*Western Radio Svcs. Co. v. U.S. Forest Svc.,*
578 F.3d 1116 (2009) .......................................................................... 60

*Western Radio Svsc. Co. v. U.S. Forest Svc.,*
No. CV04 1346HA, 2004 WL 3336879 (D. Or. Sept. 20, 2004) .......................................... 60

*Whalen v. Rutherford,*
No. 3:12cv0032, 2012 WL 6473151 (W.D. Va. Dec. 13, 2012) .......................................... 77

*Widmar v. Vincent,*
454 U.S. 263 (1981) ...................................................................... 31, 50

*Wieman v. Updegraff,*
344 U.S. 183 (1952) .......................................................................... 42

*Wigginton v. Centracchio,*
205 F.3d 504 (1st Cir. 2000) .................................................................. 13

*Wilhelm v. Blue Bell, Inc.,*
773 F.2d 1429 (4th Cir. 1985) ................................................................. 80

*Wilkie v. Robbins,*
551 U.S. 537 (2007) .................................................................. 54, 59, 61, 63

*Will v. Michigan Dep't of State Police,*
491 U.S. 58 (1989) .......................................................................... 72

*Williams v. Poretsky Mgmt., Inc.,*
955 F. Supp. 490 (D. Md. 1996) ............................................................... 17

*Williams v. Rhodes,*
393 U.S. 23 (1968) .......................................................................... 53

*Wilson v. Layne,*
526 U.S. 603 (1999) ......................................................................... 64

*Yassin v. Corrs. Corp. of Am.,*
No. 11CV0421, 2011 WL 4501403 (S.D. Cal. Sept. 27, 2011) .......................................... 62

# TABLE OF AUTHORITIES

Page

*Zak v. Chelsea Therapeutics Int'l., Ltd.,*
 780 F.3d 597 (4th Cir. 2015) .......................................................................27

*Zimbelman v. Savage,*
 228 F.3d 367 (4th Cir. 2000) ........................................................................59

*Zimbelman v. Savage,*
 228 F.3d 467 (2000)........................................................................................63

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
 132 S. Ct. 1421 (2012)...................................................................................10

*Zorach v. Clauson,*
 343 U.S. 306 (1952).......................................................................................63

**STATUTES**

1 U.S.C. § 1 ....................................................................................................72

5 U.S.C. § 2105(c) .........................................................................................59

16 U.S.C. § 497...............................................................................................60, 61

28 U.S.C. § 1361 ............................................................................................74

42 U.S.C. § 1983 ............................................................................30, 71, 72, 73

42 U.S.C. § 2000bb-1(a) ...............................................................................10, 43, 71

42 U.S.C. § 2000bb-2(1) ...............................................................................71

42 U.S.C. § 2000cc-5 .....................................................................................31

42 U.S.C. § 2000cc-5(7)(A)...........................................................................46

But the Mandamus and Venue Act ................................................................74

Title VII of the Civil Rights Act ............................................................... *passim*

Civil Service Reform Act................................................................58, 59, 61, 63

CSRA ..............................................................................................................58, 59

Federal Tort Claims Act.................................................................................55

Free Exercise Clause and Religious Freedom Restoration Act ....................39

# TABLE OF AUTHORITIES

Page

FTCA .......................................................................................................................61

Mandamus and Venue Act, 28 U.S.C. § 1391(e)(1)................................................73

Religious Freedom Restoration Act.........................................................................10

Title VII in the Civil Service Reform Act (42 U.S.C. § 2000e-16)..........................58

Universal Military Training and Service Act............................................................65

**OTHER AUTHORITIES**

*About the Humanist Society*, http://// http://humanist-society.org/about/ ....................67

First Amendment ................................................................................................ *passim*

Fourth Amendment ..................................................................................................25

*Cambridge Academic Content Dictionary* 412 (2009) .............................................73

Citing Black's Law Dictionary, the Individual Defendants........................................73

Fed. R. Civ P. 26(d) ................................................................................................76

Fed. R. Civ. P 56(c) ................................................................................................77

Fed. R. Civ. P. 56(d) ........................................................................................74, 76

Local Civil Rule 56(B)...............................................................................................4

Paul Horowitz, *Religious Tests in the Mirror: The Constitutional Law and
    Constitutional Etiquette of Religion in Judicial Nominations*, 15 Wm. & Mary
    Bill Rts. J. 75, 113 (2006) ................................................................................52

Rule 12(b)(1)...........................................................................................................17

Rule 12(b)(6)...........................................................................................................27

Rule 16............................................................................................................74, 76

Rule 26(a)................................................................................................................74

Rule 26(f)........................................................................................................74, 76

Rule 54(c)................................................................................................................15

## TABLE OF AUTHORITIES

Page

S. Rep. No. 103–111, at 1902 ....................................................................72

SECNAVINST 535.1.1 ¶ (2) 3.6 ..................................................................7

SECNAVINST 1730.9 (Feb. 7, 2008)...........................................................48

Special Regulations No. 3: Appointment of Chaplains in the Regular Army and
    the National Army of the United States, Corrected August 313, 1918
    (Washington, DC: Government Printing Office, 1918)......................................53, 54

U.S. Const. Art. VI, para 3.......................................................................51, 52

# **INTRODUCTION**

Defendants denied the application of Jason Heap to serve as a Humanist chaplain and The Humanist Society to become eligible to endorse military chaplains. The Amended Complaint alleges they did so because they disagree with Plaintiffs' Humanist beliefs. Defendants ignore the evidence and allegations, claiming there is "no basis to infer" that a policy prohibiting Humanists from serving as chaplains exists. However: the Current Navy Chief of Chaplains admits she does not see "the benefits of a Humanist Chaplain as compared to a Christian Chaplain." Amended Complaint ("AC") ¶ 8; Declaration of Commander Erwin Kamp ¶ 5. The former director of the Armed Forces Chaplains Board believes that "there is no need for [Humanists] to meet in chapels and be sponsored by chaplains. They are not a religious group." Declaration of Jason Torpy Ex. A. *Twenty-two* openly Humanist or atheist service members have applied to serve as lay leader; *all* have been rejected. Torpy Decl. ¶ 25. Navy Chaplain Corps personnel openly ridiculed Plaintiff Heap as a "humanist so-called applicant" in communications with the Chief of Chaplains, without correction. AC ¶ 91; Declaration of Matthew A. Smith ("Smith Decl.") Ex. K. When interviewed about the denial of Plaintiffs' application, an official Chaplain Corps spokesperson admitted the Navy's view that The Humanist Society is not "a religious organization by any accepted definition." AC ¶ 101; Smith Decl. Ex. C.

Plaintiffs have amassed evidence and allegations more than sufficient to defeat Defendants' Motions to Dismiss. The claims of religion-based discrimination are well pled. Because Defendants' discrimination against The Humanist Society prevented it from obtaining recognition as a qualified chaplain endorser, The Society has standing to sue for its own injuries, as well as to redress the injuries of Humanist service members. The Official Capacity Defendants' premature summary judgment motion should be denied, as Plaintiffs have had no

opportunity to discover key evidence in Defendants' possession. If considered, genuine, triable issues of material fact preclude summary judgment based on Defendants' untested materials and conclusory affidavits.

## SUMMARY OF THE ALLEGATIONS[1]

A.    The Plaintiffs

The Humanist Society is a non-profit organization recognized as a church by the Internal Revenue Service and as a faith group qualified to endorse chaplains by the Association of Professional Chaplains. Amended Complaint (ECF No. 32) ("AC") ¶ 17. The Society prepares Humanist Celebrants to serve Humanists in the military and in other Humanist communities. *Id.* Jason Heap, M.Div., Ed.D., is a Humanist Celebrant accredited by The Humanist Society to serve in the military as a Humanist Chaplain. *Id.* ¶ 16.

B.    The Navy and DoD's Policy and Practice of Discrimination Against Humanists

Approximately four percent of military service members identify as Humanists, which is a greater percentage than any non-Christian denomination and greater than the representation of some Christian denominations, such as Methodist, which are represented by chaplains from their denomination. AC ¶ 53. Despite a larger presence of self-identified Humanists in the Navy and other service branches than (for example) Jewish, Muslim, or Methodist service members, the Navy Chaplain Corps and the Department of Defense ("DoD") have at all times refused to provide Humanist service members with the same accommodation of their beliefs as service members who adhere to other belief systems. AC ¶¶ 51-66.

C.    The Navy Chaplaincy

To become a Navy chaplain, an applicant must present the endorsement of a religious organization recognized by the DoD as qualified to endorse chaplains. AC ¶¶ 47-48. However,

---

[1] Plaintiffs discuss the allegations in detail in Part II.A, *infra*.

the DoD recognizes only certain organizations. AC ¶¶ 48-50. The Armed Forces Chaplains

Board ("AFCB") maintains a list of these organizations and is responsible for deciding which

organizations are admitted to the list. *Id.* To endorse chaplain candidates, a religious organization

must obtain recognition from the AFCB as a qualified endorser and endorse a successful

candidate who is accepted to the chaplaincy. AC ¶ 50.

      D.      <u>Defendants Reject Plaintiffs' Application Because They Are Humanists</u>

Dr. Heap contacted Lt. Joel DeGraeve, a recruiter for the Navy Chaplain Corps, to apply

to become a chaplain. AC ¶ 67. DeGraeve told Dr. Heap that his credentials make him a highly

qualified candidate. *Id.* Lt. DeGraeve offered to "fast track" Dr. Heap's appearance for an

interview in July or August 2013. AC ¶ 75.

The Navy, Department of Defense, and all named Defendants learned that Dr. Heap is a

Humanist for the first time in July 2013, when the AFCB accepted Dr. Heap's Form DD 2088

indicating Dr. Heap's endorsement by The Humanist Society. AC ¶ 77. Having learned that Dr.

Heap was endorsed by a Humanist organization, the Navy, DoD, and named Defendants applied

the Navy and DoD's policy and practice of refusing to recognize or accommodate Humanists and

their beliefs. AC ¶¶ 77-101.

Navy Chief of Chaplains Mark Tidd, Deputy Chief of Chaplains Margret Kibben, and

Rear Admiral Gregory Horn, all members of the AFCB, investigated and scrutinized Plaintiffs'

religious convictions. ¶ 90. Defendant Kibben expressed interest in a news article forwarded to

her by a subordinate in which Dr. Heap "clearly identifies himself as Humanist and provides his

argument for service in the Chaplain Corps." *Id.* A subordinate wrote to Defendant Tidd

providing "a little intelligence on the humanist so called [sic] applicant to our Corps," reporting

that Dr. Heap had never been an ordained minister of a particular Christian denomination. AC ¶

91. Rather than correct his subordinate's bias in referring to Dr. Heap as a "humanist so-called

applicant," Tidd thanked the subordinate for his work. *Id.* In December 2013, Defendant Tidd's Executive Assistant, Captain Michael Parisi, conducted a "Humanist Applicant Course of Action Meeting" to coordinate the Navy's response to Plaintiffs' application. AC ¶ 93.

Only in response to a letter from legal counsel did the Navy agreed to grant Dr. Heap an interview in March of 2014, eight months after the date Dr. Heap's Chaplain Corps recruiter proposed before the AFCB received The Humanist Society's endorsement. AC ¶ 95. Dr. Heap's application was denied two weeks after he appeared for the interview. AC ¶ 98. After the rejection, the position that Dr. Heap applied for remained open, and was filled within two months by non-Humanist applicants with similar qualifications to Dr. Heap's. AC ¶¶ 106-108. Defendants rejected Plaintiffs' application pursuant to the Navy and DoD's discriminatory policy and practice toward Humanism. AC ¶¶ 26; 31-40. A Navy Chaplain Corps spokesman left no doubt by admitting the Navy's view that The Humanist Society "does not represent a religious organization by any accepted definition." AC ¶ 101.

## STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Local Civil Rule 56(B), Plaintiffs provide the following statement of material facts as to which there is a genuine issue necessary to be litigated.

1.      Whether the Navy and/or DoD adheres to a policy or practice of refusing to recognize Humanism as a religion or accord it equal treatment to other religions that was applied by the Defendants in rejecting Plaintiffs' application, as demonstrated by the following evidence:

- The admission by current Navy Chief of Chaplains, former Navy Deputy Chief of Chaplains, and current and former Armed Forces Chaplains Board member Rear Admiral Margaret Kibben that the Navy does not accept Humanist chaplains because Humanist organizations "'never really demonstrate the benefits of a Humanist Chaplain compared to a Christian Chaplain.'" Declaration of Erwin Kamp ("Kamp Decl.") ¶ 5 (quoting Defendant Kibben).

- The admission by a Navy Chaplain Corps spokesman that Dr. Heap "does not represent a religious organization by any accepted definition." Smith Decl. Ex. C at 4.

- Captain Michael J. Parisi's November 27, 2013 letter to Chief Electronics Technician Douglas Wright, written "by direction" as Executive Assistant to Defendant Tidd, stating that the denial of Chief Wright's application to serve as a Humanist lay leader was "consistent with Navy regulations and policy," when the denial was on the basis that "[H]umanism does not meet the minimum standards required by" Navy instructions governing the appointment of lay leaders. Declaration of Douglas Wright ("Wright Decl.") Exs. B & C; *id.* ¶ 11.

- The explanation given to Chief Electronics Technician Douglas Wright by his commanding officer that he could not serve as a lay leader because "Humanism is not considered a faith group by the Navy Chaplaincy[.]" Wright Decl. Ex. A.

- The statement by then-Air Force Chief of Chaplains and Armed Forces Chaplains Board Chairman Maj. Gen. Cecil R. Richardson that "[t]he Chaplain Corps will gladly provide chaplain services to Atheists and Humanists, as we would for any non-religious group (baseball players, aircraft mechanics, Alcoholics Anonymous, etc.) but we will not advertise or promote Atheist beliefs, nor will we host Atheist and Humanist meetings. To do so would be a compromise of our faith and could be deeply offensive to others we serve. . . .[T]here is no need for them to meet in chapels and be sponsored by chaplains. They are not a religious group." Declaration of Jason Torpy ("Torpy Decl.) Ex. A.

- The refusal of the United States Navy and other branches of the Armed Services to accept any one of the twenty-two atheist and Humanist candidates that have volunteered to serve as lay leader. Torpy Decl. ¶ 25.

- The negative responses by the United States Navy Chaplain Corps, the Air Force Chaplain Corps, the Army Chaplain Corps, and the Armed Forces Chaplains Board to proposals to allow Humanist or atheist chaplains. Torpy Decl. ¶¶ 27-29.

- The reversal of ship-level commanders' initial decision to approve Chief Petty Officer Martin Healey as the Navy's first-ever atheist lay leader. Torpy Decl. ¶ 24.

- The Armed Forces Chaplains Board's reference to "non-religious" groups seeking accommodation during its December 12, 2012 meeting. Smith Decl. Ex. U.

- The Department of Defense's ("DoD") ongoing refusal to include Humanism in its database of service members' religious affiliation, despite that Humanist groups and individual service members have repeatedly requested the DoD, Navy, and Armed Forces Chaplains Board to include Humanism as a recognized religious affiliation. Torpy Decl. ¶ 26.

5

- The following public comments by current and former Navy Chief of Chaplains Defendants Tidd and Kibben indicating their view that belief in a divinity is a prerequisite for service as chaplain:

  - "[The chaplaincy] is an extension of God . . . an opportunity to be the witness and the presence of God wherever you go." Smith Decl. Ex. D at 2 (Defendant Kibben).

  - "Chaplains embody the reassuring presence of God[.]" Smith Decl. Ex. E at 2 (Defendant Tidd).

- The statement on the U.S. Navy Chaplain Corps' recruitment website that chaplains "ser[ve] God, country, and those who serve." Smith Decl. Ex. F.

- The rejection of a request by a Humanist graduate of the U.S. Naval Academy to hold a Humanist wedding ceremony in the Main Chapel of the Academy on the ground that the Main Chapel is unavailable to "non-Christian or non-religious wedding ceremonies." Smith Decl. Ex. G at 2.

- The recent study of the Department of Defense's and Army's policies toward Humanists concluding that "[t]he [Department of Defense] and the Army Chaplaincy do not recognize Humanism as religious[.]" Smith Decl. Ex. F. at 8.

- The conclusions of a dissertation by Navy Chaplain Lt. Cdr. Jeffrey C. Quinn, addressing the place of non-theists in the military, that "[c]haplains and commanders alike expressed disinterest, ignorance, and even hostility toward Non-theists," and called "widespread" views of non-theists as "troublemakers or malcontents" and "outright enemies." Smith Decl. Ex. T at 2. Lt. Cdr. Quinn also surveyed chaplains, the majority of whom disagreed with the statement that "Non-theism (Atheism, Secularism, Humanism, etc.) should be considered a religion for purposes of accommodation under the Constitution, Naval Regulations and Professional Naval Chaplaincy." *See id.* at 94-133.

2.    Why the CARE Board did not recommend Dr. Heap for direct accession to an active duty component when it was authorized to recommend four chaplains during its May 13, 2014 meeting but recommended only three, and accepted a non-Humanist candidate with similar or inferior qualifications to Dr. Heap's within the following three months. Parisi Decl. Ex. A ¶ 2.a(1) & Ex. B at 1; Smith Decl. Exs. A & B.

3.      Why then-Navy Chief of Chaplains Defendant Tidd purportedly accepted the CARE Board's recommendation, when Defendants have presented no evidence or explanation of the reason for Defendant Tidd's decision.

4.      Why the Commander, Navy Recruiting Command (alleged by Plaintiffs to be Defendant Rear Admiral Annie B. Andrews) accepted the CARE Board's recommendation, when Defendants have presented no evidence or explanation of the reason for Defendant Andrews' decision.

5.      Whether the Navy Defendants and members of the Armed Forces Chaplains Board, individually or collectively, predicated a decision to accept or reject Dr. Heap's application on AFCB recognition of The Humanist Society as a qualified religious organization, as evidenced by an internal memorandum addressing Dr. Heap's application and stating that the Navy Chaplain Corps "do[e]s not accept candidates *nor process applications*" unless the candidate is "endorsed by a Religious Organization registered with the DoD," and as further evidenced by a Navy Chaplain Corps spokesman's admission that The Humanist Society "does not represent a religious organization by any accepted definition." Smith Decl. Exs. C  at 4& I at 2.

6.      Why Dr. Heap's portion of Plaintiffs' application was rejected when the CARE Board was authorized to recommend four candidates for accession to an active duty position, but recommended only three, Defendants' SOF ¶¶ 3, 14; Parisi Decl. Ex. A at 2 (¶ 2.a.1.), particularly when (1) Navy policy requires that "consideration is given to religious diversity" in recruiting chaplain candidates, "particularly where a [candidate's religious organization] is not currently represented in the [Chaplain Corps], but is represented by Service members in the [Navy]," SECNAVINST 535.1.1 ¶, (2) 3.6 % of the military specifically identifies as Humanist,

Smith Decl. Ex. S at 2, and (3) there are no Humanist chaplains or lay leaders in the Navy Chaplain Corps, Declaration of Jason Torpy ("Torpy Decl.") ¶ 30.

7.      Why Chaplain Lt. Joel DeGraeve told Dr. Heap that being endorsed by The Humanist Society could pose a problem for his application. Declaration of Dr. Jason Daniel Heap ("Heap Decl.") ¶ 11.

8.      Why Lt. DeGraeve continually assured Dr. Heap that he would appear for a July or August 2013 CARE Board interview until DeGraeve received Dr. Heap's endorsement by The Humanist Society, and Dr. Heap then was not invited for a July or August 2013 CARE Board despite DeGraeve's previous assurances. Heap Decl. ¶¶ 5, 9, 10-13.

9.      Why Defendant Kibben expressed interest in receiving a news article in which Dr. Heap "clearly identifies himself as Humanist and provides his argument for service in the Chaplain Corps." Smith Decl. Ex. J at 1-2.

10.      Why one of Defendant Tidd's subordinates referred to Dr. Heap as a "humanist so called applicant to our Corps" in an email to Defendant Tidd and informed Defendant Tidd that Dr. Heap is not affiliated with a particular Christian denomination, and whether Defendant Tidd shares the subordinate's view that Dr. Heap is not an authentic "applicant" because he is a Humanist. Smith Decl. Ex. K.

11.      Why Defendants Tidd, Kibben, and Horn received reports from subordinates about Dr. Heap's religious affiliation in July and August of 2013. Smith Decl. Exs. J & K.

12.      Why Defendant Tidd's Executive Assistant, Captain Parisi, conducted a "Humanist Applicant COA [Course of Action] meeting" in December 2013, who attended that meeting, and what was discussed at that meeting. Smith Decl. Ex. L.

13.     Why the Navy Chaplain Corps' Office of Legislative Affairs notified the Corps'

Director of Policy and Strategy that Plaintiffs' application "has a lot of interest regarding

religious accommodation on the Hill" days before Dr. Heap appeared before a CARE Board,

Smith Decl. Ex. K, and whether the following examples of congressional "interest" in Plaintiffs'

application influenced Defendants' decision to deny Plaintiffs' applications:

- The letter signed by twenty-one members of Congress, including the Chairman, Ranking Member, and two other members of the United States House of Representatives committee responsible for oversight of the U.S. Navy, sent to Secretary of Defense Charles Hagel, with copies to Defendants Secretary of the Navy Ray Mabus and Tidd, urging the DoD to deny Dr. Heap's application because he is a Humanist. Smith Decl. Ex. N.

- The views expressed by U.S. Representative John Fleming that having an "atheist" chaplain is "self-contradictory" and "an oxymoron," in comments that were circulated among Navy Chaplain Corps officials, including Defendants Tidd and Kibben. Smith Decl. Ex. P

- Proposed legislation to prevent the DoD from accepting Humanist chaplains influenced Defendants' decision to deny Plaintiffs' application. Smith Decl. Ex. Q.

14.     Whether a letter from The American Center for Law and Justice sent to Secretary

Hagel describing Dr. Heap as "non-religious" and opposing his candidacy influenced

Defendants' decision to deny Plaintiffs' application. Smith Decl. Ex. R.

15.     Why the members of the March 13, 2014 CARE Board assigned Dr. Heap the

"scores" referred to by Captain Parisi in his Declaration, which Defendants fail to explain. Parisi

Decl. ¶ 11.

## ARGUMENT

I.  **THIS COURT HAS JURISDICTION TO DECIDE PLAINTIFFS' CLAIMS ARISING UNDER THE FEDERAL RELIGIOUS FREEDOM RESTORATION ACT AND UNITED STATES CONSTITUTION**

A.    Plaintiffs' Claims Under RFRA and the United States Constitution Are Justiciable

The Official Capacity Defendants argue this Court cannot adjudicate Plaintiffs' claims of religious discrimination, relying on the political question doctrine. Official Defendants' Memorandum ("O.D. Mem.") at I.A. Yet, the political question doctrine applies only "where there is a 'textually demonstrable constitutional commitment of *the issue* to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012) (emphasis added) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)) (finding no political question absent these criteria). The issue whether the Navy and AFCB Defendants rejected Plaintiffs' application because of their Humanist principles is traditionally decided by the judiciary and not textually committed to the political branches.

1.    Judicially Administrable Standards Govern Plaintiffs' Claims

The Religious Freedom Restoration Act (Count I) explicitly allows a person whose religious exercise has been "substantially burden[ed]" by government action to assert that violation as a claim "in a judicial proceeding." 42 U.S.C. § 2000bb-1(a). Supreme Court precedents prohibit official discrimination on the basis of religious belief,[2] and well-established

---

[2] *E.g.*, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("[T]he protections of the Free Exercise Clause pertain" "at a minimum" where government action "discriminates against some or all religious beliefs"); *Larsen v. Valente*, 456 U.S. 228, 244 (1982) (Establishment Clause mandates that "one religious denomination cannot be officially preferred over another"); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (heightened scrutiny under the Equal Protection Clause applies to "inherently suspect distinctions such as . . . religion").

judicial standards of pleading and proof guide the analysis of whether Plaintiffs were rejected based on religion.[3]

The relevant issue as to Plaintiffs' constitutional claims is that Plaintiffs' religious views were "a motivating factor in the decision" to deny his application. *Vill. Of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S. 252, 266 (1977). Whether Defendants correctly or incorrectly applied their own standards for reviewing chaplain qualifications is not at issue. In *Makky v. Chertoff*, 541 F.3d 205 (3d Cir. 2008), the government argued that an unconstitutional discrimination claim was barred by the political question doctrine because it involved the exercise of discretion by Executive Branch officers in revoking the plaintiff's security clearance. *Id.* at 212. The Third Circuit rejected that argument because the issue the Court was called upon to decide was not the "political question" the defendants raised (whether they properly adjudicated his security clearance), but whether the defendants' actions were based on constitutionally prohibited criteria. *Id.* at 212-13; *see also Elrod v. Burns*, 427 U.S. 347, 352 (1976) (no political question in reviewing whether decision to fire law enforcement officers was based on protected conduct because "[t]his involves solely a question of constitutional interpretation, a function ultimately the responsibility of this Court"). Here, deciding whether Defendants rejected Plaintiffs' application based on a prohibited criterion (religion) is within the capacity of this Court.

    2.    <u>The Issue of Religious Discrimination is Not Entrusted to the Political Branches</u>

Defendants rely on *Orloff v. Willoughby,* 73 S. Ct. 534 (1953) to assert that Plaintiffs'

---

[3] *See, e.g.*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 511-12 (2002) (pleading standard for discriminatory motive in employment context); *Vill. Of Arlington Heights v. Metro. Housing Development Corp.*, 429 U.S. 252, 266 (1977) (providing examples of allegations that state a claim for intentional discrimination); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (framework for proving intentional discrimination at trial).

religious discrimination and RFRA claims are committed to the Executive Branch. O.D. Mem. ¶¶ 15-16. As the Third Circuit explained in *Dillard v. Brown*, 652 F.2d 316 (3d Cir. 1981), the constitutional claims in *Orloff* were decided *on the merits*, not dismissed for lack of jurisdiction. *Id.* at 321-22 (distinguishing *Orloff*). In *Orloff*, when an Army service member attempted to use the writ of habeas corpus to challenge his assignment to specific duties that he claimed were inappropriate given his status as a "medical and allied specialist" the Supreme Court adjudicated the merits of Orloff's constitutional claims. *Id.* at 92. The only claim the Supreme Court found non-justiciable was Orloff's claim that he had been treated unfairly in being assigned to particular duties, holding "it is not within the power of this Court by habeas corpus to determine whether specific assignments to duty fall within the basic classification of petitioner." *Id.* at 93. Neither Dr. Heap nor the Humanist Society seeks a writ of habeas corpus to challenge a military duty assignment.

Other Supreme Court and Court of Appeals cases illustrate that constitutional claims seeking instatement in a commissioned position are justiciable. In *Brown v. Glines*, 444 U.S. 348 (1980), the Supreme Court adjudicated the merits of a commissioned officer's challenge to his removal from active duty on the basis of a regulation the officer claimed violated the First Amendment where he sought "reinstatement and back pay." *Id.* at 349 (finding "members of the military services are entitled to the protections of the First Amendment."); *see Glines v. Wade*, 586 F.2d 675 (9th Cir. 1980) (explaining relief sought). The Supreme Court later approved the availability of the relief sought in *Brown*. *United States* v. *Stanley*, 483 U.S. 669, 683 (1987) (claims seeking "traditional forms of relief" are justiciable (citing *Brown*, 444 U.S. 348)). Similarly, the D.C. Circuit ruled that a Navy officer's constitutional challenge seeking "an immediate injunction requiring [the Navy] to promote him to the rank of rear admiral" was

justiciable because "[i]t is precisely the role of the courts to determine whether [constitutional] rights have been violated" when "it is alleged . . . that the armed forces have trenched upon constitutionally guaranteed rights through the promotion and selection process." *Emory v. Sec'y of Navy*, 819 F.2d 291, 293 (D.C. Cir. 1987). The First Circuit also concluded that a commissioned officer's challenge of his termination on constitutional and statutory grounds, seeking reinstatement and backpay, was justiciable because a suit for "federal constitutional violations and seeking reinstatement . . . is cognizable in federal district court." *Wigginton v. Centracchio*, 205 F.3d 504, 513 (1st Cir. 2000), *accord, e.g.*, *Smith v. United States Navy*, 573 F. Supp. 1361, 1366 (S.D. Fla. 1983) (reviewing on the merits claim for equitable relief challenging denial of commission in the Navy).

Further, in *Dillard*, the Third Circuit rejected claims that constitutional provisions entrusting control over the military eliminate judicial authority to adjudicate service members' constitutional rights, holding "[i]t is the role of the courts, not the military, to define these rights." 652 F.2d at 320; *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) (holding reviewable constitutional claims brought by a former Marine seeking reinstatement and noting that "*Orloff* itself allowed review of a constitutional claim although it denied the serviceman relief on the merits"); *Reed v. Franke*, 297 F.2d 17, 21 (4th Cir. 1961) (holding Navy service member's due process claims were justiciable because "where there is a substantial claim that prescribed military procedures violate one's constitutional rights, the District Courts have jurisdiction to resolve the constitutional questions").

Unlike all of these cases, *Kreis v. Sec'y of Air Force*, 866 F.2d 1508 (D.C. Cir. 1989) did not involve constitutional claims; rather, it turned exclusively on whether military officials evaluated an officer's credentials correctly in assigning him "to a squadron operations position

with less responsibility" instead of his preferred "position of greater responsibility at the headquarters of the Tactical Air Command." *Id.* at 1509. Like the claims ruled non-justiciable in *Orloff*, *Kreis* involved an officer's challenge to specific duty assignments, and there was no violation alleged of the Constitution or *any* justiciable standard. Indeed, in a separate ruling, the Fourth Circuit adjudicated the plaintiff's claims on the merits to the extent they involved "familiar principles of administrative law." *Id.* 1511.

Litigation seeking to reinstate discharged Navy chaplains to their former commissioned positions (the same position sought by Dr. Heap), nails the door shut against Defendants' justiciability arguments. In *Veitch v. England*, No. Civ.A 00-2982, 2005 WL 762099 (D.D.C. April 4, 2005), the District Court reached the merits of claims by a "former active-duty Navy chaplain" suing under RFRA and the Constitution and "seeking his reinstatement and return to active duty . . . as a commissioned officer" in the U.S. Navy Chaplain Corps. *Id.* at *1. The same court has adjudicated on the merits claims seeking drastically greater reforms of the U.S. Navy Chaplain Corps than Plaintiffs'. *E.g.*, *Adair v. England*, 183 F. Supp.2d 31, 35 (D.D.C. 2002) (denying motion to dismiss complaint challenging the Chaplain Corps' "system for promotion, assignments, and retention of Navy chaplains").

### 3.    Dismissal is Not Appropriate Due to the Relief Requested

Defendants' justiciability argument boils to a quarrel with awarding the remedy of instatement, which is just *one form* of equitable relief. *See* O.D. Mem at 17 (quoting Prayer for Relief). As the Seventh Circuit has explained relying on numerous authorities, dismissal based on the relief sought is inappropriate so long as plaintiff is entitled to some relief. *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002); *Charles v. Front Royal Vol. Fire & Rescue Dept., Inc.*, 21 F. Supp.3d 620, 629 (W.D. Va. 2014) ("[T]he selection of an improper remedy in the demand for relief will not be fatal to a party's pleading if the statement of the claim indicates the pleader

14

may be entitled to relief of some other type."). Rule 54(c) explicitly provides that a prevailing

party may obtain any relief to which he is entitled even if he "has not demanded such relief in

[his] pleadings." *Bontkowski*, 305 F.3d at 762 (reversing dismissal). Indeed, a court may award

alternative equitable remedies or tailor the scope of the instatement awarded. *See Hecht Co. v.

Bowles*, 321 U.S. 321, 329 (1944) (court of equity may "mould each decree to the necessities of

the particular case"). Backpay, declaratory relief,[4] or an injunction are among the alternative

remedies available. *E.g.*, *Doll v. Brown*, 75 F.3d 1200, 1205 (7th Cir. 1996) (holding court may

award front pay as an equitable substitute for instatement); *Crawford*, 531 F.2d at 1126-27

(monetary ordered against Marine Corps in lieu of reinstatement); *Dilley*, 603 F.2d at 920

(ordering Army to reconsider commissioned officers' application for promotion).

     B.     <u>The Humanist Society Has Standing to Sue and its Claims are Ripe</u>

          1.     <u>The Humanist Society has Standing to Sue for its own Injuries</u>

Constitutional standing consists of (1) an injury that is (2) fairly traceable to the

defendant's allegedly unlawful conduct and that is (3) likely to be redressed by the requested

relief. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 590 (1992). Plaintiff satisfies these requirements by "alleg[ing] that [it]

---

[4]    Defendants' contention that declaratory relief would not be among the remedies available is wrong. O.D. Mem. at 15 n. 8.  Dr. Heap would be entitled—as one form of equitable relief—to a declaration that Defendants' discrimination on the basis of Humanism is unconstitutional, enabling him to reapply to a chaplaincy accession process that does not bar him because of his beliefs. *See Hopwood v. Texas*, 78 F.3d 932, 962 (5th Cir. 1996) (declaratory relief available to enable plaintiffs "to reapply [to public university] under an admissions system that invokes none of these serious constitutional infirmities" (i.e., race discrimination)), *abrogated on other grounds*, 539 U.S. 306 (2003). The problem with declaratory relief in *Dynaquest Corp v. U.S. Postal Serv.*, 242 F.3d 1070 (D.C. Cir. 2001) was that the defendants lacked authority to make the determination the plaintiffs sought. *See id.* at 1076 (defendant's determination that "he was without authority to grant [plaintiff's] request for release of [] escrow funds . . . was correct."). There is no such problem here.

has suffered an injury that 'is indeed fairly traceable to [D]efendant[s'] acts or omissions.'" *Scott v. Greenville Cnty*, 716 F.2d 1409, 1414 (4th Cir. 1983) (quoting *Vill. of Arlington Heights*, 429 U.S. at 1414)). "'[G]eneral factual allegations of injury resulting from the [Defendants'] conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013) (quoting *Lujan*, 504 U.S. at 561)). The Court also "must assume the Plaintiffs' claim has legal validity[;]" it cannot "put the merits cart before the standing horse." *Cooksey v. Futrell*, 721 F.3d 226, 239 (4th Cir. 2013).

> a. *The Society May Sue Defendants For Rejecting Plaintiffs' Application Because of Discrimination Against The Society*

To obtain recognition as a qualified religious endorser, Defendants require The Humanist Society to endorse a chaplain applicant who is accepted by the Navy and to receive recognition from the AFCB. ¶ 50. Here, the Society failed to obtain recognition as a qualified religious endorser because Defendants denied The Society's candidate, Dr. Heap, who, in turn, was denied because he was endorsed by The Humanist Society. AC ¶¶ 77-101;[5] *e.g.*, Smith Decl. Ex. C at 4(Navy spokesman admits Navy's position that The Humanist Society does not "represent[] a religious organization by any accepted definition"); Smith Decl. Ex. I at 2 (stating in reference to Plaintiffs' application that the Navy does not "accept candidates nor process applications" unless the candidate is "endorsed by a Religious Organization registered with the DoD"); Heap Decl. ¶ 13. By rejecting Plaintiffs' application because The Humanist Society provided the endorsement, Defendants "with[eld] recognition from The Humanist Society as a qualified ecclesiastical endorser because of its Humanist beliefs." AC ¶¶ 30-38. Because The Society cannot

---

[5] Because Defendants' affidavits do not contest these factual allegations, the Court must "'assume the truthfulness of the facts alleged.'" *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)).

successfully endorse chaplains without obtaining DoD recognition, Defendants' refusal to recognize The Society because of religious disagreement with its views "stands as an absolute barrier to" The Society endorsing chaplains to serve in the military. *Vill. of Arlington Heights*, 429 U.S. at 261 (standing upheld where challenged zoning decision prevented organization from completing construction project). The Society's failure to obtain recognition as a qualified endorser is thus "fairly traceable" to discrimination against The Society,[6] and will be redressed by requiring Defendants to give that recognition or, at the very least, to consider The Society's application without discriminating on the basis of its beliefs.[7]  That is enough for standing.[8]

> **b.** *The Society May Sue Because Defendants' Discrimination Frustrates The Society's Organizational Purposes*

"*Havens [Realty Corp. v. Coleman*, 455 U.S. 363 (1982)], makes clear . . . that an organization establishes Article III injury if it alleges that the purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action.'" *Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 493-94 (D. Md. 1996) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)). In *Havens*, an organizational plaintiff established Article III standing by demonstrating that Defendants' discriminatory activities

---

[6] Standing is satisfied if discrimination against The Humanist Society was "at least in part responsible" for its failure to obtain recognition. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (observing that "[t]he Supreme Court has . . . recognized the concept of concurrent causation" in its standing analysis and holding organization had standing where concurrent causes of injury existed).

[7] The Society undisputedly satisfies all DoD requirements for recognition of an ecclesiastical endorser. ¶¶ 103-05.

[8] Whether Defendants rejected Plaintiffs' application because Dr. Heap was endorsed by The Society is intertwined with the merits of Plaintiffs' discrimination claim. *See Kerns v. United States*, 585 F.3d 187 at 196 (4th Cir. 2009) ("[W]hen [an] issue is determinative of both jurisdiction and the underlying merits of [a] claim, dismissal under Rule 12(b)(1) is inappropriate, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous."). Prior to dismissing on this basis, Plaintiff would be entitled to discovery.

"perceptibly impaired [the plaintiff's] ability to provide counseling and referral services to low-and – moderate-income homeseekers" by requiring it "to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379-80.

Because The Society's application to become a qualified religious organization failed because of Defendants' disagreement with its Humanist views, The Society cannot endorse Humanists to serve as chaplains in the military. AC ¶ 199. Defendants' discrimination therefore frustrates The Society's organizational mission to train, endorse, and provide access to Humanist Celebrants in the military, while at the same time limiting the pool of applicants The Society may endorse to serve as chaplains. AC ¶ 17; *see* Torpy Decl. ¶¶ 10-16. The AFCB's refusal to recognize The Society as a qualified endorser has *already* disqualified The Society from endorsing several candidates as chaplains, and has prevented The Society from endorsing another candidate to participate in a DoD-sponsored training program for chaplains. Torpy Decl. ¶¶ 11, 13-16. Because The Society has no recourse in the Navy and DoD,[9] the Society must attempt to persuade Congress to force the Navy and AFCB to change their policy toward Humanism. AC ¶ 201. This has involved diverting at least 100 hours of staff time to organizing a congressional briefing and lobbying Members of Congress. AC ¶ 201. So long as Defendants continue their refusal to recognize The Society because of disagreement with its beliefs, The Society will continue to engage in burdensome efforts to counteract Defendants' discrimination, and the universe of candidates it can successfully endorse to serve as chaplains will continue to be constricted. AC ¶ 202; Torpy Decl. ¶16. Rectifying the discriminatory rejection of The Humanist Society has required The Society to divert resources from its other activities such as "creating new chapters across the country [and] certifying new Celebrants and interviewing

---

[9] The Society's recent requests to meet with members of the AFCB and Navy Chaplain Corps have been rejected. AC ¶¶ 89 & 94.

Celebrant candidates." AC ¶ 201. This "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resource – constitutes far more than simply a setback to [The Society's] abstract social interests" and satisfies the injury requirement under Article III. *Havens*, 455 U.S. at 380.

          c.    *The Society Alleges Concrete Plans to Endorse Specialist Joe Farkas in December of 2017*

As required by *Lujan,* The Society alleges both "'concrete plans'" and "'specification of *when*" it will endorse its next chaplain candidate by explaining it will endorse Specialist Joseph Farkas as its next candidate on a specific date, December 2017. AC ¶ 199; *see also* Torpy. Decl. ¶¶ 2-7. A concrete description of future plans suffices to establish standing. *Clatterbuck*, 708 F.3d at 554 (finding plaintiffs challenging an ordinance prohibiting begging on designated public property established standing even *without* alleging specific plans to beg within the prohibited area); *Reed v. Salazar*, 744 F. Supp.2d 98, 112 (D.D.C. 2010) (declaration specifying dates of planned future visits to wildlife refuge sufficient to establish standing); *Citizens for Better Forestry v. United States Dep't of Agric.*, 632 F. Supp.2d 968, 979 (N.D. Cal. 2009) (same); *Emergency Coal. to Defend Educ. Travel v. United States Dept. of Treasury*, 498 F. Supp.2d 150, 158 (D.D.C. 2007) ("[C]oncrete and definite statements of future plans" sufficient to establish standing).

          d.    *The Society's Injury is Not "Self – Inflicted"*

Defendants' contention that The Society's efforts to investigate and counteract the discriminatory rejection of Plaintiffs' application is "self-inflicted" ignores that The Society suffered an injury *independent* of these efforts—the rejection of Plaintiffs' application because of The Society's Humanist beliefs. AC ¶¶ 30-38, 50, ¶¶ 77-101. Accordingly, the Court need not consider Defendants' assertions about "self-inflicted" harm. *Supra* at I.B.1.a.

If considered, Defendants' argument directly conflicts with the Supreme Court's holding in *Havens* that a plaintiff has organizational standing when it "devote[s] significant resources to identify and counteract the defendant's discrimination." *Havens*, 455 U.S. at 379. Numerous courts in this Circuit have held a plaintiff has organizational standing when it carries out these activities in response to discriminatory conduct. *See Moseke v. Miller & Smith, Inc.*, 202 F. Supp.2d 492, 498-99 (E.D. Va. 2002) (rejecting *dicta* on self-inflicted harm in *Fair Emp't Council of Greater Wash. v. BMC Mkting Corp.*, 28 F.3d 1268 (D.C. Cir. 1994) and holding standing satisfied where organization "devote[s] significant resoures to identifying and counteracting the defendant's discriminatory practice"); *Havens,* 455 U.S. at 497 (standing satisfied where organization "devote[s] significant resoures to identifying and counteracting the defendant's discriminatory practice"); *see also Cent'l Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 642 (11th Cir. 2000) ("[T]he underlying logic of *Havens* is at odds with the D.C. Circuit's analysis in [*BMC Marketing*]," because "(1) the *Havens* court regarded the identification and combating of discrimination as a 'concrete and demonstrable' injury, which could cause a drain on organization resources and thereby give rise to an organization's direct standing to sue.").[10]

Moreover, The Society suffers from a continuing injury from the limitations imposed on its ability to endorse chaplains because of the AFCB's refusal to recognize The Society. Torpy Decl. ¶¶ 10-20. These injuries are inflicted by Defendants' rules and conduct, not The Society's.

---

[10] *See also Ragin v. Harry Macklowe Real Estate Co*., 6 F.3d 898, 905 (2d Cir. 1993) (holding that organization had standing where it devoted significant resources to identify and combat defendant's alleged discriminatory advertising practices, including preparation of lawsuit itself); *Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (finding that organization had standing where it devoted resources to investigating Defendants' practices alleged in plaintiff's complaint); *Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1525 (7th Cir. 1990) ("[D]eflection of the agency's time and money from counseling to legal efforts directed against discrimination" sufficient to show standing.)

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) is nothing like this case, because in *Lane* the defendants took no action directed at the organizational plaintiff or that interfered with any of the organization's preexisting activities. *Id.* at 675. Here, as in *Havens* (and unlike *Lane*), Defendants' discriminatory rejection of The Society's application interferes with The Society's preexisting and ongoing efforts to provide chaplains in the military by erecting a barrier to The Society's participation, *see* Torpy Decl. ¶¶ 10-16, and requires The Society to take on additional costs in order to eliminate the obstacle created by Defendants' conduct. AC ¶ 201; *see also BMC Mkting Corp.*, 28 F.3d at 1278 (standing *upheld* where defendants' conduct "made [the plaintiff's] overall task more difficult"). "[T]here is an obvious difference between the situation highlighted by defendants—where an organization manufacturers the injury necessary to maintain a suit by expending resources on that very suit—and the situation where an organization incurs diversion of resources and frustration of purpose damages as a result of specific documented incidents of unlawful discrimination toward" the organization and its activities. *Lowder Realty Co.*, 236 F.3d at 642. This case, like *Havens*, involves the latter situation.

    e.    *Defendants Misstate The Society's Organizational Mission*

Defendants erroneously assert that endorsing chaplains to serve in the military is not part of The Society's organizational mission. O.D. Mem. at 21. Yet, the Complaint explicitly pleads that The Society "seeks to strengthen Humanist communities by providing . . . access to Humanist Celebrants, including to Humanist communities within the Armed Services." AC ¶17; *see* Torpy Decl. ¶¶ 7-8. Indeed, The Society has developed a Celebrant credential and training program specifically for chaplains and lay leaders seeking to serve in the military, which the Society implements "[a]s part of its mission to provide support for Humanists in the Armed Services." AC ¶ 153. The First Amendment prohibits Defendants from second guessing whether

these activities are at the "core"[11] of The Society's religious mission. *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith[.]"); *Corp. of Presiding Bishop of Church of Jesus Christ Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987) (holding Title VII exemption permissible to avoid "governmental interference with the ability of religious organizations to define and carry out their religious missions").

2.   <u>The Humanist Society May Sue on Behalf of its Members in the Navy</u>

An organization may sue on behalf of its members when "(1) at least one of its members would have standing to sue in his own right, (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (organization had standing based on injury to single member). Each of these is satisfied here. <u>First</u>, Chief Electronics Technician Douglas Wright is a member of The Humanist Society whose observance of Humanism is burdened by the Navy's failure to admit Humanists into the chaplaincy. AC ¶¶ 203-08; *see* Wright Decl. ¶¶ 2, 4-8. That injury is fairly traceable to Defendants' discriminatory denial of Plaintiffs' application and redressable by admitting a Humanist to the chaplaincy, which would alleviate these burdens. *Id.* ¶¶ 204-08; Wright Decl. ¶¶ 4-8; Torpy Decl. ¶¶ 9, 19, 20, 22. Defendants' argument that there is no guarantee a Humanist chaplain will always be personally available to Technician Wright ignores the specific allegations that his injury persists

---

[11] O.D. Mem. at 21. In both *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) and *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996), the organizational plaintiff failed to allege a conflict between any aspect of its organizational mission and the challenged activity. *See S. Walk*, 713 F.3d at 183(organization "d[id] not allege in its amended complaint that the [challenged practice] frustrates its stated organizational purpose").

"[e]ven in situations where a Humanist chaplain is not immediately available," and "is not based solely on the unavailability of a Humanist chaplain in the particular location where [he] serve[s.]" AC ¶¶ 207-08 (detailing the factual basis for these allegations); *see also* Torpy Decl. ¶ 9; Wright Decl. ¶ 7. <u>Second</u>, Defendants do not dispute that Technician Wright's interest in a Humanist Chaplain is "germane to [The Society's] purpose" as alleged in the Complaint. *Supra* I.B.1.e. Finally, Defendants do not dispute the allegations that Wright's individual participation is not required, as The Society seeks prospective relief. *See Int'l Bottled Water Ass'n v. Eco Canteen, Inc.*, 2010 WL 3719313, at *6 (W.D.N.C. Sept. 17, 2010) (standing upheld where organization seeks equitable relief because "[t]ypically, when an organization seeks . . . 'prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" (quoting *Warth v. Seldin*, 422 U.S. 490 , 515 (1975))).

Instead, Defendants' arguments attempt to raise "barriers to standing that the Constitution does not require and Congress has not embraced." *Friends of the Earth*, 204 F.32d at 155-56 (reversing trial court order that held plaintiff lacked standing despite satisfying all elements). Defendants' argument that The Society is not the "functional equivalent of a membership organization" is immaterial because The Society *is* a membership organization. *Compare* O.D. Mem. at 23 *with* AC ¶ 17 ("The Humanist Society maintains an active membership . . ."); Torpy Decl. ¶ 21.[12] And Defendants identify no reason whatsoever why Wright's injury differs from "Humanist congregants" in the Navy. Wright's harm is the same as other Humanists in the Navy. Wright Decl. ¶¶ 4-8; *see also* Torpy Decl. ¶ 22; AC ¶¶ 204-08.

---

[12] Defendants's cases involve organizations that did *not* have members. *See, e.g.*, *Fund Democracy, LLC v. S.E.C.*, 278 F.3d 21, 25 (D.C. Cir. 2002) (organization did not argue it had members); *Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (organization admitted it did not have formal members whose rights were at issue in the proceeding).

3.    The Humanist Society May Sue on Behalf of Humanist Non-Members

A plaintiff has standing to assert the rights of third parties where the plaintiff is part of the third party's constitutionally protected activity and there is a "genuine obstacle" to the third party asserting rights on its own behalf. *Singleton v. Wulff*, 428 U.S. 106, 116-17 (1976) (finding physicians had standing to challenge a statute limiting the use of state Medicaid funds to pay for abortions because physicians participate in patients' constitutionally protected activity  and the patients "may be chilled" from asserting their rights by "the publicity of a court suit"). Similarly, in *Barrows v. Jackson*, 346 U.S. 249, 259 (1953), the vendor of land subject to a racial covenant had standing to assert the Equal Protection Clause rights of purchasers to buy the land free of discrimination due to the alignment of interests between vendor and purchaser. *Id.*

Similarly, The Society seeks to provide Humanist chaplains to Humanist service members like Petty Officer Todd Kregel, Chief Wright, and Commander Antonio MacCabe who are unable to receive adequate support from the chaplaincy without a Humanist chaplain. ¶¶ 204-08; Wright Decl. ¶¶ 4-8. Humanist service members' "enjoyment of the right" to religious accommodation by Humanist chaplains "is inextricably bound up with the activity [The Society] wishes to pursue," namely, endorsing Humanist chaplains to serve in the Navy. Like the patients in *Singleton* who "may be chilled" from asserting their rights by "the publicity of a court suit," Humanist service members are deterred from bringing their own lawsuits by fear of retaliation, negative publicity, or hostile treatment from their fellow officers and superiors. Torpy Decl. ¶ 23; Wright Decl. ¶ 9.

C.    The Humanist Society's Claims are Ripe

Claims are ripe when "the issue is substantively definitive enough to be fit for judicial decision and . . . hardship will result from withholding court consideration." *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 602 (4th Cir. 1997). "When a plaintiff is challenging a

24

governmental act, the issues are ripe for judicial review if 'a plaintiff . . . shows he has sustained . . . a direct injury as a result of that act.'" *Nat'l Advertising Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005). Further, claims seeking equitable relief to redress actions taken pursuant to an unconstitutional policy are ripe. *See Milwaukee Police Ass'n v. Bd. of Fire & Police Com'rs*, 708 F.3d 921, 930 (7th Cir. 2013) ("[I]f a litigant challenges [an ongoing] policy through a declaratory judgment, then the case should proceed when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" (quoting *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974)); *see, e.g.*, *I.N.S. v. Delgado*, 466 U.S. 210, 217 n.4 (1984) (standing upheld where plaintiffs allege "an ongoing policy which violated the Fourth Amendment and which will be applied to their workplace in the future"); *Allee v. Medrano*, 416 U.S. 802, 815 (1974) (injunctive relief appropriate to remedy "a persistent pattern of . . . misconduct" in violation of First Amendment rights).

Here, Plaintiffs' joint application was denied because Dr. Heap was endorsed by The Society pursuant to an ongoing policy or practice of discriminatory treatment of Humanists and Humanism by the DoD and Navy Chaplain Corps. AC ¶¶ 51-66, 81-96 & 10; SOF ¶ 1. Defendants offer no evidence contrary to Plaintiffs' allegations that the Navy's treatment of Plaintiffs' application changed radically once the Navy and AFCB learned that Dr. Heap was endorsed by The Humanist Society. AC ¶¶ 77-101 (Defendants reject application after learning of The Society's endorsement); *see* Heap Decl. ¶¶ 1-13. Under the "relaxed" requirements for ripeness "in First Amendment cases," an agency's position may be challenged where the agency has "manifested its view" as to how the plaintiff will be treated in light of its rules and policies,

25

even before taking specific action. *Cooksey*, 721 F.3d at 241 (agency's manifestation of its view that protected conduct was prohibited established standing and ripeness). Here, the Navy Chaplain Corps and DoD have unquestionably "manifested [their] view" by word and deed that Humanists are unfit to serve as chaplains. SOF ¶ 1. Discrimination against The Society pursuant to an ongoing discriminatory policy or practice caused its application to fail, which states a "ripe" claim. *See United States v. Town of Garner, North Carolina*, 720 F. Supp. 2d 721, 729 (E.D.N.C. 2010) (holding plaintiff stated a ripe claim by alleging that town board "fail[ed] to act after being presented with [plaintiff's] requests" for accommodation under circumstances raising inference of discrimination).

Defendants would have The Society repeat the entire process anew. O.D. Mem. at 27. Given the views manifested by The Navy and DoD, the fact pattern would be *precisely the same*—The Society would endorse another Humanist candidate (like Specialist Joe Farkas), the Navy would deny Specialist Farkas's application because he is endorsed by The Society, and Defendants would claim once again that makes The Society's claim "unripe." "[F]ederal ripeness rules do not require the submission of further and futile applications with other agencies." *Palazzolo v. Rhode Island*, 533 U.S. 606, 626 (2001); *see Town of Garner*, 720 F. Supp. 2d at 729 (claims ripe where plaintiff pursued "all available avenues to receiving a reasonable accommodation, and has been met with either misunderstanding or resistance").[13]

"In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." *Cooksey*, 721 F.3d at 240. Denial of recognition as a qualified endorsing organization continues to obstruct The

---

[13] As detailed in the declarations of Jason Torpy and Douglas Wright, The Humanist Society and Humanists and atheists in the military have a long history of attempting to obtain recognition from the Chaplain Corps and the Armed Forces Chaplains Board, and their attempts have been consistently repudiated. Torpy Decl. ¶¶ 24-30; Wright Decl. ¶¶ 10-15.

Society's ecclesiastical mission by preventing it from (1) enrolling chaplain candidates such as Specialist Farkas in the Chaplain Candidate Program (which in turn impairs Specialist Farkas's chances of being accepted), (2) endorsing currently-serving chaplains who wish to receive The Society's endorsement, (3) endorsing chaplains to serve in the National Guard or Reserves, (4) endorsing candidates who require waivers of certain AFCB requirements, and (5) advising military commanders on the needs and perspectives of military chaplain endorsers through the National Conference on Ministry to the Armed Forces. Torpy Decl. ¶¶ 10-16. The hardship to both The Society *and* to Humanist service members of continuing to be denied access to Humanist chaplains is powerful. AC ¶¶ 199 (impairment of The Society's mission); 204-08 (hardship to service members); *see* Torpy Decl. ¶¶ 10-16; Wright Decl. ¶¶ 4-8.

## II.    THE MOTIONS TO DISMISS UNDER RULE 12(B)(6) SHOULD BE DENIED

### A.    The Complaint Plausibly Alleges Defendants Denied Plaintiffs' Applications Because Plaintiffs are Humanists

"Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kikwebati v. Strayer Univ. Corp.*, No. 2:14-cv-203, 2014 WL 7692396, at *5 (E.D. Va. Oct. 21, 2014) (quoting *Kensington Vol. Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012)). The Court cannot consider the factual assertions in Defendants' affidavits,[14] nor can it accept Defendants' version of disputed facts. *Zak v. Chelsea Therapeutics Int'l., Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015) (vacating district court order relying on materials outside the complaint to decide Rule 12(b)(6) motion); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th

---

[14] The untested assertions of Captain Parisi and Col. Pitts — neither of whom have been disclosed as potential witnesses, let alone deposed — ***must*** be disregarded in ruling on the Rule 12(b)(6) motions.

Cir. 2011) (reversing district court decision that "accepted [Defendants'] statement [of the facts] as true"). Instead, the Court "must consider the complaint in its entirety" and consider "*all* of the facts alleged, taken collectively." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "'Detailed factual allegations'" are not required, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)), rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. " *Id.* at 678. Contrary to Individual and Official Defendants' assertions, the Complaint's sixty-four pages of substantive factual allegations readily permit a reasonable inference that Defendants rejected Plaintiffs' application because of their disagreement with Plaintiffs' Humanist views and therefore sufficiently allege Establishment, Equal Protection, Free Exercise, and Speech Clause claims.

1.    The Complaint Alleges Defendants Denied Plaintiffs' Application Based on a Discriminatory Policy

The allegations of intentional discrimination are sufficient if they permit the inference that "a discriminatory purpose has been a motivating factor in the decision" to deny Plaintiffs' application. *Vill of Arlington Heights*, 429 U.S. at 563. Discriminatory purpose may be based on a facially discriminatory policy. *Monroe v. City of Charlottesville*, 471 F. Supp. 2d 657, 661 (W.D. Va. 2007) (intentional discrimination may be pled by showing a "policy that 'expressly classifies persons'" on a prohibited basis (quoting *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000))). Discriminatory purpose also may be based on a practice of applying facially neutral criteria in a discriminatory manner. *Booth v. Maryland*, 327 F.3d 377, 381 (4th Cir. 2003). Here, Plaintiffs allege both (1) a consistent policy and practice of refusing to recognize Humanism as religion or to accord Humanists equal treatment to adherents of other

28

beliefs, AC ¶¶ 51-66, and (2) that Defendants applied this policy in denying Plaintiffs' application, AC ¶¶ 21-24 & 26-40.

For years, Humanist organizations have lobbied the DoD, the Navy, and the AFCB to include Humanism among the religious affiliations recognized by the DoD, but the DoD has consistently refused. AC ¶ 63. Current Chief of Navy Chaplains Defendant Kibben admits the Navy prefers Christian Chaplains to Humanist Chaplains. AC ¶ 56. Senior Chaplain Corps leadership has overruled subordinates' decisions to recognize atheist lay leaders because they are atheists. AC ¶ 61. Similarly, the AFCB has referred to Humanists as "non-religious." AC ¶ 62. An impartial study concludes the DoD "do[es] not recognize Humanism as religious." AC ¶ 66.

The Complaint alleges that Defendants applied this discriminatory policy in denying Plaintiffs' application. AC ¶ 67-101. In an interview about the denial of Plaintiffs' application, A Navy spokesperson asserted that Dr. Heap does not "represent[] a religious organization by any accepted definition." AC ¶ 101. Defendants Tidd, Kibben, and Horn personally investigated Dr. Heap's Humanist beliefs, and Defendant Tidd intervened personally (contrary to Navy instructions) to ensure that Dr. Heap's application was denied. AC ¶¶ 90-93, 100. Navy and Chaplain Corps recruiters expressed interest in Dr. Heap's application and offered to fast-track his appearance before a CARE Board, *until* Dr. Heap submitted his endorsement by The Humanist Society. AC ¶ 67-76. Dr. Heap was not invited to participate in a CARE Board until legal counsel confronted Defendants Tidd and Kibben about the delay in handling the application. AC ¶ 95.

2.    The Complaint Alleges Direct Evidence of Intentional Discrimination

Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006). That is alleged here.

After learning that Dr. Heap would be endorsed by The Humanist Society instead of the Evangelical Christian Alliance, Dr. Heap's Chaplain Corps recruiter told him that his endorsement could pose a problem for his application. AC ¶ 82. Defendants Tidd, Kibben, and Horn specifically sought to identify the content of Dr. Heap's beliefs and whether he was affiliated with any Christian denomination. AC ¶¶ 88 (Kibben "look[s] forward to seeing a copy of" article in which Dr. Heap "clearly identifies himself as Humanist and provides his argument for service in the Chaplain Corps"); 89 (Tidd accepts and thanks subordinate for reporting on Dr. Heap's lack of affiliation with Disciples of Christ). Tidd also did nothing to correct his subordinate's discriminatory reference to Dr. Heap as a "humanist so called applicant to our Corps." AC ¶ 89. An official chaplain corps spokesperson admitted to a reporter that Dr. Heap does not "represent[] a religious organization by any accepted definition." AC ¶ 100.

3.    The Allegations State a Prima Facie Case of Intentional Discrimination

In the alternative to alleging that Defendants applied a discriminatory policy and direct evidence of intentional discrimination, a plaintiff who alleges he was rejected for employment based on unlawful discrimination may raise an inference of discriminatory intent by showing (1) membership in a protected class or participation in protected activity, "(2) that he applied and was qualified for a job for which the employer was seeking applicants, (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[15] Satisfying this prima facie case

---

[15] *McDonnell Douglas* applies to constitutional claims seeking to remedy employment discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) (applying *McDonnell Douglas* to 42 U.S.C. § 1983 claim alleging employment discrimination); *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1058 (4th Cir. 1984) (same as to §§ 1983 and 1981). "A *Bivens* action is the federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983." *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006).

"create[s] an inference that the decision was a discriminatory one." *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44 (1977); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) ("The Supreme Court constructed the elements of the prima facie case to give plaintiffs . . . a method of raising an inference of discrimination."); *see Tobey v. Jones*, 706 F.3d 379, 387-88 (4th Cir. 2013) (complaint that "satisfies all three elements of a First Amendment claim . . . [has] 'facial plausibility' that 'allow[s] the court to draw reasonable inference that Defendants are liable for [the] misconduct alleged'" (quoting *Iqbal*, 556 U.S.at 678)); *Matthews v. Novant Health, Inc.*, No. 3:09-cv-494, 2010 WL 2131559, at *6 (W.D. N.C. April 29, 2010) (prima facie case is "sufficient 'factual content that allows the Court to draw the reasonable inference that the defendant is liable'" and denying motion to dismiss (quoting *Iqbal*, 129 S. Ct. at 1949)); *Bogan v. Roomstore, Inc.*, No. 3:09-cv-705, 2010 WL 370306, at *3 (E.D. Va. Jan. 29, 2010) (denying motion to dismiss where prima facie case pled).

a.  *Membership in Protected Class and Participation in Protected Activity*

Defendants do not dispute that the Humanism practiced by Plaintiffs constitutes religion. O.D. Mem. at 1 n.1. Religious affiliation is undisputedly a protected classification for purposes of the RFRA and constitutional provisions alleged by Plaintiffs, as well as a "viewpoint" under the Speech Clause of the First Amendment.[16]

---

[16] *See* 42 U.S.C. § 2000cc-5 (defining "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"); *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 532 ("[T]he protections of the Free Exercise Clause pertain" "at a minimum" where government action "discriminates against some or all religious beliefs"); *Widmar v. Vincent*, 454 U.S. 263, 268 (1981) (discrimination on the basis of religious belief constitutes viewpoint-based discrimination under Speech Clause); *Larsen*, 456 U.S. at 244 (Establishment Clause mandates that "one religious denomination cannot be officially preferred over another"); *City of New Orleans*, 427 U.S. at 303 (heightened scrutiny under the Equal Protection Clause applies to "inherently suspect distinctions such as . . . religion").

b.    *Dr. Heap and The Humanist Society Meet Defendants' Criteria*

Dr. Heap and The Humanist Society meet Defendants' criteria for appointment as chaplain and religious organization. AC ¶¶ 104, 106-11, 113-15 & 117-18. Defendants do not dispute that both Plaintiffs were qualified, except to claim that Dr. Heap lacked experience in Humanist ministry. Individual Defendants' Memorandum ("I.D. Mem.") at 30 n. 23. But The Humanist Society certified on Dr. Heap's Form DD 2088 that he has four years of ministry experience, two years more than required by Defendants. AC ¶ 109. The Humanist Society's recognition of what qualifies as Humanist ministry is strictly a "matter[] of church government as well as . . . of faith and doctrine" that the Navy and DoD have no authority to overrule. *Hosana-Tabor Evangelical Lutheran Church & School v. EEOC*, 132 S. Ct. 694, 704 & 712 (2012). Defendants accepted another applicant that had the same amount of ministry experience but whose application did *not* address his ability to serve in pluralistic environments. AC ¶ 118. The District Court cannot "accept [Defendants'] possible justifications" over plausible allegations stated by Plaintiffs. *Clatterbuck*, 708 F.3d at 559-60. Indeed, because an active duty position remained open after Dr. Heap was rejected, ¶¶ 124-27, even if applicants recommended for acceptance at the May 2014 CARE Board or reviewed by later CARE Boards had *superior* qualifications, that would not explain why Dr. Heap was rejected for the open position. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (plaintiff may avoid summary judgment by showing "the position remained open" despite being qualified).

c.    *Acceptance of Similar Non-Humanist Applicants*

The final two requirements—that Plaintiffs were rejected and "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications" are satisfied here. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The May 2014 CARE Board meeting was authorized to recommend four applicants for appointment in Active

32

Duty Components. AC ¶ 97. Dr. Heap applied to serve as chaplain in an Active Duty

Component. AC ¶ 98. However, the CARE Board recommended only three. AC ¶ 99.[17]

Moreover, Defendants appointed two chaplains in the two months after Plaintiffs were rejected

who were at least similarly qualified and were not Humanists. AC ¶¶ 106-128.[18]

> 4.    Plaintiffs Allege Additional Facts Permitting the Inference Defendants
> Rejected their Applications Because they are Humanists

An inference of purposeful discrimination also may arise from (a) "[t]he historical

background of the decision," (b) "[t]he specific sequence of events leading up to the challenged

decision," (c) "substantive departures" from normal requirements, and (d) "contemporary

statements by . . . the decisionmak[er]." *Vill. Of Arlington Heights*, 429 U.S. at 267-68. All raise

an inference of intentional discrimination here.

> a.    *The Historical Background of Defendants' Decision to Reject
> Plaintiffs' Application Reveals a Discriminatory Purpose*

"[T]he historical background of the decision" can provide circumstantial evidence of

discriminatory intent, "particularly if it reveals a series of official actions taken for invidious

purposes." *Vill. of Arlington Heights*, 429 U.S. at 267. On at least three separate occasions on or

before the time Plaintiffs applied to serve as Humanist chaplain and endorsing organization,

Humanist and non-theist service members attempted to gain recognition as lay leaders in the

Navy. AC ¶¶ 57-60. Chief Electronics Technician Douglas Wright was endorsed for this position

---

[17] Contrary to Individual Defendants' claim that selection of similarly qualified, non-Humanist applicants "say[s] nothing . . . about the reason Dr. Heap was not selected," I.D. Mem. at 29, proof that similarly situated applicants were selected is sufficient to defeat a motion for *summary judgment*. *See Hill*, 354 F.3d at 285 (showing "the position remained open" sufficient to defeat summary judgment). It would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits." *Swierkiewicz*, 534 U.S. at 511-12

[18] Contrary to Individual Defendants' criticism of the criteria Plaintiffs use to compare Dr. Heap's credentials with other applicants', those criteria are drawn from Defendants' own regulations. *Compare* DoDI 1304.28 ¶ 6.1.2-6.1.4, *with* Amend. Compl. ¶¶ 120-28.

by The Humanist Society. AC ¶ 57. Chief Wright's application was rejected by a Navy chaplain on the ground that Humanism "does not meet the minimum standards required" by the Navy. AC ¶ 58. Defendant Tidd affirmed that decision as "consistent with Navy regulations and policy." AC ¶ 59. Similarly, an atheist applying to act as lay leader was initially approved by his ship-level command, but his status as lay leader was revoked when senior Navy Chaplain Corps leadership learned that his endorsing organization, like The Humanist Society, does not believe in a divinity. AC ¶ 60. A Humanist's application to serve as lay leader was rejected because the Army considers Humanism "philosophy and not religion." AC ¶ 65. The lay leaders' rejection is "a series of official actions taken for invidious purposes" because all three were rejected based on the content of the applicant's beliefs as a Humanist or atheist. *Vill. of Arlington Heights*, 429 U.S. at 267. An impartial study of the DoD's policy concluded that "the DoD . . . do[es] not recognize Humanism as a religion." AC ¶ 65.

For the three years prior to Plaintiffs' applications, Defendants Garfola-Wright and the DoD have rejected requests to include Humanism in the DoD's list of recognized religious affiliations. *Id.* Despite receiving requests for accommodation, the AFCB considers non-theism as synonymous with "non-religion." AC ¶ 61. The refusal even to allow a Humanist Naval Academy graduate to be married in the Academy's Main Chapel on the ground that it is unavailable for "non-Christian or non-religious wedding ceremonies" also demonstrates the Navy's policy. AC ¶ 64.

        b.     *The Specific Sequence of Events Leading Up to Rejection of Plaintiffs' Application Evidences Discriminatory Intent*

"[T]he specific sequence of events leading up to the challenged decision" also provides evidence of discriminatory intent. *Vill. of Arlington Heights*, 429 U.S. at 267. The Navy Chaplain Corps, through Lt. Joel DeGraeve acting as the Corps' official recruiter, initially

encouraged Dr. Heap to apply and told him he was highly qualified for the position. AC ¶ 67.

DeGraeve counseled Dr. Heap on the application process and advised him how to present his

application to ensure it succeeded. AC ¶ 71. Dr. Heap interviewed with a U.S. Marine Chaplain,

who gave Dr. Heap a perfect score in his review of Dr. Heap's credentials. AC ¶ 74. Lt.

DeGraeve met again with Dr. Heap, repeated his assessment that Dr. Heap was highly qualified,

and told Dr. Heap he would "fast-track" Dr. Heap's application so that he could appear before a

CARE Board in July or August of 2013. AC ¶ 75.

However, after the AFCB received The Humanist Society's endorsement, Dr. Heap was

not invited to a CARE Board in July or August of 2013 as he was told by Lt. DeGraeve. AC ¶

81.[19] All discussion of fast-tracking his application stopped. *Id.* An internal memorandum

identified The Humanist Society as Dr. Heap's endorser and stated that the Navy does not

"process" applications until the candidate is "endorsed by a Religious Organization registered

with the DoD." AC ¶ 79. Lt. Degraeve told Dr. Heap that being endorsed by The Humanist

Society could pose a problem for his application. AC ¶ 82.

At the same time, political and media pressure mounted on Defendants Hagel and Tidd to

deny Plaintiffs' application because he is a Humanist. AC ¶¶ 84-85. The Navy Chaplain Corps'

Office of Legislative Affairs warned the Chaplain Corps' Policy Office of this political pressure.

AC ¶ 84. Defendants Tidd, Kibben, and Horn personally investigated Dr. Heap's religious views

---

[19] Individual Defendants' claim that these allegations are based on a "subjective (and unsupported belief as to appropriate length of time" is wrong. I.D. Mem. at 28. They are based on the difference between what Lt. DeGraeve, speaking for the Chaplain Corps, told Dr. Heap as his official recruiter, and what actually happened after Dr. Heap's endorsement was submitted. In *Village of Arlington Heights*, the Court held proof of intentional discrimination insufficient, but stated that "we would have a far different case" if the property's zoning "suddenly was changed . . . when the town learned of [the plaintiff's] plans to erect integrated housing." 429 U.S. at 266-67. Here, the Navy's treatment of Dr. Heap's application suddenly changed once Defendants learned that Dr. Heap is a Humanist. *See, e.g.*, AC ¶¶ 76 & 82.

after learning he was endorsed by The Humanist Society. AC ¶¶ 88 & 89. Defendant Tidd's

Executive Assistant continued the investigation in a "Humanist Applicant Course of Action

Meeting" held in December. AC ¶ 91. Only in response to a letter from legal counsel at The

Humanist Society did the Navy agree to grant Dr. Heap an interview. AC ¶ 93. The Navy denied

Plaintiffs' application less than two weeks later. AC ¶¶ 93 & 95. A spokesperson for the Navy

Chaplain Corps asserted to a reporter in an interview about the rejection that Dr. Heap does not

"represent a religious organization by any accepted definition." AC ¶ 101.

        c.    *Defendants' Substantive Departures from Chaplain Corps Recruitment Regulations*

"[S]ubstantive departures" raise an inference of intentional discrimination, "particularly if

the factors usually considered important by the decisionmaker strongly favor a decision contrary

to the one reached." *Vill. Of Arlington Heights*, 429 U.S. at 267. Navy regulations require

Defendants to give "consideration to religious diversity" in the recruitment of chaplain

candidates, "particularly where" a chaplain candidate's religious organization is represented

among Navy personnel but is not yet represented in the Chaplain Corps. AC ¶ 54. Regulations

also require that "Commanders shall provide" religious programs to "accommodate the religious

needs . . . of members of their commands." *Id.* Nearly four percent of the Armed Services self-

identifies as Humanist, a larger percentage than any other non-Christian denomination that has

chaplains, and equivalent to the representation of some Christian denominations that have

chaplains. AC ¶ 53. However, Defendants rejected Plaintiffs' application even though there are

*no* Humanist chaplains, lay leaders, or endorsing organizations in the Chaplain Corps. AC ¶ 55.

        d.    *Contemporary Statements by Navy and AFCB Defendants Show Intentional Discrimination*

During and immediately after their evaluation of Plaintiffs' application, Defendants Tidd

and Kibben stated publicly their opinion that chaplains are "an extension of God" and "embody

the reassuring presence of God." AC ¶ 63. While Defendants Tidd and Kibben were Chief and Deputy of Chief of Chaplains, the Navy Chaplain Corps continued to adhere to the motto that chaplains "serve God." *Id*  These statements reflect Defendants Tidd and Kibben's bias that chaplains must believe in a divinity. Defendant Tidd approved the denial of a Humanist's application to serve as a lay leader on the ground that Humanism "does not meet the minimum standards required by" the Navy, stating that the denial is "consistent with Navy regulations and policy." AC ¶¶ 58-59. Defendant Kibben admits she does not perceive "the benefits of a Humanist Chaplain compared to a Christian Chaplain." AC ¶ 56. Defendant Kibben's interest in an article in which Dr. Heap "clearly identifies himself as Humanist and provides his argument for service in the chaplain corps" indicates that Dr. Heap's Humanism would be a factor in her decision as to Plaintiffs' application. AC ¶ 88. When a subordinate reported to Defendant Tidd that he had "received a little intelligence on the humanist so called applicant to our Corps" and reported he had found no evidence that Dr. Heap had been a minister of the Disciples of Christ, Defendant Tidd thanked him for his work. AC ¶ 89; *see Mendelsohn v. Sprint/United Mgmt. Co.*, 587 F. Supp. 2d 1201, 1219 (D. Kan. 2008) (inference "that a decision-maker adopted or relied upon [a] discriminatory statement" may be drawn in employment discrimination case).[20]

5.    The Allegations Are Sufficient as to Each Defendant

Each of the Individual Defendants was *required* by Navy and DoD regulations to make a recommendation or final decision as to Plaintiffs' candidacy to become a chaplain and endorsing organization. Each exercised that authority to deny Plaintiffs' application pursuant to their policy of non-recognition of Humanism. AC ¶¶ 21-24 & 26-40. The Complaint alleges additional

---

[20] Individual Defendants' contention that "there is no allegation that anyone associated with the chaplaincy application process made" any biased comments ignores these allegations. I.D. Mem. at 30.

instances of personal involvement by Defendants Tidd, Kibben, Horn, and Andrews in denying

Plaintiffs' applications. AC ¶¶ 89-93 & 100. The Complaint sufficiently alleges discrimination

by (1) naming as Defendants  the people who were required to make the decision and (2)

alleging sufficient facts to permit the inference that the decision was based on Plaintiffs'

Humanist beliefs. *See, e.g.*, *Bonner v. Outlaw*, 552 F.3d 673, 678-79 (8th Cir. 2009) (allegations

that individual defendant was "personally involved in creating, applying, or interpreting" an

unconstitutional policy sufficient to state *Bivens* claim); *Lewis v. Smith*, 855 F.2d 736, 738 (11th

Cir. 1988) (personal involvement requirement met where individual defendants had official

responsibility for challenged procedure); *Massenburg v. Adams*, No. 3:08-cv-106, 2010 WL

1279087, at *3 (E.D. Va. Mar. 31, 2010) (allegations that individual defendants had the formal

"authority and responsibility" for the relevant decisions sufficient to state *Bivens* claim); *Navab-

Safavi v. Broadcasting Bd. of Governors*, 650 F. Supp. 2d 40, 53 (D.D.C. 2009) (*Bivens*

allegations sufficient where plaintiff alleged that defendants acted collectively in terminating

employment contract); *Collin v. Rector & Bd. of Visitors of Univ. of Va.*, 873 F. Supp. 1008,

1018 (W.D.Va. 1995) (allegations that members of committee had authority to make challenged

tenure decision and participated in the decision sufficient to state Equal Protection claim against

them).[21]

---

[21] Whether Individual Defendants lacked "personal feelings of animosity or bias" toward Plaintiffs (I.D. Mem. at 27) is irrelevant. "'[I]ll will, enmity, or hostility'" are not required. *Floyd v. City of New York*, 959 F. Supp. 2d 540, 662 (S.D.N.Y. 2013) (internal quotation marks omitted); *see Ferrill v. Parker Grp, Inc.*. 168 F.3d 468, 472-73 (11th Cir. 1999). ("[A]nimus and intent to discriminate are not synonymous."). What Plaintiffs must allege is that "the decisionmakers . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," and they have done that here. *Hayden*, 594 F.3d at 163 (quoting *Feeney*, 442 U.S. at 279).

B.    Discrimination Against Dr. Heap and The Humanist Society Because They Are Humanists Violates the Establishment and Equal Protection Clauses

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 245 (1982). Similarly, "classification[s]" that "trammel[] fundamental personal rights" or are "drawn upon inherently suspect distinctions such as . . . religion" receive strict scrutiny under the Equal Protection Clause. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). Defendants drew such a classification on the basis of denomination in denying Plaintiffs' applications. Defendants do not dispute that the allegations state violations of the Establishment Clause or that excluding Plaintiffs from the chaplaincy and denying service members access to a Humanist chaplain because they are Humanists violates the Establishment and Equal Protection Clauses

C.    Plaintiffs Plausibly Allege Violations of the Free Exercise Clause and Religious Freedom Restoration Act

1.    Defendants' Intentional Discrimination Violates the Free Exercise Clause

Governmental action that discriminates intentionally on the basis of religious belief violates the Free Exercise Clause unless it is supported by a compelling governmental interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993) ("A law failing to satisfy the[] requirements [of neutrality and general applicability] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.").[22] In *McDaniel v. Paty*, 435 U.S. 618, 626 (1978), the Supreme Court explained that excluding ministers from holding public office "solely because of [their] religious beliefs" violates the First Amendment since "[t]he Free Exercise Clause categorically prohibits government from

---

[22] The same prohibition applies even if not embodied in writing. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) (upholding challenge to unwritten policy or practice requiring student actors to adhere to scripts that were claimed to be religiously offensive).

regulating, prohibiting, or rewarding religious beliefs as such." In the context of the chaplaincy, Navy officers' failure to hire and promote chaplains because of religious affiliation burdens rights under the Free Exercise Clause. *See Adair*, 183 F. Supp. 2d at 52-53 (free exercise rights burdened by policy preferring members of some religious denominations for promotion and accession to chaplaincy).[23]  Because Defendants excluded Plaintiffs from the chaplaincy "solely because of [their] religious beliefs," the Free Exercise clause "categorically prohibits" such exclusion. *McDaniel*, 435 U.S. at 626.

Plaintiffs' free exercise rights are substantially burdened by requiring them to disavow their Humanist beliefs as a condition of employment as chaplain and recognition as a qualified ecclesiastical endorser. A substantial burden "'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs,'" or "forces a person to 'choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning one of the precepts of her religion on the other hand.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981) and *Sherbert v. Verner*, 374 U.S.398, 404 (1963)). In *Thomas*, a steel plant worker's religious exercise was substantially burdened by denial of unemployment benefits after the worker left his job because it required him to participate in producing weapons in violation of his sincere beliefs. 450 U.S. at 717-18 (finding a substantial burden because "the employee was put to the choice between fidelity to religious belief or cessation of work."). And in *McDaniel*, a minister's Free Exercise rights were substantially burdened by prohibiting him from holding public office as long as he remained a minister. 435 U.S. at 626-29. A similar analysis applies

---

[23] Defendants argue that "statutes [and] regulations used to evaluate Navy chaplains are [not] facially discriminatory on the basis of religious affiliation." O.D. Mem. at 32. Plaintiffs Free Exercise and RFRA claims do not challenge the written statutes and regulations (and indeed argue they have not been followed), but rather challenge rejection because they are Humanists.

here: Dr. Heap must either violate the tenets of his beliefs by affiliating with one of DoD's recognized religious organizations, or forego employment as a chaplain. ¶ 212. The burden on Dr. Heap is *more* substantial than the burden in *Thomas*, and is the same as the burden in *McDaniel*, because the Navy and DoD requirement that Dr. Heap renounce his Humanist beliefs is imposed as a prerequisite for the job itself, whereas the burden in *Thomas* was merely "indirect" because the government did not require a violation of religious belief as a prerequisite for employment. *Thomas*, 450 U.S. at 718. Similarly, to obtain DoD recognition as an approved religious organization, The Humanist Society must either violate its beliefs by endorsing chaplains from DoD "approved" belief systems or abandon its organizational mission. AC ¶ 213.

Categorically barring Humanists from serving as chaplains also substantially burdens the free exercise rights of Humanist service members. The Navy chaplaincy is a required accommodation of religion, "sustained on constitutional grounds as necessary to secure to the members of the Armed Forces . . . those rights of worship guaranteed under the Free Exercise Clause." *Sch. Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 297 (1963) (Brennan, J., concurring); *see id.* at 309 (Stewart, J., dissenting) ("[A] lonely soldier stationed at some far-away outpost could surely complain that a government which did not provide him the opportunity for pastoral guidance was affirmatively prohibiting the free exercise of his religion."). "Unless the [military] provided a chaplaincy it would deprive the soldier of his right under the Establishment Clause not to have religion inhibited and of his right under the Free Exercise Clause to practice his freely chosen religion." *Katcoff v. Marsh*, 755 F.2d 223, 234 (2d Cir. 1985). The continued absence of *any* Humanist chaplain substantially burdens Humanist service members' religious exercise by making the chaplaincy ineffective as to them. A.C. ¶¶ 205-08. Theist chaplains have proven unwilling or unable to provide counseling to Humanists, as

they provide such counseling from the perspective of belief in a divinity, and even proselytize Humanist service members. AC ¶ 205. Because chaplains provide for religious accommodation by service members even in places where they personally are not present, lack of a Humanist chaplain prevents Humanist exercise and observance throughout the Navy. AC ¶ 206-08. Both the Free Exercise Clause and the Establishment Clause require neutrality among religious denominations. *Bd of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994) ("'A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion.'" (quoting *Comm. for Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792-93 (1973))). Defendants cannot exclude Humanists from the Navy chaplaincy based on the content of their religious beliefs and affiliation once Defendants have opened the chaplaincy to adherents of other religions. AC ¶¶ 252-58.[24]

Contrary to Defendants' argument, excluding Humanists from the chaplaincy burdens their rights even if there is no "right" to be a chaplain or to have a particular chaplain. O.D. Mem. at 33-34. The use of religion-based criteria to exclude applicants from public office was invalidated "whether or not 'an abstract right to public employment exists.'" *Torcaso v. Watkins*, 367 U.S. 488, 495-96 (1961) (quoting *Wieman v. Updegraff*, 344 U.S. 183, 191-92 (1952)). Excluding ministers from public office because of their religious affiliation violated the Free Exercise Clause, even though there is no "right" to be a legislator. *McDaniel*, 435 U.S. at 626.

---

[24] Plaintiffs' allegations differ from those in *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013), where Wiccan inmates' allegations showed they were *not* categorically denied access to services from a chaplain of their faith group and in fact were treated similarly to other faith groups because they, like other inmates, were provided a volunteer Wiccan chaplain. *Id.* at 1119 & 1124. Unlike the *Hartmann* plaintiff who was suing only for the "chaplain of [his] choice" (paid vs. volunteer) Humanist service members are treated differently from service members of other faiths and have *no* access to any Humanist chaplain—professional or otherwise—or even to Humanist lay leaders, because Defendants disapprove of their Humanist viewpoint.

Denial of unemployment benefits to an employee who resigned based on religion violated the

Free Exercise Clause, even though unemployment benefits are a "privilege" and not a "right."

*Sherbert*, 374 U.S. at 404 ("[T]he liberties of religion and expression may be infringed by the

denial of or placing of conditions of upon a benefit or privilege.").[25]

              2.     Defendants' Exclusion of Humanists Violates RFRA

RFRA prohibits the "Government from substantially burdening a person's exercise of

religion'" unless the Government "demonstrates that application of the burden to the person – (1)

is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of

furthering that compelling governmental interest." 42 U.S.C. §2000bb-1(a) & (b). RFRA

"provides greater protection for religious exercise than is available under the First Amendment."

*Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct.

2751, 2767 (2014). Defendants' contention that excluding Plaintiffs "only closes off one avenue

to the performance of their religious exercise" does not make the burden insubstantial. O.D.

Mem at 28. In *Holt*, the Supreme Court rejected that argument, holding that although plaintiff

had been provided with some accommodations, his free exercise was substantially burdened by

---

[25] Defendants' claim that "free exercise claims in the employment context" must satisfy "the same analytical framework as free speech claims" is wrong. O.D. Mem. at 34. Strict scrutiny applies to intentional discrimination that burdens Free Exercise rights in the "employment context" as in any other area. *Booth*, 327 F.3d at 380 (holding strict scrutiny applicable to government employer's discrimination against employee based on religious practice (citing *Church of the Lukumi*, 508 U.S. at 531)); *Francis v. Keane*, 888 F. Supp. 568, 576-77 (S.D.N.Y. 1995) (applying heightened scrutiny to Free Exercise claims alleging religious discrimination in employment); *Adair*, 183 F. Supp. 2d at 65-66 (applying strict scrutiny to Navy chaplains' Free Exercise claims challenging denomination-based preference for promotion and accession to Navy chaplaincy). *Pickering v. Bd. of Educ of Tp. High Sch. Dist. 205*, 391 U.S. 563 (1968), like all of the cases cited by Official Defendants at pages 32-33 of their brief, dealt with allegations that employers *retaliated* against their employees in the context of an existing employment relationship. Plaintiffs are not required to plead the elements of a retaliation claim when, as here, they state a claim on other bases.

prohibiting one aspect of his religious practice. *Id.* at 862.[26] The "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the [plaintiff] is able to engage in other forms of religious exercise.'" *Id.* The Fourth Circuit has also rejected this "alternative means" argument. *Bethel World Outreach Ministries v. Montgomery Cnty*, 706 F.3d 548, 558-59 (4th Cir. 2013) (finding a zoning ordinance preventing a congregation from building a church on one of its properties substantially burdened religious exercise even if the church could conduct services on its other properties).

The burden on Plaintiffs' religious exercise is far greater than in either of Defendants' out-of-circuit cases, both decided before *Holt*. In *Mahoney v. Doe*, 642 F.3d 1112 (D.C. Cir. 2011) and *Henderson v. Kennedy*, 253 F.3d 12 (D.C. Cir. 2001), plaintiffs were prohibited from selling t-shirts on the National Mall (*Henderson*) and writing in sidewalk chalk in front of the White House (*Mahoney*).[27] In both cases, the plaintiffs' conduct was prohibited by neutral, generally applicable laws against vandalism and selling goods, rather than, as alleged here, by intentional discrimination against their particular belief system that would violate even pre-RFRA standards under the Free Exercise Clause. In neither case did the challenged governmental action condition employment on espousing different religious beliefs. In contrast, Plaintiffs cannot become a chaplain or be recognized as an AFCB-approved religious endorser unless they violate their beliefs by claiming to be affiliated with an AFCB-approved religion. *See supra*

---

[26] *Holt* involved RLUIPA instead of RFRA, but the "substantial burden" test in both statutes is the same. *See Holt*, 135 S. Ct. at 861 ("substantial burden" test of RLUIPA embodies "the same standard as set forth in RFRA'" (quoting *Gonzales v. O Centro Espirata Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006))).

[27] In Defendants' other case, the court held the regulation at issue imposed a substantial burden on the plaintiffs' religious exercise because, as here, it "impos[ed] substantial pressure on the [p]laintiffs to modify their behavior and violate their religious beliefs[.]" *Roman Catholic Archdiocese of Atlanta v. Sebelius*, No. 1:12-cv-03489-WSD, 2014 WL 1256373, at *13 (N.D. Ga. Mar. 26, 2014).

II.C.1. The burden of not selling t-shirts or drawing with sidewalk chalk in a particular location is not comparable to the burden on Humanist service members who are denied access to the chaplaincy. AC ¶¶204-08; *see Katcoff*, 755 F.2d at 234 (services of the chaplaincy necessary to avoid "depriv[ing] the soldier of his right . . . under the Free Exercise Clause to practice his freely chosen religion").[28]

Defendants argue that "serving as a chaplain *in the Navy*" and endorsing chaplains to serve in the military "is not critical to their religious exercise." O.D. Mem. at 30. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith[.]" *Hernandez*, 490 U.S. at 699 (1989). Defendants' argument "dodges the question that RFRA presents" and "instead addresses a very different question" of whether or not the practice in question is important to the religion itself, which "the federal courts have no business addressing." *Hobby Lobby*, 134 S. Ct. at 2778 (rejecting government's position); *Amos*, 483 U.S. at 335 (noting religious exercise is burdened by "governmental interference with the ability of religious organizations to define . . . their religious missions"). Even if this inquiry were "within the judicial ken," unlike the *Henderson* plaintiffs' concession that the practice at issue was not "central to the exercise of their religion," 253 F.3d at 312, endorsing Humanists to the chaplaincy is a central element of The Society's organizational mission and an important aspect of both Plaintiffs' observance of Humanism. *E.g.*, ¶¶ 5, 17, 70, 71, 73, 118. The Humanist Society has developed credentials specifically to prepare Humanists to serve as military chaplains and lay leaders, and has tried on numerous occasions—and will continue trying—to provide chaplains and lay leaders to support Humanists in the military. *Id.* ¶¶ 57, 153, 208-11. Even if serving as

---

[28] Plaintiffs in *Henderson* and *Mahoney* were able to sell t-shirts and draw in chalk on the pavement in nearby locations. *Henderson*, 253 F.3d at 17; *Mahoney*, 642 F.3d at 1121. Plaintiffs have no comparable opportunity to support Humanist service members without violating their religious beliefs.

chaplain and as an endorsing organization were not "critical," RFRA protects religious practices "whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

      D.    <u>Excluding Plaintiffs From the Chaplaincy Because of Their Humanist Affiliation and Viewpoint Violates the Speech and Association Clauses of the First Amendment</u>

          1.    <u>Denying Plaintiffs' Applications Because of Their Humanist Affiliation Unconstitutionally Conditions Public Employment on Their First Amendment Freedoms of Association</u>

The government "may not condition public employment on an employee's exercise of his or her First Amendment rights." *O'Hare Truck Svc., Inc. v. City of Northlake*, 518 U.S. 712, 717 (1996) (First Amendment prohibits city government from failing to renew contract because of contractor's political affiliation). One of the rights protected by the First Amendment is the right to choose one's form of religious belief and to affiliate with the denomination of one's choosing. *Wallace v. Jaffree*, 472 U.S. 38, 53 (1985) ("[T]he individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."). As a result, the government is prohibited from denying employment because of an individual's religious association. *Elrod*, 427 U.S. at 356 ("[I]f there is any fixed star in our constitutional constellation, it is that no official . . . can prescribe what shall be orthodox in politics, nationalism, [or] religion," including "by the denial of public employment"). In *Torcaso*, the Supreme Court invalidated a state law requiring an oath affirming belief in God as a prerequisite to public office because the law "unconstitutionally invades the [applicant's] freedom of belief and religion[.]" 367 U.S. at 496. Defendants committed the same "unconstitutional invasion" by conditioning the otherwise-available benefit of public employment as chaplain and recognition as ecclesiastical endorser on Plaintiffs renouncing their Humanist beliefs, violating their First Amendment rights to associate with "any religious faith[.]"  *Wallace*, 472 U.S. at 53.

2.    Rejecting Plaintiffs' Application Because of Their Humanist Viewpoint Violates the Speech Clause

a.    *Dr. Heap's Intended Speech as Navy Chaplain is Protected by the First Amendment*

The Speech Clause bans discrimination based on viewpoint, at a minimum, when the government by its own conduct recognizes a First Amendment interest in the speech. In *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995) speech by student groups that was funded by a public university was protected by the First Amendment because the university required disclosures that the student groups' speech was their own and not the university's. *Id.* at 835. In *Flower v. United States*, 407 U.S. 197 (1972) (per curiam), leaflet distribution on a road running through a military base was protected by the First Amendment because the military allowed the public to use the road for general purposes. *Id.* at 198.[29] And the design on license plates was protected speech because the state's communications to the license plate holders indicated they retained control over the message. *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'n of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 621 (4th Cir. 2002).

Applying the same principles, government employees' speech is protected — at a minimum — when it occurs in a forum that the government itself has provided for expression. For example, in *Bryant v. Secretary of the Army*, 862 F. Supp. 574 (D.D.C. 1994), the court found that Army service members had a protected interest in the "Letters to the Editor" section of an Army newspaper because the Army's presentation of that section as open for messages created by service members demonstrated the government itself recognized the service members' protected interest. *Id.* at 580. Similarly, in *Lister v. Def. Logistics Agency*, 482 F.Supp. 2d 1003

---

[29] "Military bases generally are nonpublic forums" in which the government may not restrict speech on the basis of viewpoint. *M.N.C. of Hinesville, Inc. v. United States. Dep't of Defense*, 791 F.2d 1466, 1473 (11th Cir. 1986).

(S.D. Ohio 2007), postings on a bulletin board provided for DoD employees were not exempt from the First Amendment because "[t]he policies regulating the bulletin board expressly permit the placement of messages on the board by all employees," and "[t]he content of [the] message[s]" posted on the board "is determined by a single employee." *Id.* at 1012.

Here, the chaplaincy programs of the Armed Forces, including the Navy, are a forum designated for religious exercise and expression.[30] *Schempp*, 374 U.S. at 296 (Brennan, J., concurring); *Katcoff*, 755 F.2d at 234. The Navy and DoD *disclaim* authority to regulate the content of chaplains' speech. Navy regulations designate chaplains' communications as confidential to encourage "unconstrained ability to discuss personal matters in complete privacy." ¶ 252 (quoting SECNAVINST 1730.9 (Feb. 7, 2008)). These regulations grant chaplains' communications the clergy penitent privilege. *Id.* Federal law gives chaplains an unqualified right to refuse to participate in "'any rite, ritual, or ceremony'" on the basis of their religious convictions. ¶ 255 (quoting P.L. No. 112-239). Navy regulations broadly forbid commanders from "compelling [chaplains] to act in a way" that a chaplain determines is "inconsistent with the tenets of [his] faith." *Id.* ¶ 256. Navy regulations also forbid commanders from assigning chaplains to duties "that violate" the chaplain's "religious principles," or that create the possibility that the chaplain "may later be called upon to reveal" confidential information. *Id.*[31] In light of these extensive protections for chaplains' religious expression, the

---

[30] The relevant "forum" for purposes of Speech Clause analysis is determined by "the access sought by the speaker." *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985).

[31] *Brown*, 444 U.S. at 348 and *Parker v. Levy*, 417 U.S. 733 (1974) did not involve viewpoint-based restrictions in a forum otherwise made available for speech. *Brown*, 444 U.S. at 357-58 (rejecting facial challenge to content- and viewpoint-neutral regulation); *Parker*, 444 U.S. at 752-60 (rejecting facial vagueness challenge to articles of Uniform Code of Military Justice). *Parker* rebuts Defendants' arguments that Navy chaplains have no constitutionally

Navy cannot discriminate based on the religious viewpoint of chaplains' speech. In *Adair*, the court denied the government's motion to dismiss Navy chaplains' claims "that the Navy's policies and practices amount to an unconstitutional abridgement of religious speech with a specific viewpoint" (there "Evangelical" speech), because "the Constitution prevents the Navy from regulating the religious speech of [one denomination] but not that of [another denomination]." 183 F. Supp. 2d at 66.

By contrast, *Garcetti v. Ceballos*, 547 U.S. 410 (2006) did not involve speech in the context of an accommodation designed to provide for the free exercise of religion, and was limited to claims of retaliation against public employees for their past communications. *Id.* at 422. Nor did *Garcetti* involve a viewpoint-based restriction of speech, or whether candidates for employment may be rejected because of the religious viewpoint of their intended speech. *See Lister*, 482 F. Supp. 2d at 1011-12 (distinguishing *Pickering v. Board of Education*, 391 U.S. 563 (1968) as not involving "an open forum for employee . . . messages"). The Fourth Circuit, along with other courts, has concluded that *Garcetti* does not apply to speech that is a special concern of the First Amendment, even when it is the speaker's job to speak on the subject. *See Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (finding *Garcetti* inapplicable where it would "place beyond the reach of First Amendment protection many forms of public speech or service" engaged in by a university professor); *see Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967) (holding *Garcetti* inapplicable to "teaching and academic writing")). Similar to public university professors' speech, Navy chaplains' speech addresses a core First Amendment concern—the free exercise of religion. AC ¶¶ 252-58. Thus, in *Brown v.*

---

protected interest in their religious speech by reaffirming that "members of the military are not excluded from the protection granted by the First Amendment." *Parker*, 417 U.S. at 758.

*Polk Cnty.*, 61 F.3d 650 (8th Cir. 1995) (en banc) (cited at O.D. Mem. 34-35), a public employer's prohibition of religious speech by its employees violated the Free Exercise Clause because religious speech "lies right at the core of the free exercise clause" and the government failed to demonstrate any "diminution whatever in the effectiveness of governmental functions" arising from that speech. *Id.* at 658. As Humanist chaplains' and service members' speech as Humanists is "at the core of the free exercise clause" and is granted extensive protections by DoD and Navy regulations, it is protected by the First Amendment.[32]

      b.    *Viewpoint-Based Exclusion of Dr. Heap and The Humanist Society Because They are Humanists Violates the Speech Clause*

"[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius*, 473 U.S. at 806. In *Widmar v. Vincent*, 454 U.S. 263 (1981), the Supreme Court held a public university could not deny the religious groups access to a forum available to other types of organizations "based on the religious content of [the] group's intended speech." *Id.* at 270.[33]

Here, the chaplaincy is open to chaplains and their endorsing organizations who meet the Navy and DoD's prescribed criteria. Like the religious student organizations in *Widmar*, Dr. Heap and The Humanist Society seek access to the chaplaincy for religious discourse and meet all qualifications necessary to be included. AC ¶¶ 102-28. By denying Plaintiffs access to this forum because of "the religious content of [their] intended speech,"*Widmar*, 454 U.S. at 270,

---

[32] Unlike *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir. 1986), where retaliation against an institutional chaplain was upheld because the chaplain's conduct interfered with the functioning of the institution, Defendants do not contest *any* of Plaintiffs' allegations that there is no rational reason to single out Humanists among other religious traditions for disfavored treatment. AC ¶¶ 162-82.

[33] The Court recognized the organizations' First Amendment interest notwithstanding that, just as the military may exclude civilians and anyone who does not qualify for the chaplaincy based on permissible criteria, the public university defendant in *Widmar* did not need to "make all of its facilities equally available to students and nonstudents alike[.]" *Id.* at 267 n. 5.

Defendants impose an unconstitutional viewpoint-based restriction. *Id.*; *see Adair*, 183 F. Supp. 2d at 66-67 ("[T]he Constitution prevents the Navy from regulating the religious speech of [one denomination's] chaplains but not that of [another]").

        3.      <u>Excluding Humanists from the Chaplaincy Violates Humanist Service Members' Speech Clause Rights</u>

Defendants attempt to downplay the impact on Humanist service members of barring Humanists categorically from the chaplaincy by asserting there is no guarantee any particular Humanist service member will, at a given time, have access to a Humanist chaplain. O.D. Mem. at  31 n.12. However, like all chaplains, a Humanist chaplain would facilitate service members' speech even without in-person meetings. *See* AC ¶ 205-08. Humanist service members are situated identically to the plaintiffs in *Bryant* and *Lister*, whose First Amendment rights were violated by viewpoint-based restrictions in a forum otherwise made available for speech by their public employers. *See Lister* 482 F.Supp. 2d at 1009; *Bryant*, 862 F. Supp. at 580. Denying certain denominations opportunities for religious assembly while allowing assembly by other groups violates the Free Exercise Clause even in institutional settings. *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (prison inmate stated free exercise claim by alleging "he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners"). By categorically barring Humanist chaplains, Defendants have effectively denied Humanist service members access to a forum they hold open to other religious adherents for no reason other than their viewpoint as Humanists. AC ¶¶ 204-08; *see Cornelius,* 473 U.S. at 807 (viewpoint-based restrictions impermissible).

     E.      <u>The Ecclesiastical Endorsement Requirements of DoDI 1304.28, Facially and As Applied to Dr. Heap, Violate the No Religious Test Clause</u>

 "[N]o religious test shall ever be required as a qualification to any office or public trust under the United States." U.S. Const. Art. VI, para 3. The No Religious Test Clause "put[s] the

people securely beyond the reach of religious test oaths." *Torcaso*, 367 U.S. at 491. The Clause is "narrow, but deep," as it "prohibits Congress or the President from formally requiring office-holders to swear (or foreswear) allegiance to some particular faith, or some particular set of religious doctrinal propositions, as a condition for attaining public office, or from requiring actions . . . that have the same operative effect." Paul Horowitz*, Religious Tests in the Mirror: The Constitutional Law and Constitutional Etiquette of Religion in Judicial Nominations*, 15 Wm. & Mary Bill Rts. J. 75, 113 (2006).

Defendants do not dispute that the Navy chaplaincy is an "office or public trust under the United States." U.S. Const. Art. VI, para. 3. As a precondition to attaining that office, Dr. Heap and all applicants to the Navy chaplaincy are required to submit a "DD Form 2088, 'Statement of Ecclesiastical Endorsement,'" which must demonstrate the applicant's affiliation with a particular religious organization. DoDI 1304.28 ¶ 6.1.1.1. The AFCB maintains a list of approved religious organizations, and candidates must receive an endorsement from an approved religious organization to become a chaplain. DoDI 1304.28  ¶ 6.1. All candidates, including Dr. Heap, must "certify" the accuracy of all statements in their application and "additional statements pertaining thereto," including their Ecclesiastical Endorsement. AC ¶ 246.

This procedure conditions employment in federal office on a declaration of affiliation with a religious organization, and, moreover, gives preferential treatment to religious organizations that have been approved by the AFCB. This procedure falls within the "narrow but deep" prohibition of the Clause, which is as absolute as it is emphatic: "*no* religious test shall *ever* be required[.]" U.S. Const. Art. VI, para. 3 (emphasis added).

Official Defendants' claim that the Clause has no effect apart from the Establishment and Free Exercise Clauses violates the rule that "no constitutional guarantee enjoys preference, so

none should suffer subordination or deletion." *Ullmann v. United States*, 350 U.S. 422, 428 (1956). Although the Test Clause analysis may be coterminous with other constitutional provisions where the same conduct is challenged simultaneously under both the Test Clause and the First Amendment,[34] that is not the case here. Plaintiffs challenge Defendants' discrimination against them as Humanists under the First Amendment, but challenge the distinct requirement of a declaration of religious affiliation as a prerequisite to holding public office under the Test Clause.

Defendants invoke "entanglement," O.D. Mem. at 36, but do nothing to explain why the notion of "entanglement," a judicial gloss on the Establishment Clause, *see Lemon v. Kurtzman*, 403 U.S. 602 (1971), permits a violation of what Article VI unambiguously prohibits. *See Saenz v. Roe*, 526 U.S. 489, 508 (1999) (authority under one constitutional provision "'may not be exercised in a way that violates other specific provisions of the Constitution'" (quoting *Williams v. Rhodes*, 393 U.S. 23, 29 (1968))). DoDI 1304.28 causes greater entanglement with religion by requiring the DoD to maintain a list of approved religious denominations and conditioning public employment on proof of affiliation. *See Texas Monthly v. Bullock*, 489 U.S. 1, 20 (1989) (plurality opinion) (purported accommodation unconstitutional where it "produce[s] greater state entanglement with religion"). Requiring a statement of affiliation with an approved religious organization is in no way necessary to the operation of the chaplaincy, which operated for a century and a half before requiring candidates to demonstrate an "ecclesiastical endorsement," let alone maintaining a list of approved endorsers. *See* Special Regulations No. 3: Appointment

_____

[34] In *Anderson v. Laird*, 316 F. Supp. 1081 (D.D.C. 1970), *rev'd on other grounds*, 466 F.2d 283 (D.C. Cir. 1972), the plaintiffs predicated their Test Clause claim on the same facts as their Establishment Clause claim.

of Chaplains in the Regular Army and the National Army of the United States, Corrected August 313, 1918 (Washington, DC: Government Printing Office, 1918) (adopting this requirement).

F.    This Court May Award Damages to Remedy the Individual Defendants' Intentional Discrimination

*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 396 (1971) "established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978). Plaintiffs "who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights" have a *Bivens* right of action. *Davis v. Passman*, 442 U.S. 228, 241-42 (1979). Dr. Heap may obtain damages under *Bivens* "for employment discrimination in violation of the Due Process Clause" as alleged at Count Four of the Amended Complaint, the remedy upheld in *Davis*. *Wilkie v. Robbins*, 551 U.S. 537, 549-50 (2007) (citing *Davis*, 551 U.S. at 228). The Supreme Court and lower courts authorize *Bivens* remedies for violations of the First Amendment provisions alleged here. *Infra* II.F.4.

1.    Damages May Be Awarded in Actions By Civilians Whose Injuries Were Not Incurred During Service

Defendants rely on cases addressing *Bivens* claims by current or former service members seeking relief for injuries suffered during their service. I.D. Mem. at 14-18. *Bivens* remedies are not foreclosed to plaintiffs who, like Dr. Heap, are civilians suing for injuries not incurred during the course of military service. In *Chappell v. Wallace*, 462 U.S. 296 (1983), and *United States v. Stanley*, 483 U.S. 669 (1987), the Supreme Court held its "analysis in *Feres [v. United* States, 340 U.S. 135 (1950)] guides [the] analysis" of whether, in claims against the military, a *Bivens* remedy is available. *Chappell*, 462 U.S. at 299; *see Stanley*, 483 U.S. at 683-84 (adopting *Feres*

54

analysis). In *Feres*, the Court held the Federal Tort Claims Act does not "extend[] its remedy to one sustaining 'incident to the service' what under other circumstances would be an actionable wrong." 340 U.S. at 138. In *Chappell*, the Court applied *Feres* and ruled that a *Bivens* claim brought by enlistees against their commanding officers was "incident to" the plaintiffs' "military service," and therefore was barred. 462 U.S. at 299. In *Stanley*, damages claims by a former service member challenging the Army's involuntary administration of LSD during his military service were barred under the *Feres* rule. *Id.* at 707.

Under the "incident to service" test adopted by *Feres/Chappell/Stanley*, damages claims may be barred if (1) they are brought by current or former service members who (2) sue for injuries that occurred during their service. But where either element is missing, the Court allows damages claims to proceed. In *Brooks v. United States*, 337 U.S. 49 (1949), the Court approved damages for injuries suffered by two service members while they were on leave. *Id.* at 919-20. Because the plaintiffs were "on furlough" and "under compulsion of no order of duty and on no military mission," "the injury . . . did not arise out of or in the course of military duty." *Feres*, 340 U.S. at 146 (discussing *Brooks*). In *United States v. Brown*, 348 U.S. 110 (1954), because "the injury for which suit was brought was not incurred while [the plaintiff] was on active duty or subject to military discipline," but the plaintiff "enjoyed a civilian status" at the time of the injury, the damages claim was not barred. *Id.* at 112. And in *Indian Towing Co. v. United States*, 350 U.S. 61 (1955), a damages claim was upheld where it did not involve a serviceman suing for "injuries [that] arise out of or are in the course of activity incident to service." *Id.* at 69.

As in *Brooks*, *Brown*, and *Indian Towing*, claims against military personnel that do not seek damages for injuries incurred during military service are viable. In *Jackson v. Tate*, 648 F.3d 729 (9th Cir. 2011), a former member of the Washington National Guard sued two National

Guard recruiters for alleged constitutional torts committed in processing the plaintiff's application for re-enlistment. *Id.* at 731-32. The Ninth Circuit allowed the *Bivens* claims because, as an applicant for re-enlistment, the plaintiff's injury did not occur in the context of an "existing military service obligation;" instead, the plaintiff challenged an injury occurring in the process of "incur[ring] an *additional* service obligation, entirely distinct from his 'current military service.'" *Id.* at 735. Similarly, the Ninth Circuit permitted a retired Army officer to bring *Bivens* claims against service members who detained and assaulted him on an Army base. *McGowan v. Scoggins*, 890 F.2d 120, 128 (9th Cir. 1989) (finding that cases involving claims by service members "cannot act as a bar to the maintenance of this action because [the plaintiff] was not a member of the armed forces of the United States" when he suffered the injury).[35]

Dr. Heap is not a current or former member of the military suing for an injury incurred during his service. Dr. Heap's injury (intentional discrimination based on his religious views) occurred in the context of processing his application to serve in the Armed Forces. Like the plaintiff in *Jackson*, Dr. Heap's injury is "entirely distinct from [any] current military service." *Jackson*, 648 F.3d at 735. Defendants can offer no principled justification why an applicant to begin serving in the military should be barred from suing under *Bivens* for torts committed in processing his application while an applicant for reenlistment is allowed to sue for the same misconduct. Like the *McGowan* plaintiff, Dr. Heap is a civilian and is not seeking relief for injuries suffered during military service.

---

[35] The court distinguished cases holding that claims by civilians were barred on the basis that they "bring[] into question command or personnel decisions by military personnel," because "[i]n each of [those] cases*,* the injured person was working under the direct supervision of military personnel" at the time the injury occurred. *Id.* at 138. In contrast, the plaintiff was, like Dr. Heap, a civilian at the time of his injury whose "work . . . is not subject to military supervision, command, or discipline." *McGowan* at 139.

Defendants cite *United States v. Stanley* and other cases, but fail to address the incident to service test applied by those cases. I.D. Mem. at 14-18. Contrary to Defendants' reading of *Middlebrooks v. Leavitt*, 525 F.3d 341 (4th Cir. 2008), in *Middlebrooks*, the plaintiff's application required approval by both the United States Public Health Service Commissioned Corps (PHSCC), a military department, and the National Institutes of Health (NIH), a civilian agency. *Id.* at 343. Under one method of processing the application, the PHSCC would have "preapproved" the application, in which case "the applicant would essentially be a *de facto* member of the PHSCC" *before* the NIH acted on the application. *Id.* at 348. In light of this process, the Fourth Circuit held that a *Bivens* remedy was preempted ***if*** the plaintiff's application was approved first by the PHSCC, because in that situation she was already a "*de facto* member of the" military at the time the alleged discrimination occurred. *Id.* at 348. *Bivens* was foreclosed because—like the *Feres/Chappell/Stanley* cases, but unlike this case and the *Jackson/McGowan/Brooks/Brown/Indian Towing* cases—the plaintiff's injury was suffered during her military service. *Id.* at 350 (holding that "members of the armed forces . . . lack a *Bivens* remedy for discrimination claims arising out of military employment"); *id.* at 350 n.4 (invoking *Feres* and other cases prohibiting suits "by uniformed members of the military for injuries that 'arise out of or are in the course of activity incident to service'" (quoting *Feres*, 340 U.S. at 146)). Unlike *Middlebrooks*, but like *Jackson*, Dr. Heap's claims arose before he became a service member and his injuries were *not* suffered because of an "existing military service obligation." *Jackson*, 648 F.3d at 735.[36]

---

[36] *Ciocca v. Rumsfeld*, 720 F.3d 505 (4th Cir. 2013) is even more obviously unlike this case and like the *Feres* line of cases, because the plaintiff's allegations "clearly allege[d] injuries that stem solely from [their] military service," and, indeed, directly challenged the military's disciplinary system to which they were subject. *Id.* at 513-14, 515.

2.    Absence of a Remedy Under Title VII Does Not Preclude *Bivens* Relief

*Bivens* provides "a right to recover damages against [an] official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980). Defendants concede that Title VII of the Civil Rights Act does not provide a remedy to Dr. Heap, yet maintain that because the uniformed military is not covered by the expansion of Title VII in the Civil Service Reform Act ("CSRA") (42 U.S.C. § 2000e-16), Title VII *implicitly* forecloses *Bivens* relief. The very same argument was rejected by *Davis*. In *Davis*, the Supreme Court reversed a court of appeals' determination that the CSRA foreclosed a *Bivens* remedy, holding "[t]here is no evidence . . . that Congress meant [§ 2000e-16] to foreclose alternative remedies available to those not covered by the statute. *Such silence is far from the clearly discernible will of Congress*" to foreclose *Bivens*. *Id.* at 247 (emphasis added) (internal quotation marks omitted). The Court rejected the dissent's position that *Bivens* was preempted because Congress had implicitly "indicated an intention to reserve to its Members the right to select, employ, promote, and discharge staff personnel without judicial interference" by omitting congressional employees from the Civil Service Reform Act. *Id.* at 254 (Stewart, J., dissenting).

Like the *Davis* plaintiff, Dr. Heap is "not in the competitive service," and accordingly, "the remedial provisions of § 717 of Title VII are not available to [him]." *Id.* at 247 n.26 (majority opinion). Defendants' argument adopts *the dissent's* contention in *Davis* that the CSRA implicitly precludes *Bivens* remedies for plaintiffs who are not covered; on the contrary, as the Court held in *Davis*, "[t]here is no evidence . . . that Congress meant [42 U.S.C. § 2000e-16] to foreclose alternative remedies available to those not covered by the statute." *Id.* at 247; *see also Navab-Safavi*, 650 F.Supp. 2d at 76 (upholding *Bivens* relief for employment discrimination claims where the CSRA was inapplicable).

58

Defendants' cases do not contradict *Davis* by holding that Title VII forecloses a *Bivens* remedy for Dr. Heap. *Zimbelman v. Savage,* 228 F.3d 367 (4th Cir. 2000) is inapplicable because the plaintiffs there were "specifically exempted from coverage" under Title VII , I.D. Mem. at 20.[37] Inferring an intent to foreclose a *Bivens* remedy because Congress has explicitly excluded other employees from Title VII coverage, but *not* Dr. Heap, would contradict *Davis'* holding that the CSRA does not *implicitly* foreclose *Bivens* remedies for employees who are not covered. The *Zimbelman* court was also concerned with the inequity of allowing NAFI employees access to *Bivens* remedies that other civil servants do not have, and by the fact that *Zimbelman* plaintiffs "had other safeguards, in the form of internal appeals, available to them." *Id.* at 371. Neither consideration applies here. Similarly, *Middlebrooks* held a *Bivens* remedy was foreclosed if the plaintiff had a viable remedy under Title VII,[38] *not* that the availability of Title VII to *other* plaintiffs forecloses *Bivens* to plaintiffs who, like Dr. Heap, cannot sue under Title VII. *See Middlebrooks*, 525 F.3d at 349-50.[39]

---

[37] 5 U.S.C. § 2105(c) explicitly *excludes* from the Civil Service Reform Act federal employees who, like the *Zimbelman* plaintiffs, work for "non-appropriated fund instrumentalit[ies]" ("NAFI") *Id.* at 369; *see* 5 U.S.C. § 2105(c).

[38] The Fourth Circuit ruled that if the application had been approved by the civilian agency rather than the military department, the Plaintiff would have a remedy under Title VII. No such remedy is available to Dr. Heap. *Middlebrooks*, 525 F.3d at 349.

[39] *Bivens* remedies for unconstitutional discrimination in employment under *Davis v. Passman* are not limited to instances where the defendant is also subject to the Speech and Debate Clause. *Contra* I.D. Mem. at 20 n. 16; *see, e.g., Wilkie*, 551 U.S. at 549-50 (*Davis* provides damages remedy "for employment discrimination in violation of the Due Process Clause"); *Navab-Safavi*, 650 F. Supp. 2d at 66 (allowing *Bivens* remedy for employment discrimination by federal Executive Branch employees); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 915 (1st Cir. 1988) (permitting public university employee to sue under *Davis*). The passage of *United States v. Stanley* that Individual Defendants quote addressed why the "special factors" analysis is not co-extensive with qualified immunity; it did not hold *Bivens* is unavailable wherever the Speech and Debate Clause does not apply. *See Stanley*, 483 U.S. at 685 (concluding "we are compelled . . . to make our own assessment of whether . . . *Bivens* actions will lie").

3.      The APA Does Not Preempt Dr. Heap's *Bivens* Claims

In *Navab-Safavi v. Broadcasting Bd. of Governors*, 650 F.Supp. 2d 40 (D.D.C. 2008), the court rejected Defendants' argument that the APA precludes *Bivens* claims for unconstitutional discrimination in employment. The court reasoned that the statutes the Supreme Court *has* held preempt *Bivens* "provide[] both substantive rights and administrative procedures for adjudicating those rights," or at the very least, constitute a "substantive statutory scheme[]" that operates "in conjunction with" the APA. *Navab-Safavi*, 650 F.Supp. 2d. at 70-72. The APA, however, does not preempt *Bivens* remedies because "[u]nlike those statutory schemes, the APA does not establish a government program that administers substantive rights," instead, it "'is merely a procedural vehicle for review of agency action.'" *Id.* at 71 (quoting *Furlong v. Shalala*, 156 F.3d 384, 394 (2d Cir. 1998)).

Defendants *concede* there is no "statutory remedial scheme" available to Dr. Heap. I.D. Mem. at 14; *see* ¶¶ 183-97 (unavailability of Title VII and Board for Correction of Naval Records). Absent such a remedial scheme, the APA does not preempt Plaintiff's claims. *See Navab-Safavi*, 650 F. Supp. 2d at 34-36; *accord Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, No. S-10-2414, 2012 WL 1131387, at *17 (E.D. Cal. Mar. 29, 2012) (rejecting argument that APA preempts *Bivens* absent substantive statutory right administrable under APA); *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 128-29 (D. Conn. 2010) (same). Defendants' reliance on *Western Radio Svcs. Co. v. U.S. Forest Svc.*, 578 F.3d 1116 (2009) and other cases is misplaced because in these cases the plaintiff was provided a substantive property right (e.g., a license in *Western Radio*, under 16 U.S.C. § 497) the administration of which could be challenged procedurally under the APA. *Id.* at 1117; Complaint, *Western Radio Svsc. Co. v. U.S.*

*Forest Svc.*, No. CV04 1346HA, 2004 WL 3336879 (D. Or. Sept. 20, 2004) (invoking 16 U.S.C. § 497).[40]

The Supreme Court has ruled the APA does not automatically foreclose *Bivens* relief. *Wilkie*, 551 U.S. at 554 (holding "it would be hard to infer" from the APA "that Congress expected the judiciary to stay its *Bivens* hand"). In *Carlson*, the Court allowed a *Bivens* remedy against officials of the Federal Bureau of Prisons ("BOP"), 446 U.S. at 19-22, notwithstanding that the APA provides for judicial review of BOP actions, *see, e.g.*, *Ramer v. Saxby*, 522 F.2d 695, 697 (D.C. Cir. 1975) (holding BOP is subject to APA). Further, in *Brown v. GSA*, 425 U.S. 820 (1976), the Court noted that Congress has concluded the APA does not apply to employment discrimination claims. *See id* at 826.[41] This Court should not infer that Congress considers the APA an adequate remedy when, as *Brown* explained, Congress does not.

4.     The "First Amendment Context" Is Not a "Special Factor"

Both the Supreme Court and lower courts have repeatedly recognized the availability of *Bivens* relief for First Amendment violations. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (holding federal officials "subject to an action for damages on the authority of *Bivens*" for

---

[40] In *Sky Ad, Inc. v. McClure*, 951 F.2d 1146 (9th Cir.1991), the APA and FTCA preempted *Bivens* because "'legislative history of both APA and FTCA showed that "Congress indicated that tort damages were an inappropriate remedy for *unconstitutional rulemaking*." *Navab-Safavi*, 650 F. Supp.2d at 76 n.19 (distinguishing *Sky Ad*, 951 F.2d at 1148)(emphasis added). No rulemaking is at issue. In Individual Defendants' remaining cases, Congress and the Secretary of Agriculture had provided the aggrieved employees with substantive rights by limiting their removal to "for cause" and providing "three levels of administrative appeal rights." *Moore v. Glickman*, 113 F.3d 988, 993-94 (9th Cir. 1997) (describing regulatory background); *see Miller v. U.S. Dept. of Agric. Farm Svcs. Agency*, 143 F.3d 1413, 1415-16 (11th Cir. 1998) (noting "the administrative remedy made available by the Secretary to terminated ASCS county workers" and adopting the reasoning of *Moore*).

[41] The Court held that Title VII of the Civil Rights Act of 1964, as amended by the Civil Service Reform Act of 1972, provides the exclusive remedy for employment discrimination against federal civil service employees. *Id.* at 824-25; *see Davis*, 442 U.S. at 247 n. 26 (explaining *Brown* ruled that Title VII remedies "are exclusive" only as to "federal employees covered by the statute").

violations of Speech Clause of First Amendment); *Am. Humanist Ass'n v. United States*, No. 3:14-cv-00565-HA, 2014 WL 5500495, at *7-8 (D. Or. Oct. 30, 2014) (denying motion to dismiss *Bivens* claim by Humanist inmate for violations of the Establishment Clause); *Chesser v. Rivas*, No. 13-cv-00456-JPG, 2013 WL 2634798, at *4 (S.D. Ill. June 12, 2013) (allowing *Bivens* claim to proceed under Establishment Clause); *Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 352-53 (E.D.N.Y. 2013) (upholding *Bivens* remedy for violations of Free Exercise Clause); *Yassin v. Corrs. Corp. of Am.*, No. 11CV0421, 2011 WL 4501403, at *5-76 (S.D. Cal. Sept. 27, 2011) (denying motion to dismiss *Bivens* claims under Free Exercise Clause); *Panagacos v. Towery*, 782 F. Supp. 2d 1183, 1191-93 (W.D. Wash. 2011) (denying motion to dismiss *Bivens* First Amendment associational rights claims), *aff'd* 501 Fed. Appx. 620 (9th Cir. Dec. 17, 2012). None of Individual Defendants' authorities suggest that the First Amendment itself is a "special factor" that justifies withholding *Bivens* relief.[42]

5.    Defendants Have Not Shown *Bivens* Is Precluded

Individual Defendants assert their arguments, considered "collectively," amount to a reason to deny *Bivens* relief, but several bad reasons do not add up to a good one. I.D. Mem. at 23. As Individual Defendants' cited cases demonstrate, the "incident to service" test provides the applicable standard for evaluating Dr. Heap's *Bivens* claims. Individual Defendants ignore this standard, and ask this Court to foreclose *Bivens* relief for injuries to a category of plaintiffs that

---

[42] *Bivens* was withheld in *Bush v. Lucas*, 462 U.S. 367 (1983) because "the history of the development of civil service remedies and the comprehensive nature of the remedies currently available" to the plaintiff in that case counseled hesitation. *Id.* at 388; *see Reichle v. Howards*, 132 S. Ct. 2088, 2093 n.4 (2012) (expressly declining to reach the question "whether Bivens extends to First Amendment retaliatory arrest claims"). In *Goldman v. Weinberger*, the Court held First Amendment claims by active duty service members are justiciable (albeit under a more deferential standard of review), contrary to Individual Defendants' attempt to deny review of Dr. Heap's *Bivens* claims here. *See id.* at 507 (service members protected by the "guarantees of the First Amendment").

the Supreme Court and other courts allow. *See United States v. Brown*, 348 U.S. 110 (1954) (damages available to plaintiff who "enjoyed a civilian status" when injured); *Jackson*, 648 F.3d at 735 (*Bivens* claims challenging constitutional violations in the course of processing an application to join the armed services are viable because they involve an "*additional* service obligation, entirely distinct from . . . current military service"); *McGowan*, 890 F.2d at 120 (*Bivens* claims against the military generally may proceed where the plaintiff "was not a member of the armed forces of the United States" at the time he suffered the injury that he sued for). Individual Defendants' claim that Dr. Heap's *Bivens* remedies are implicitly foreclosed by Title VII is directly contrary to *Davis*, which held that Title VII "leaves undisturbed" *Bivens* remedies by non-civil service plaintiffs, *Davis*, 442 U.S. at 247, and is unsupported by *Zimbelman*, which involved a plaintiff who was *explicitly* excluded from Title VII's coverage. 228 F.3d at 367; *see Navab-Safavi*, 650 F. Supp. 2d at 65-73  & 67 n.14 (allowing *Bivens* claims where the Civil Service Reform Act "has no application"). And Individual Defendants' argument based on the APA is refuted by cases refusing to find preemption, particularly where no statute provides a substantive right administrable under the APA. *See Wilkie*, 551 U.S. at 554 (rejecting argument that the APA categorically preempts *Bivens* remedies); *Carlson*, 446 U.S. at 19-22; *Hardesty*, 2012 WL 1131387 at *17; *Diaz-Bernal*, 758 F. Supp. 2d at 128-29; *Navab-Safavi*, 650 F.Supp. 2d at 70-73.

Defendants rejected Plaintiffs' application because of religious favoritism that compromises the chaplaincy's constitutionality. *Katcoff*, 755 F.2d at 231 (upholding constitutionality of Army chaplaincy against facial challenge because it "observes the basic prohibition" that "'[t]he government must be neutral when it comes to competition between sects.'" (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). Conduct that would undermine

the chaplaincy itself presents an urgent need for a *Bivens* remedy. *See Carlson*, 446 U.S. at 21 (upholding *Bivens* to achieve deterrent effect). Conversely, refusing to recognize this remedy in the face of blatant denominational discrimination would undermine the rule that "all individuals, whatever their position in government, are subject to federal law" and "'are bound to obey it.'" *Butz*, 438 U.S. at 506 (quoting *United States v. Lee*, 106 U.S. 196, 220 (1882))).[43]

G.    The Individual Capacity Defendants Are Not Entitled To Qualified Immunity

Qualified immunity is available only "insofar as [Defendants'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This "clearly established" requirement does not mandate that "the very action in question has previously been held unlawful" because "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002); *see also Meyers v. Baltimore Cnty.*, 713 F.3d 723, 734 (4th Cir. 2013). "The decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose" may clearly establish the law. *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 771 F.3d 201, 205 (4th Cir. 2014) (internal quotation marks and citation omitted). Even in the absence of Supreme Court or circuit precedent, a "'consensus of cases of persuasive authority such that a reasonable offic[ial] could not have believed that his actions were lawful'" forecloses qualified immunity. *Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

---

[43] Nonetheless, if there were any doubt, the Court may defer ruling on the issue until making a determination as to the availability of other remedies. *E.g.*, *Am. Humanist Ass'n*, 2014 WL 55000495 at *7 (denying motion to dismiss *Bivens* claims while deferring determination on availability of damages, citing *Corr. Svcs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001)).

1.    <u>Humanism Is a Religion Under Clearly Established Law</u>

    a.    *The Supreme Court Has Expressly Recognized Humanism as a Religion*

Individual Defendants' qualified immunity defense relies entirely on the premise that Humanism is not a religion under clearly established law. But the Supreme Court has long recognized Humanism as religion. In *Torcaso v. Watkins*, 367 U.S. 488, 494–95 (1961), a Maryland law requiring notaries to declare a belief in God violated the Establishment Clause because it would "aid all religions as against non-believers" and also "aid those religions *based on a belief in the existence of God* as against those religions *founded on different beliefs*." *Id.* (emphasis added); *see also Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 695 (1970) (Harlan, J., concurring) (characterizing this as *Torcaso*'s "holding"). This holding recognized religions that "do not teach what would generally be considered a belief in the existence of God." *Id.* at 495 n.11. The Court pointed to "Secular Humanism" as an example of these non-theistic religions. *Id.*

The Court reaffirmed that belief in divinity is not a required element of "religion" in *United States v. Seeger*, 380 U.S. 163, 165-66 (1965), and *Welsh v. United States*, 398 U.S. 333 (1970), where the Court interpreted the Universal Military Training and Service Act ("UMTSA") to broadly "embrace all religions"—notwithstanding the UMTSA's definition of religion as "in a relation to a Supreme Being[.]" Any "sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God" of traditional religions is religion. *Seeger*, 380 U.S. at 176; *see also Welsh*, 398 U.S. at 339. Although this interpretation involved a statutory provision, the Court construed the statute to avoid the formidable constitutional difficulties if nontheistic beliefs were excluded. *See Welsh*, 398 U.S. at 356–58 (Harlan, J. concurring) (explaining, in providing the fifth vote necessary to the result, that he would strike

65

down the UMTSA's conscientious objector provision "as exclud[ing] from its 'scope' individuals motivated by teachings of nontheistic religions" and referring to *Torcaso* as providing "notice of the fact that recognized 'religions' exist that 'do not teach what would generally be considered a belief in the existence of God"); *Seeger*, 380 U.S. at 188–93 (Douglas, J. concurring) (explaining that the words "Supreme Being" should be construed "to save [the UMTSA's conscientious objector provisions] from demise on constitutional grounds")).

In light of *Torcaso*, *Seeger*, and *Welsh*, lower courts have reached a consensus recognizing Humanism as a religion under the First Amendment's religion clauses.[44] According to this "consensus of cases," a "reasonable offic[ial] could not have believed that" discrimination against Humanist belief is lawful. *Rogers*, 249 F.3d at 287.

---

[44] *See, e.g.*, *Ctr. for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 873–75 (7th Cir. 2014) (holding that a Humanism was protected by the Establishment Clause); *Newdow v. U.S. Cong.*, 313 F.3d 500, 504 n.2 (9th Cir. 2002) (noting that "recognized religions exist that do not teach a belief in God, e.g., secular humanism."); *United States v. Ward*, 989 F.2d 1015, 1017–18 (9th Cir. 1993) (recognizing that a religion need not be theistic); *Chess v. Widmar*, 635 F.2d 1310, 1318 n.10 (8th Cir. 1980) (noting that "Secular Humanism" is a "religion"); *Am. Humanist Ass'n v. United States*, No. 3:14-cv-00565, 2014 WL 5500495, at *5 (D. Or. Oct. 30, 2014) (holding that "Humanism is a religion for Establishment Clause purposes"); *Howard v. United States*, 864 F. Supp. 1019, 1022 (D. Co. 1994) (holding that an inmate with "humanistic ethical system" was entitled to practice his "religious" beliefs); *Greater Houston Chapter of the ACLU v. Eckels*, 589 F. Supp. 222, 239 n.20 (S.D. Tex. 1984) (noting that the Supreme Court recognized "Humanism as a religion"); *Crockett v. Sorenson*, 568 F. Supp. 1422, 1425 (W.D. Va. 1983) (noting that the Supreme Court has recognized that "secular humanism is a religion"); *see also Remmers v. Brewer*, 494 F.2d 1277, 1278 (8th Cir. 1974) (inmates of nontheistic church were entitled to "freely exercise their religion in the same degree as other inmates"); *Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) ("A religion need not be based on a belief in the existence of a supreme being."); *ACLU v. City of St. Charles*, 794 F.2d 265, 270 (7th Cir. 1986) (noting that the Supreme Court's Establishment Clause jurisprudence treats non-theists as a "sect of nonbelievers"); *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977) (if a legal test of religion includes the criterion "that one possess a belief in a Supreme being and such a criterion excludes, for example, agnosticism or conscientious atheism, from the Free Exercise and Establishment shields, that requirement is too narrow" (internal quotation marks, citation, and ellipses omitted)).

The Fourth Circuit is no exception. In *Dettmer v. Landon*, 799 F.2d 929, 931 (4th Cir. 1986), the court explained: "[i]n determining whether the Church of Wicca is a religion protected *by the free exercise clause of the first amendment*, the district court properly considered whether the Church occupies a place in the lives of its members 'parallel to that filled by the orthodox belief in God' in religions more widely accepted in the United States." (quoting *Seeger*, 380 U.S. at 166 (emphasis added)). The Fourth Circuit concluded Wicca is religion under the First Amendment based on: (1) adherence to doctrines that "concern ultimate questions of human life," *id*.; (2) the use of ceremonies, *id*.; (3) the employment of "spiritual leaders," *id*. at 932; and (4) the existence of a "long history," *id*. Like Wicca, Humanism is a religion under *Dettmer*. Humanism is a comprehensive worldview concerned with the same ultimate questions of life as traditional religions. ¶¶ 130-38. Humanists perform ceremonies—such as weddings and funerals—and observe regular holidays, including Human Light and World Humanist Day. ¶¶ 142-45. The Humanist Society trains and certifies Celebrants to perform functions equivalent to ministers, priests, and rabbis in other religions. ¶¶ 146-55. The Society has a long history dating back to the Humanist Society of Friends, established in 1939.[45] Humanist Manifesto I, published in 1933, sought to create "a vital, fearless, and frank *religion* capable of furnishing adequate social goals and personal satisfactions."[46] And the Humanist Society is recognized by governments and the public as a religious organization. AC ¶ 154. Even without the clear guidance provided by the Supreme Court, these attributes of Humanism put Defendants on notice that discrimination against Humanist belief is unlawful.

---

[45] *See* Humanst-society.org, *About the Humanist Society*, *http:/// http://humanist-society.org/about/*.

[46] Humanist Manifesto I (1933) (emphasis added).

b.    *The Individual Defendants Fail to Show that Humanism's Status as a Religion Is Not Clearly Established*

The Individual Defendants have the burden of proof and persuasion to establish qualified immunity. *Henry v. Purnell*, 501 F.3d 374, 378 (4th Cir. 2007). By relying largely on a single case, *Kalka v. Hawk*, 215 F.3d 90 (D.C. Cir. 2000) that is distinguishable and inconsistent with binding precedent, they fail to meet that burden. First, because *Torcaso* cited Secular Humanism to illustrate the broad proposition that non-theistic beliefs may be religions, 367 U.S. at 495, the *Kalka* court's characterization that *Torcaso* described Secular Humanism as a religion only to show that a "particular non-theistic group calling itself the 'Fellowship of Humanity' qualified as a religious organization under California law" is clearly wrong.[47] *Kalka*, 215 F.3d at 99. Nor does *Torcaso*'s citation to *Fellowship of Humanity v. Alameda Cnty.*, 315 P.2d 394 (Cal. Dist. Ct. App. 1957) support *Kalka*'s reading, because *Fellowship of Humanity* expressly based its interpretation of state law on its understanding that certain non-theistic beliefs like Humanism are religions for *First Amendment* purposes. *See id.* at 692 (ruling that "[u]nder the [C]onstitution[]," the "only valid test" for determining if a group is a religion is "whether or not the belief occupies the same place in the lives of its holders that the orthodox beliefs occupy in the lives of believing majorities.").

Second, *Kalka*'s view that it was "doubtful" that *Seeger* meant to define religion under the First Amendment, is contrary to the Fourth Circuit's holding in *Dettmer* that *Seeger* governs the definition of religion under the Free Exercise Clause. *Dettmer*, 799 F.2d at 931. *Kalka*'s

---

[47] Defendants fail to point to any relevant difference between the Humanist Society and Fellowship of Humanity. Both groups are affiliates of the American Humanist Association; the president of the Fellowship of Humanity is a signatory to the Humanist Manifesto II—one of the foundational documents of the Humanist movement, and to which the Humanist Society subscribes; and the description of the Fellowship of Humanity in *Fellowship of Humanity* is consistent with the Humanity Society's practices as described in the complaint in this case and the present brief. *Compare Fellowship of Humanity*, 315 P.2d at 397–99, *with* AC ¶¶ 129-161.

complaint that *Torcaso* "offered no test for determining what system of beliefs qualified as a 'religion under the First Amendment," 215 F.3d at 99, is inapplicable to courts in the Fourth Circuit, which may rely on *Dettmer*. *See* 799 F.2d at 931–32.

Third, *Kalka*'s holding—that "[t]here was neither precedent declaring humanism in general to be a religion nor any prior ruling on the religious nature of Kalka's beliefs"—has been superseded by *Hope v. Pelzer*, which clarified that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. at 741.

Finally, the authorities cited in *Kalka* fail to support its conclusions. The First Amendment status of an *organized* group committed to the Humanist religion was not at issue in *Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528 (9th Cir. 1985), and *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994), which address whether teaching evolution or secular literature in public schools, branded "humanism" by the plaintiffs in those cases, violates the Establishment Clause. Indeed, Judge Canby's concurrence in *Grove* emphasized that while "*Torcaso* does not stand for the proposition that 'humanism' is a religion . . . an *organized* group of 'Secular Humanists' may be." 753 F.2d at 1537 (Canby, J., concurring) (citation omitted and emphasis added). The teaching of an autobiographic novel in *Grove* was "far removed from a comprehensive belief system laying claim to ultimate truth and support by a formal group, *which the [Supreme] Court was prepared to concede in* Torcaso *would constitute a religion*." *Id*. (internal quotation marks and citations omitted) (emphasis added).[48] The Individual Capacity

---

[48] Like *Peloza* and *Grove*, *McGinley v. Houston*, 361 F.3d 1328 (11th Cir. 2004) (holding that the removal of the Ten Commandments from the rotunda of an Alabama court building did not establish a religion of "nontheistic beliefs"), was brought by a plaintiff who used the term "secular humanism" as a generic descriptor of nontheism—rather than in reference to a comprehensive worldview of an established Humanist organization.

Defendants' lone citation to *Kalka* fails to demonstrate there is no clearly established law that Humanism is a religion.

        c.     *Many of Plaintiffs' Claims—Including Under the Establishment Clause—Do Not Depend on Whether Humanism Is a Religion*

     That the Establishment Clause "mandates government neutrality" not only "between religion and religion," but also "between religion and *nonreligion*," is clearly established law. *See McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (emphasis added).[49]  According to this "neutrality principle," the Establishment Clause prohibits discrimination against Humanists *regardless* of whether Humanism is deemed a religion for First Amendment purposes. Thus, "when a secular moral system is equivalent to religion except for non-belief in God—is, indeed, equivalent to religions such as Shinto and Jainism that do not worship gods— . . . the state must treat them the same way it treats religion." *Ctr for Inquiry, Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869 (7th Cir. 2014) (invalidating marriage-solemnization statute that permitted clergy of religious groups but not equivalent officials of secular groups to officiate marriages). Because Humanism is, at a minimum, a secular moral system equivalent to religion, Dr. Heap's *Bivens* claims predicated on the Establishment Clause are viable regardless of whether Humanism is religion under the Establishment Clause. Similarly, Humanism is a "viewpoint" under the Speech Clause, regardless of whether it is a religious one. *See Cornelius*, 473 U.S. at 807 (viewpoint-based restrictions impermissible).

---

    [49] *See also Lee v. Weisman*, 505 U.S. 577, 610–11 (1992) (Souter, J., concurring) ("[W]e have consistently held the [Establishment] Clause applicable no less to governmental acts favoring religion generally than to acts favoring one religion over others . . . . Such is the settled law."); *Epperson v. State of Ark.*, 393 U.S. 97, 103–04 (1968) ("The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."); *Torcaso*, 367 U.S. at 495.

2.    RFRA Creates a Cause of Action Against the Individual Capacity
Defendants

Contrary to Individual Defendants' claim that RFRA does not allow Dr. Heap to sue for

damages against them in their individual capacities, RFRA authorizes a plaintiff to "obtain

appropriate relief against a government," 42 U.S.C. § 2000bb-1(c), and defines "government"

broadly to encompass non-official capacity actors, including an "official (or other person acting

under color of law) of the United States, or of a covered entity." 42 U.S.C. § 2000bb-2(1).

RFRA's inclusion of "person acting under color of law" in its definition of "government" is

nearly identical to language in § 1983 that subjects individual capacity defendants to liability.

*See* 42 U.S.C. § 1983 ("person . . . under color of any statute"); *see also Kentucky v. Graham*,

473 U.S. 159, 166 (1985) ("[T]o establish personal liability in a § 1983 action, it is enough to

show that the official, acting under color of state law, caused the deprivation of a federal right."). 

Congress's decision to borrow this language was not accidental: "When administrative and

judicial interpretations have settled the meaning of an existing statutory provision, repetition of

the same language in a new statute indicates, as a general matter, Congress's intent to

incorporate such interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 626 (1998).

Accordingly, the "judicial interpretation of the phrase 'acting under color of law,' as used in 42

U.S.C. § 1983, applies equally in [a] RFRA action." *Sutton v. Providence St. Joseph Med. Ctr.*,

192 F.3d 826, 834–35 (9th Cir. 1999).[50]

Individual Defendants' construction would conflate the separate terms "official" and

"person acting under color of law," in violation of the "basic premise of statutory construction

---

[50] *See also Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (holding "that Congress intended for RFRA 'color of law' analysis to overlap with Section 1983 analysis."); *Roman Catholic Diocese of Rockville Centre, N.Y. v. Inc. Vill. of Old Westbury*, No. 09 CV 5195, 2011 WL 666252, at *10 (E.D.N.Y. Feb. 14, 2011).

. . . that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage."  *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991).[51]  Nor is it a valid reply that RFRA merely intended to extend *official* capacity claims to private parties "acting under color of law."  Private actors—even when "acting under color of law"—"do not have an 'official capacity'" under which they may be sued.[52]  *Jones v. Barry*, 33 Fed. App'x 967, 971 n.5 (10th Cir. Apr. 25, 2002). The government's construction would also run contrary to the distinction between "officials" and "persons."  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that "neither a State nor its *officials* acting in their official capacities are '*persons*' under § 1983." (emphasis added)).

Construing RFRA to exclude money damages against government officials acting in their individual capacities also conflicts with Congress's goal of restoring pre-*Smith* free exercise rights. *Jama v. U.S.I.N.S.*, 343 F. Supp. 2d 338, 374–75 (D.N.J. 2004). Money damages are available against officials who violate the Free Exercise Clause under § 1983. *Ward v. Polite*, 667 F.3d 727, 742 (6th Cir. 2012). It is unlikely that Congress would pass legislation with the express purpose of expanding a right only to impliedly restrict the remedies available when that right is breached. *See* S. Rep. No. 103–111, at 1902 (RFRA "does not expand, contract or alter the ability of a claimant to obtain relief in a manner consistent with the Supreme Court's free exercise jurisprudence under the compelling governmental interest test prior to *Smith*.").

---

[51] Furthermore, under the Dictionary Act, which is used "[i]n determining the meaning of any Act of Congress," the word "person" is defined to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, *as well as individuals*." 1 U.S.C. § 1 (emphasis added).

[52] Under the Individual Capacity Defendants' interpretation of RFRA, private actors "acting under color of law," such as private prisons, would be completely immune from liability for violating the religious rights of their prisoners because they would not be amenable to suit under either their official or personal capacities. There is no evidence that Congress intended to insulate from all liability private actors acting under color of law.

Accordingly, numerous courts have held that damages are available against officials sued in their personal capacities under RFRA.[53] By contrast, Individual Defendants fail to cite a single decision adopting their proposed construction of RFRA. *See Padilla*, 633 F. Supp. 2d at 1039 (holding that "there is no authority to indicate that the language in RFRA . . . which clearly tracks the same language in 42 U.S.C. § 1983, should not be interpreted to establish individual liability for violations" and denying immunity).

Citing Black's Law Dictionary, the Individual Defendants assert that "government," as used in RFRA, can refer only to a political entity and not an individual person employed by the government. I.D. Mem. at 38. But "[o]nly in the absence of a statutory definition does [a] court normally look to the ordinary meaning or dictionary definitions of a term." *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011); *see also Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, [courts] must follow that definition, even if it varies from that term's ordinary meaning.").[54] The Individual Defendants also reference the Supreme Court's construction of the phrase "under color of legal authority" in the Mandamus

---

[53] *E.g., Jama*, 343 F. Supp. 2d 338; *Mack v. O'Leary*, 80 F.3d 1175, 1177 (7th Cir. 1996), *judgment vacated on other grounds*, 522 U.S. 801 (1997) (permitting an individual capacity suit for damages under RFRA because "the Act defines 'government' to include government employees acting under color of state law."); *Elmaghrahy v. Ashcroft*, No. 04 cv 1809 JG SMG, 2005 WL 2375202, at *30 n.27 (E.D.N.Y. Sept. 27, 2005) (holding that damages claims under RFRA "reach . . . officials acting in their individual capacities."), *dismissed on other grounds sub nom. Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) *Lepp v. Gonzales*, No. C-05-0566 VRW, 2005 WL 1867723, at *8 (N.D. Cal. Aug. 2, 2005), *aff'd sub nom. Harris v. Mukasey*, 265 F. App'x 461 (9th Cir. 2008); *Padilla v. Yoo*, 633 F. Supp. 2d 1005, 1039 (N.D. Cal. 2009), *as amended* (June 18, 2009), *rev'd on other grounds*, 678 F.3d 748 (9th Cir. 2012); *Brownson v. Bogenschutz*, 966 F. Supp. 795, 797 (E.D. Wis. 1997) ("Because the statutory definition of 'government' under RFRA includes any person 'acting under color of law,' 42 U.S.C. § 2000bb–2(1), the required degree of state action under RFRA is analyzed under the same standard as § 1983.").

[54] Other dictionaries define government more broadly to include the individuals who work for political entities. *Cambridge Academic Content Dictionary* 412 (2009) (defining "government" as "the offices, departments, and *groups of people* that control a country, state, city, or other political unit" (emphasis added)).

and Venue Act, 28 U.S.C. § 1391(e)(1), as excluding individual capacity damages actions. *See Stafford v. Briggs*, 444 U.S. 527 (1980). But the Mandamus and Venue Act was "explicitly limited to 'action[s] in the nature of mandamus,'" to the exclusion of damages actions. *Id*. at 535 (quoting 28 U.S.C. § 1361). RFRA does not include any similar limitation.[55]

## III.  DEFENDANTS' PREMATURE SUMMARY JUDGMENT MOTION MUST BE DENIED

### A.    The Motion for Summary Judgment Must be Denied as Premature

The Official Capacity Defendants assert that Plaintiffs' constitutional claims can be resolved as a matter of *summary judgment*, even though Defendants have not yet answered the Complaint, no Rule 16 conference has been scheduled, no Rule 26(f) conference has taken place, the parties have not made Rule 26(a) disclosures, Defendants have thus far opposed discovery, and Plaintiffs have had no opportunity to conduct discovery as to *any* issues. Pursuant to Fed. R. Civ. P. 56(d),"'summary judgment *must* be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986) (emphasis added)). Motions under Fed. R. Civ. P. 56(d) to deny summary judgment are "'broadly favored and liberally should be granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc) (reversing grant of summary judgment before adequate discovery) (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir.

---

[55] Defendants have articulated no threats to national security like those relied on in *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), which involved enemy combatants seeking to challenge the conditions of their detention.

2010)); *McCray v. Maryland Dept. of Transp, Maryland Transit Admin.*, 741 F.3d 480, 484 (4th

Cir. 2014) (reversing summary judgment before adequate discovery in discrimination case).

The Fourth Circuit's decisions in *Harrods* and *McCray* govern here. In *Harrods*, the

district court granted summary judgment in favor of Defendants "[a]s discovery was just

beginning" and the defendant moved "just over six weeks after the amended complaint was

filed." *Harrods*, 302 F.3d at 220, 245. The Court of Appeals reversed, holding that summary

judgment "was premature" because "relevant facts about [the defendant's] intent were in the

exclusive possession of [the defendant]," and "the issue of [the defendant's]intent . . . was a

complex one" requiring factual development. *Id.* at 247.

As in *Harrods*, Defendants' motion for summary judgment was filed soon after the filing

of the Amended Complaint—just over eight weeks. *See id.* at 220 (denying motion filed "just

over six weeks" after amended complaint). This case involves *both* factors identified by *Harrods*

as making summary judgment premature: intent is the crucial question as to Plaintiff's

constitutional claims, and the "relevant facts about" all Defendants' intent are exclusively in

Defendants' possession in the form of documents and testimony revealing their reasons for

denying Plaintiffs' application. The issue of intent is certainly "complex" enough to warrant

discovery as it requires proof that the named defendants "selected or reaffirmed a particular

course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an

identifiable group." *Hayden v. Paterson*, 594 F.3d 150, 163 (2d Cir. 2010) (quoting *Pers. Adm'r

of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)).

Similarly, in *McCray*, the Fourth Circuit vacated and remanded a district court order to

the extent it granted summary judgment against an employment discrimination plaintiff because

the plaintiff "ha[d] no adequate access to" evidence of "how defendants selected [her] position . .

. for termination" which was "the crux of [plaintiff's] discrimination claims." *Id.* at 484. And whereas the *Harrods* plaintiff had obtained access to *some* discovery, 302 F.3d. at 220, Plaintiffs have had none. *See Rinaldi v. CCX, Inc.*, No. 3:11-cv-457-GCM-DCK, 2013 WL 1121265, at *4 (W.D.N.C. Feb. 20, 2013) (denying motion for summary judgment as premature after discovery had begun and prior to its close, where "Plaintiff has not yet deposed a single witness"); *Flattery v. Sw. Va. Fertility Center, LLC*, No. 7:08cv00256, 2009 WL 49995, at *2 (W.D. Va. Jan. 7, 2009) (denying motion for summary judgment as "premature" in Title VII case because plaintiff "had not had the opportunity to conduct any discovery"). Further, the *Harrods* court reversed the district court's premature summary judgment even though the plaintiffs had failed to file a Rule 56(d) affidavit. 302 F.3d at 243-47. Plaintiffs have done that here.[56] *See Kennebeck v. Napolitano*, No. 1:13cv88, 2013 WL 3368960, at *6 (E.D. Va. July 3, 2013) (denying summary judgment as premature where Rule 56(d) affidavit (1) stated need for discovery and (2) identified evidence required to oppose defendants' motion).

Plaintiffs have not been dilatory while filing the Amended Complaint and briefing their opposition to Defendants' voluminous responses. Plaintiffs' Motion to Compel the Official Capacity Defendants to participate in discovery has been deferred. Order (ECF No. 51). Fed. R. Civ P. 26(d) prohibits Plaintiffs from seeking discovery until a Rule 26(f) conference. *See Raeman v. Cnty of Ontario*, No. 12-cv-6009 CJS, 2013 WL 956758, at *7 (W.D. N. Y. Mar. 12, 2013) (denying summary judgment where "[n]o Rule 16 conference has been scheduled, and the docket contains no indication that the parties have exchanged initial discovery[.]"). Even where summary judgment is sought *after* formal discovery has initiated, it must be denied where discovery is incomplete as to disputed material issues. *See King v. S&S Foods,* LLC, No. 6:14-

---

[56] *See* Rule 56(D) Declaration of Matthew A. Smith in Support of Plaintiffs' Opposition.

CV-00014, 2014 WL 6609115, AT *2 (W.D. Va. Nov. 20, 2014) (summary judgment denied as premature where defendants moved *after* pretrial order setting discovery deadlines); *Whalen v. Rutherford*, No. 3:12cv0032, 2012 WL 6473151, at *4 (W.D. Va. Dec. 13, 2012) (same). Where, as here, Defendants move for summary judgment with their response to the Amended Complaint, "[i]t cannot be said that plaintiff has been dilatory in taking discovery." *Anderson v. Town of South Boston*, No. 4:10CV004, 2010 WL 2836125, at *2 (W.D. Va. July 10, 2010) (denying motion for summary judgment as premature where defendants filed their motion with their response to the complaint); *see Harrods*, 302 F.3d at 245 (summary judgment denied where filed six weeks after amended complaint). Defendants' summary judgment motion therefore must be denied.

B.    Genuine, Triable Issues of Material Fact Preclude Summary Judgment

Summary judgment is appropriate only if the moving party meets its burden of demonstrating that there are no genuine disputes of material fact. Fed. R. Civ. P 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[A]ll reasonable inferences" must be drawn in favor of Plaintiffs as the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Summary judgment is rarely appropriate in employment discrimination cases since "the elusive factual question of intentional discrimination is inevitably tough and rarely clear cut." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 254 n.8 (1981)). Evidence offered by the moving party that requires credibility determinations or that comes from interested witnesses should be discounted. *See Reeves*, 530 U.S. at 150-51("[T]he Court should give credence to" evidence in witness affidavits "to the extent that the evidence comes from *disinterested witnesses*."). Here, Defendants' evidence consists of little more than the declarations of Parisi, a defendant by virtue of his membership on the May 13 CARE Board, ¶ 25, and Pitts, who as a

non-voting member of the AFCB is hardly a "distinterested witness." Accordingly, the Court should give these affidavits little to no weight. *Reeves,* 530 U.S. at 150-51.

Even crediting these affidavits, Defendants fail to meet their initial burden of submitting evidence from *any* defendant with ultimate authority to accept or reject Plaintiffs' application. Defendants submit *no* evidence regarding Defendant Tidd's motivations for recommending against Dr. Heap's accession. That Tidd approved the CARE Board's recommendation says nothing about why he did so. Similarly, Defendants submit no evidence regarding Defendant Andrews' decision to accept the CARE Advisory Group's recommendation as to Dr. Heap. This failure alone precludes summary judgment. *See Ray Commcns, Inc. v. Clear Channel Commcns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) ("'[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied[.]'" (internal quotation marks omitted)).

Defendants assert it cannot be disputed that there is no unwritten policy of excluding Humanists from the Chaplaincy, however, not only is there substantial evidence of exactly that, SOF ¶ 1, but Defendants ignore that Plaintiffs' constitutional claims do not require the existence of a policy. Plaintiffs have alleged that Defendants rejected Plaintiffs because Plaintiffs are Humanists, either pursuant to a policy, or not. *Supra* II.A.2-4. Defendants' summary judgment argument and evidence do nothing to address whether, notwithstanding the alleged non-existence of a policy, Defendants rejected Plaintiffs' applications *in this particular instance* based on their Humanist beliefs.[57] Because Defendants again fail to meet their initial burden of providing

---

[57] Despite 80 pages of briefing and two separate declarations, Defendants *never* identify a nondiscriminatory reason for rejecting Plaintiffs' application. The Parisi Declaration states that each member of the CARE Board gave each candidate a score for each criterion listed in the Precept, and that it recommended the three candidates with the highest aggregate scores. Parisi Decl. ¶ 11. The evidence, on its face, fails to provide a nondiscriminatory reason for rejecting

evidence regarding the allegedly nondiscriminatory reasons for rejecting Plaintiffs' applications, summary judgment must be denied. *See Ray Commcns*, 673 F.3d at 299.

Even *without* discovery, Plaintiffs have amassed considerable evidence demonstrating that there *is* a policy of discriminating against Humanists in chaplaincy and lay leader accession. SOF ¶ 1. Defendant Kibben states that "the American Humanist Association and The Humanist Society 'never really demonstrate the benefits of a Humanist Chaplain compared to a Christian Chaplain.'" Kamp Decl. ¶ 5. Navy officials rejected a Humanist service member's request to serve as a lay leader on the basis that "Humanism is not considered a faith group by the Navy Chaplaincy," and that "[H]umanism does not meet the minimum standards required by" Navy regulations. Wright Decl. ¶ 11; Wright Decl. Exs. B & C. The DoD refuses to include Humanism in its database of service members' religious affiliations. Torpy Decl. ¶ 26. The Navy and other branches of the Armed Forces have refused the requests of *twenty-two* Humanist or atheist candidates who have volunteered to serve as lay leaders. Torpy Decl. ¶ 25. The former Chairman of the Armed Forces Chaplains Board claims "there is no need for [Humanists] to meet in chapels and be sponsored by chaplains. They are not a religious group." Torpy Decl. Ex. A.

The evidence also shows Defendants applied this Navy and DoD policy in denying Plaintiffs' application. In an interview about the application, a Navy spokesperson admitted that The Humanist Society "does not represent a religious organization by any accepted definition." Smith Decl. Ex. C at 4. Tidd, Kibben, and Horn investigated Dr. Heap's beliefs and lack of affiliation with a Christian denomination, Smith Decl. Exs. J & K, and Tidd's Executive Assistant, Parisi (who also chaired the May 13 CARE Board), led a "Humanist Applicant COA

---

Plaintiffs' application. All it describes are the mechanics of the CARE Board proceedings. It is silent on the CARE Board members *reasons* for assigning the "scores" they gave. Indeed, some or all of the CARE Board members could have given Dr. Heap lower scores, consistent with the Parisi Declaration, for the impermissible reason that he is a Humanist.

[Course of Action] meeting[]" in connection with Plaintiffs' application, Smith Decl. Ex. L. Tidd's subordinate was free to demonstrate blatant prejudice against Dr. Heap by referring to him as a "humanist so called applicant to our Corps" in a written email to Tidd, without correction by Tidd. Smith Decl. Ex. K. As soon as Dr. Heap's Navy Chaplain Corps recruiter learned Dr. Heap would be endorsed by The Humanist Society, he told Dr. Heap that his endorsement could pose a problem for his application, and terminated all previous discussion of expediting Dr. Heap's application, which he had repeatedly assured Dr. Heap he would do. Heap Decl. ¶¶ 5, 9, 11-14. Defendants admit the May 2013 CARE Board was authorized to recommend four candidates for direct accession to an active duty component, but recommended only three, Parisi Decl. Exs. A at 2 & B, and Defendants accepted a non-Humanist candidate with similar qualifications to Dr. Heap's less than three months later. Smith Decl. Exs. A & B. Defendants' only evidence that such a policy does not exist consists of conclusory declarations that fail to offer a qualification-based rationale for rejecting Dr. Heap. But even if Defendants offered a such a rationale, Plaintiffs' "direct evidence" of discriminatory intent "obviate[s] the need for an independent showing by [P]laintiffs that [Defendants'] articulated reasons" are "pretextual." *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1434 (4th Cir. 1985). The evidence permits—and therefore requires—the reasonable inference that Humanism was "a motivating factor in the decision" to deny the application. *Vill. Of Arlington Heights*, 429 U.S. at 266.[58]

## **CONCLUSION**

Defendants' Motions to dismiss and for summary judgment (ECF Nos. 39 & 42) should be denied.

---

[58] Given that Plaintiffs have discovered this benefit even *without* the benefit of discovery, there can be little doubt that this evidence is just the tip of the iceberg.

May 28, 2015                              Respectfully submitted,


                                          /s/ Joshua S. Devore
                                          Joshua S. Devore (#45312)
                                          R. Joseph Barton
                                          Matthew A. Smith
                                          Times Wang

                                          COHEN MILSTEIN SELLERS & TOLL PLLC
                                          1100 New York Ave., N.W.
                                          Suite 500, East Tower
                                          Washington, D.C.  20005
                                          (202) 408-4600


                                          Matthew K. Handley
                                          WASHINGTON LAWYERS' COMMITTEE
                                            FOR CIVIL RIGHTS AND URBAN AFFAIRS
                                          11 Dupont Circle, N.W.
                                          Suite 400
                                          Washington D.C.  20036
                                          Tel.:  (202) 319-1000

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2015, I electronically filed the foregoing and all exhibits filed with the foregoing with the Clerk of the Court using the ECF system, which in turn sent notice to all counsel of record who are registered with that system.


/s/ Joshua S. Devore
Joshua S. Devore