IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

JASON DANIEL HEAP, *et al.*,        )
                                    )
                                    )
      Plaintiffs,                   )
                                    )
         v.                         )    1:14cv1490(JCC/TCB)
                                    )
ASHTON CARTER, *et al.*,            )
                                    )
                                    )
      Defendants.                   )

**M E M O R A N D U M   O P I N I O N**

Dr. Jason D. Heap applied to be a chaplain in the U.S. Navy and was rejected. He, along with The Humanist Society, the organization that endorsed him for the chaplaincy, bring this suit against the Department of Defense, the U.S. Navy, and several military officers in their official and individual capacities alleging that the Department of Defense and the Navy have an unconstitutional policy of discrimination against Humanism. This matter is before the Court on the Official Defendants' Motion to Dismiss and for Summary Judgment [Dkt. 42] and on the Individual Defendants' Motion to Dismiss [Dkt. 39]. The Court will grant in part and deny in part the Official Defendants' motion. THS will be dismissed from the case because it lacks standing under any theory it has advanced. The Religious Freedom Restoration Act claims, the constitutional

1

Free Exercise Clause and No Religious Test Clause claims, and the speech and associational claims under the First Amendment will be dismissed.  The Official Defendants' motion for summary judgment as to the Establishment Clause and Equal Protection/Substantive Due Process claims will be denied.  The Court will grant the Individual Defendants' motion.  The Court declines to create a damages remedy under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*.  Even if such a remedy were available, however, the Individual Defendants are entitled to qualified immunity.  This Memorandum Opinion memorializes the Court's reasoning.

## I. Background

Dr. Jason Heap ("Dr. Heap") is an Oxford University-educated instructor in history and theology who has spent ten years leading religious services and teaching in the United States and internationally.  (Am. Compl. [Dkt. 32] ¶ 2.)  He is a Humanist and is certified as a Humanist Celebrant by The Humanist Society ("THS"), a § 501(c)(3) tax-exempt organization qualified as a church under the Internal Revenue Code.  (*Id.*)  As a Celebrant, Dr. Heap is deemed qualified by THS to lead services, give ceremonial invocations, officiate at funerals and weddings, and perform other ritual functions that are also performed in other religious traditions.  (*Id.*)  As a Humanist, Dr. Heap does not believe in a god or gods.  (*Id.* ¶ 3.)  Rather,

he believes in a system of ethical principles "that are as central and guiding as the moral precepts developed in religious traditions that believe in a god or gods." (*Id.*) After consulting with religious and academic colleagues and mentors, Dr. Heap applied to become a chaplain in the U.S. Navy Chaplain Corps ("Chaplain Corps"). (*Id.* ¶ 5.)

Chaplain recruitment is governed by regulations from both the Navy and the Department of Defense ("DoD"). (*Id.* ¶ 46 (citing relevant regulations).) The Chaplain Appointment and Retention Eligibility Advisory Group ("CARE Board") reviews applications for the Navy Chaplaincy Corps. (*Id.*) The CARE Board reviews professional qualifications and forwards a recommendation regarding a chaplain applicant to the U.S. Navy Chief of Chaplains. (*Id.*) If the CARE Board certifies the applicant's professional qualifications, the Deputy Chief of Naval Operations, or the Commander, Navy Recruiting Command (acting on behalf of the Deputy Chief), determines whether the applicant is otherwise qualified for a commission as a chaplain. (*Id.*) The Chief of Chaplains approves or disapproves the recommendation by the CARE Board and then forwards it to the Chief of Naval Personnel, who makes the final determination as to whether the applicant is accepted or denied. (*Id.*)

An applicant for the chaplaincy must also demonstrate that he or she has received the endorsement of a religious

organization by submitting form "DD 2088." (*Id.* ¶ 47 (citing
Department of Defense Instruction ("DoDI") 1304.28 ¶ 6.1
(2014)).) DoD and Navy instructions create a two-track system
for endorsements submitted by endorsing religious organizations.
(*Id.* ¶ 48.) If the applicant's endorsing organization has
previously endorsed an applicant who was accepted into the
chaplaincy, the applicant need file only a single form
indicating the endorsement of his or her religious organization.
(*Id.*) The Armed Forces Chaplain Board ("AFCB") keeps a list of
these organizations. (*Id.*) If, however, the Navy has not
accepted a chaplain candidate endorsed by the religious
organization, the organization must submit additional
documentation[1] and obtain the approval of the AFCB. (*Id.*) DoDI

---

[1] That documentation must demonstrate that the religious
organization:

- "is organized as an entity functioning primarily to perform
  religious ministries to a non-military lay constituency and
  currently holds a section 501(c)(3) exempt status . . . as
  a church for Federal tax purposes from the Internal Revenue
  Service . . .";
- "possesses ecclesiastical authority to grant and withdraw
  initial and subsequent ecclesiastical endorsement for
  ministry in the Armed Forces";
- "verifies the religious organization shall provide
  chaplains who shall function in a pluralistic environment .
  . . and who shall support directly and indirectly the free
  exercise of religion by all members of the Military
  Services, their family members, and other persons
  authorized to be served by the military chaplaincies"; and
- "agrees to abide by all DoD Directives, Instructions, and
  other guidance and with Military Department regulations and
  policies on the qualification and endorsement of [religious
  ministry professionals] for service as military chaplains."

1304.28 requires the AFCB to accept the required documents from an organization seeking recognition as a qualified endorser only when the applicable military department has determined that the candidate was otherwise qualified.  (*Id.* ¶ 78.)

Dr. Heap contacted Chaplains Program Officer and Navy Chaplain Lt. Joel DeGraeve ("Lt. DeGraeve") in February 2013 to inquire about becoming a chaplain.  (*Id.* ¶ 67.)  After reviewing Dr. Heap's credentials, Lt. DeGraeve told Dr. Heap that his academic record and international experience make him a highly qualified candidate for the Navy chaplaincy.  (*Id.*)  Lt. DeGraeve encouraged Dr. Heap to apply and said that Lt. DeGraeve's own endorser, the Evangelical Christian Alliance ("Alliance"), would endorse Dr. Heap.  (*Id.* ¶¶ 67, 68.)  Dr. Heap began to apply for an endorsement from the Alliance, but concluded that the Alliance did not accurately reflect his religious views.  (*Id.* ¶ 69.)  Instead, Dr. Heap requested an endorsement from THS.  (*Id.*)

As part of the application process, Dr. Heap interviewed with U.S. Marine Chaplain (Lt. Commander, Retired) Rabbi Reuben Israel Abraham ("Rabbi Abraham").  (*Id.* ¶ 74.)  Rabbi Abraham gave Dr. Heap a perfect ranking in his assessment of Dr. Heap's qualifications to serve as chaplain.  (*Id.*)  Dr. Heap then met with Lt. DeGraeve.  (*Id.* ¶ 75.)  Lt. DeGraeve

---

(*Id.* ¶ 49 (citing DoDI 1304.28).)

reiterated that Dr. Heap was highly qualified to serve as a Navy chaplain and that Lt. DeGraeve would attempt to fast track Dr. Heap's application so that he could appear before the CARE Board soon, in either July or August 2013.  (*Id.*)  As of June 2013, Dr. Heap had submitted all of the paperwork required by the DoD and Navy except for the paperwork identifying his endorsing religious organization.  (*Id.* ¶ 76.)

The Navy and AFCB learned that Dr. Heap is a Humanist for the first time on July 3, 2013, when the AFCB received administrative paperwork identifying THS as Dr. Heap's endorsing organization.  (*Id.* ¶ 77.)  The AFCB accepted THS's administrative paperwork on July 3, 2013.  (*Id.* ¶ 79.)

Lt. DeGraeve contacted Dr. Heap in late July 2013 and told him that being endorsed by THS rather than the Alliance could pose a problem for his application.  (*Id.* ¶ 83.)  Soon after Dr. Heap and THS submitted their applications, political pressure mounted on DoD to deny them.  (*Id.* ¶ 85.)  Twenty-one members of Congress submitted a letter to then-Secretary of Defense Charles Hagel, with copies to Secretary of the Navy Ray Mabus and Chief of Navy Chaplains Rear Admiral Mark L. Tidd ("Rear Admiral Tidd"), to express their concern over Dr. Heap's and THS's applications.  (*Id.* ¶ 85.)  Representative John Fleming introduced legislation in the House of Representatives to prevent DoD from accepting Humanist chaplains.  (*Id.* ¶ 86.)

6

Media outlets reported that an atheist had applied to become a chaplain in the Navy. (*Id.* ¶ 87.)

Meanwhile, Dr. Heap continued to check on the status of his application. (*Id.* ¶ 88.)  Dr. Heap wrote to Lt. DeGraeve on July 12, 2013 to inquire whether his application would be complete before the next CARE Board meeting. (*Id.*)  Around the same time, a THS representative contacted Rear Admiral Tidd and offered to discuss Dr. Heap's and THS's applications, which Rear Admiral Tidd declined. (*Id.*)

In response to a letter from legal counsel, in a letter dated March 28, 2014, the Navy invited Dr. Heap to appear before the April 8, 2014 CARE Board in Washington, D.C. (*Id.* ¶ 95.)  Given the short amount of time and extensive travel required,[2] Dr. Heap nonetheless agreed to appear and did appear at the May 13, 2014 CARE Board. (*Id.* ¶¶ 95, 97.)

On May 27, 2014, Lt. DeGraeve contacted Dr. Heap and told him that his application had been denied. (*Id.* ¶ 98.)  Dr. Heap requested a written denial stating reasons for the decision. (*Id.*)  He received a letter explaining that he was denied for the position but without stating any of the reasons. (*Id.*)

---

[2] Dr. Heap was living abroad during the pendency of his application.

Heap and THS (collectively "Plaintiffs") argue that Defendants discriminated against Heap and THS because Plaintiffs are Humanists. (*Id.* ¶ 198.) Defendants made this determination by applying to Plaintiffs a Navy and DoD policy and practice of not recognizing Humanism as a religion or according it equal treatment to other religions. (*Id.* ¶ 198.) Plaintiffs have filed the instant lawsuit, naming several defendants. They allege seven different sources of law in the complaint as grounds for relief: (1) Religious Freedom Restoration Act ("Count One") (*Id.* ¶¶ 210-218); (2) Establishment Clause ("Count Two") (*Id.* ¶¶ 219-227); (3) Free Exercise Clause ("Count Three") (*Id.* ¶¶ 228-234); (4) Equal Protection and Substantive Due Process ("Count Four") (*Id.* ¶¶ 235-242); (5) No Religious Test Clause ("Count Five") (*Id.* ¶¶ 243-248); (6) subject matter and viewpoint discrimination, prior restraint, and freedom of association under the First Amendment ("Count Six") (*Id.* ¶¶ 249-261); and (7) *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, against the Individual Defendants[3] in

---

[3] Plaintiffs have sued eleven U.S. Navy, U.S. Army, U.S. Air Force and DoD officials, each in his or her own individual capacity. These defendants are: Rear Admiral Tidd, former Chief of Chaplains, U.S. Navy; Rear Admiral Annie B. Andrews, Commander, Navy Recruiting Command; Rear Admiral Margaret G. Kibben, Chief of Chaplains, U.S. Navy; Rear Admiral (Retired) Gregory C. Horn, Deputy Chief of Chaplains for Reserve Matters, Marine Forces Reserve; Rear Admiral Daniel L. Gard, Deputy Chief of Chaplains for Reserve Matters, U.S. Navy; Vice Admiral William F. Moran, Chief of Naval Personnel, U.S. Navy; Major

violation of the constitutional provisions alleged in Counts Two through Four and Count Six ("Count Seven") (*Id.* ¶¶ 262-263). Plaintiffs seek a declaratory judgment stating that denying Plaintiffs' applications violated the Plaintiffs' rights under the Religious Freedom Restoration Act, the First and Fifth Amendments, and/or the No Religious Test clause of the Constitution and a declaration that DoDI 1304.28 is unconstitutional under the No Religious Test clause. (*Id.* at 82.) Additionally, Plaintiffs seek an order instating Heap as a Navy chaplain and awarding back pay and damages; requiring DoD and the Navy to recognize THS as a qualified ecclesiastical endorser within the meaning of the relevant regulations or alternatively, declaring the Navy and DoD's policy requiring chaplaincy candidates to be endorsed by a religious organization unconstitutional and void; enjoining Defendants from requiring THS to comply with the procedures for first-time ecclesiastical endorsers in DoDI 1304.28; enjoining Defendants from rejecting applications from candidates for the Navy chaplaincy and from organizations seeking to become qualified ecclesiastical endorsers on the basis that the candidates and/or organization

---

General Donald L. Rutherford, Chief of Chaplains, U.S. Army; Brigadier General Charles R. Bailey, Deputy Chief of Chaplains, U.S. Army; Brigadier General Bobby V. Page, Deputy Chief of Chaplains, U.S. Air Force; Major General Howard D. Stendahl, Chief of Chaplains, U.S. Air Force; and Jessica L. Garfola Wright, Under Secretary of Defense for Personnel and Readiness.

are Humanists, or alternatively, declaring that Defendants may
not require that applicants for the chaplaincy be adherents of
any religion; awarding Dr. Heap equitable relief in the form of
back pay; awarding Dr. Heap monetary relief in the form of lost
wages and other compensatory damages; and awarding Plaintiffs
reasonable costs and expenses.  (*Id.* at 83-84.)

All Defendants have moved to dismiss.  The Official
Defendants move to dismiss all counts except Counts Two
(Establishment Clause) and Four (Equal Protection and
Substantive Due Process), for which they move for summary
judgment.  (*See generally* Official Defs.' Mem. in Supp. [Dkt.
43].)  The Individual Defendants move to dismiss Counts One and
Seven, the only counts asserted against them.  (*See generally*
Individual Defs.' Mem. in Supp. [Dkt. 40].)  Having been fully
briefed and argued, this motion is ripe for disposition.

## II. Legal Standard

### A. Motion to Dismiss

"A motion to dismiss under Rule 12(b)(6) tests the
sufficiency of a complaint[.]"  *Republican Party of N.C. v.
Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted).
The Supreme Court has stated that in order "[t]o survive a
motion to dismiss, a [c]omplaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

10

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570
(2007)).  "A claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged."  *Iqbal*, 556 U.S. at 678.  *Id.*  The issue in resolving
such a motion is not whether the non-movant will ultimately
prevail, but whether the non-movant is entitled to offer
evidence to support his or her claims.

Moreover, the plaintiff does not have to show a
likelihood of success on the merits.  Rather, the complaint must
merely allege – directly or indirectly – each element of a
"viable legal theory."  *Twombly*, 550 U.S. at 562-63.

**B. Summary Judgment**

Summary judgment is appropriate only where, on the
basis of undisputed material facts, the moving party is entitled
to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex
Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The moving party
always bears the initial burden of "informing the district court
of the basis for its motion," and identifying the matter "it
believes demonstrate[s] the absence of a genuine issue of
material fact."  *Celotex,* 477 U.S. at 323.  Once a motion for
summary judgment is properly made and supported, the opposing
party has the burden of showing that a genuine dispute exists.
*See Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d

294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial.").

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

### III. Analysis

#### A. Jurisdiction

##### 1. Justiciability of Dr. Heap's Claims

The Official Defendants argue Dr. Heap's claims must be dismissed because he seeks relief in this action that is beyond the authority of the judiciary to grant, namely, a judicial declaration that Heap is "qualitatively superior to other candidates selected for accession" and an order directing Defendants to commission Heap as an officer in the Navy Chaplain Corps.  (Official Defs.' Mem. in Supp. [Dkt. 43] at 15.)  Dr. Heap argues that religious discrimination is not entrusted to

the political branches.  (Pls.' Opp'n [Dkt. 61] at 11.)
Additionally, he argues that even if one measure of requested
relief fails, his entire complaint does not fail because he
seeks other remedies that are squarely within the Court's power
to order.  (*Id.* at 14-15.)

Federal courts are courts of limited jurisdiction and
possess only that power authorized to them by the United States
Constitution and by federal statute.  Article III of the
Constitution limits the jurisdiction of federal courts to "cases
and controversies."  This requirement serves two purposes:
conserving judicial resources to cases "presented in an
adversary context and in a form historically viewed as capable
of resolution through the judicial process" and "assur[ing] that
the federal courts will not intrude into areas committed to the
other branches of government."  *Flast v. Cohen*, 392 U.S. 83, 95
(1968).  This "dual limitation" is known as justiciability.  *Id.*
The scope of justiciability "is illustrated by the various
grounds upon which questions sought to be adjudicated in federal
courts have held not to be justiciable."  *Id.*  A case is non-
justiciable when the parties seek only adjudication of a
political question, when the parties are asking for an advisory
opinion, when the case has been mooted by subsequent
developments, and when a party has no standing to maintain the
action.  *Id.*

The Official Defendants argue Heap's claims are non-justiciable because the relief they seek would require this Court to intrude into matters committed to the executive and legislative branches.  (Official Defs.' Mem. in Supp. at 16.) The Constitution vests authority in the President, with the advice and consent of the Senate, to determine whom to commission as a Navy officer.  *See* U.S. Const. art II, § 2, cl. 2; *see also* 10 U.S.C. § 531(a)(1) (providing that the President may appoint Navy officers in grades up to and including that of lieutenant without the advice and consent of the Senate).

It is clear that this Court lacks power to order Dr. Heap's instatement as a Navy chaplain.  U.S. Const. art. II, § 2, cl. 2; *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989) (stating plaintiff's demand for appointment as an officer is "squarely within the realm of nonjusticiable military personnel decisions").  However, this does not mean that Dr. Heap's suit fails.

First, while this Court has "no quarrel . . . that the operation of the military is vested in Congress and the Executive, and that it is not for the courts to establish the composition of the armed forces," that does not mean that this Court lacks jurisdiction to decide constitutional questions that arise out of military decisions about establishing the armed forces.  *Emory v. Sec'y of Navy*, 819 F.2d 291, 294 (D.C. Cir.

14

1987).  "Where it is alleged, as here, that the Armed Forces have trenched upon constitutionally guaranteed rights through the promotion and selection process, the courts are not powerless to act.  The military has not been excepted from constitutional provisions that protect the rights of individuals."  *Id.* (citing *Parker v. Levy*, 417 U.S. 733 (1974)).

In fact, "it is precisely the role of courts to determine whether those rights have been violated."  *Id.* (citation omitted) (reversing district court's dismissal for lack of subject matter jurisdiction in case where plaintiff alleged he was not promoted to rear admiral because of racial discrimination); *see also Chappell v. Wallace*, 462 U.S. 296, 301 (1983) ("This Court has never held, nor do we now hold, that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service."); *Wigginton v. Centracchio*, 205 F.3d 504, 512 (1st Cir. 2000) ("The second, and controlling reason is that, taken together *Chappell* and [*United States v.*] *Stanley* . . . make it clear that intramilitary suits alleging constitutional violations but not seeking damages are justiciable."); *Dillard v. Brown*, 652 F.2d 316, 320 (3d Cir. 1981) ("Yet these sections of the Constitution [art. II, § 2 and art. I, § 8] do not provide or intimate that, when statutes or regulations regarding the composition of the military trench upon other constitutional

15

guarantees, the courts are powerless to act."); *cf. Kreis*, 866
F.2d at 1511 (stating plaintiff's non-constitutional challenge
to military assignment and lack of promotion non-justiciable).
Here, Heap claims that he has been improperly discriminated
against because of his religious beliefs.  Determining whether
his constitutional rights have been violated in the process is
clearly within this Court's competence and jurisdiction.

Second, Dr. Heap's action does not fail because the
Court is powerless to order one of his requested remedies:
instatement as a Navy chaplain.  "Although Rule 8(a)(3) of the
civil rules requires that a complaint contain a 'demand for
judgment for the relief the pleader seeks,' the demand is not
itself part of the plaintiff's claim." *Bontokowski v. Smith*,
305 F.3d 757, 762 (7th Cir. 2002) (citing 5 Charles Alan Wright
& Arthur R. Miller, <u>Federal Practice and Procedure</u>, § 1255 (2d
ed. 1990)).  Therefore, failure to specify relief to which the
plaintiff is entitled does not warrant dismissal for failing to
state a claim.  *Id.*  This conclusion is supported by Federal
Rule of Civil Procedure 54(c), which states "[e]very other final
judgment should grant the relief to which each party is
entitled, *even if the party has not demanded that relief in its
pleadings*."  (emphasis added)*; see Bontkowski*, 305 F.3d at 762
(collecting cases); *Charles v. Front Royal Vol. Fire & Rescue
Dep't, Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014) ("[T]he

16

selection of an improper remedy in the demand for relief will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type.").

Here, Dr. Heap has requested several forms of relief, including a declaratory judgment that the rejection of his application violated his rights under the Religious Freedom Restoration Act and the First and Fifth Amendments, and/or the No Religious Test Clause of the Constitution, as well as a declaration that DoDI 1304.28 is unconstitutional as violative of the No Religious Test Clause. (Am. Compl. at 82.) The Official Defendants argue that declaratory relief would not be an appropriate resolution of this case because it would not have any effect on their behavior toward Dr. Heap, thus amounting to nothing more than an advisory opinion. They cite to *Dynaquest Corp. v. U.S. Postal Service*, 242 F.3d 1070 (D.C. Cir. 2001) in support. (Official Defs.' Mem. in Supp. at 15 n.8.) *Dynaquest* is inapposite here. In *Dynaquest*, the D.C. Circuit rejected the plaintiff's challenge to the decision of the Postal Service Administrative Judicial Officer ("AJO") on grounds that the AJOs are appointed in violation of the Appointments Clause of the United States. *Dynaquest*, 242 F.3d at 1076. The court declined to reach the merits of the Appointments Clause challenge because "[n]o AJO, regardless of the validity of his appointment, would

17

have authority to decide the issue otherwise."[4]  *Id.*  Thus,
resolving the Appointments Clause issue in favor of the
plaintiff could not bring the plaintiff any relief and would be
an advisory opinion.  *Id.*  Here, resolving the issue of whether
Dr. Heap was rejected from the Navy Chaplain Corps would change
the criteria used to evaluate Dr. Heap's application if he were
to reapply – namely, that the Navy cannot bar him from the
Chaplain Corps on the basis of his affiliation with Humanism.
Accordingly, Dr. Heap's claims are justiciable, and the Official
Defendants' motion will be denied as to this ground.

### 2. THS's Standing

An organizational plaintiff may establish standing to
bring suit either on its own behalf or on behalf of its members.
*White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir.
2005).  "A justiciable case or controversy requires a plaintiff
[who] has alleged such a personal stake in the outcome of the
controversy as to warrant his invocation of federal court
jurisdiction and to justify exercise of the court's remedial
powers on his behalf."  *Planned Parenthood of S.C. v. Rose*, 361
F.3d 786, 789 (4th Cir. 2004) (citations and internal quotation

---

[4] The case involved parallel administrative and judicial
proceedings.  The AJO denied the plaintiff's request for
releasing funds held in escrow because the escrow accounts had
been established under the Agreed Order of the district court
and only that court had jurisdiction over the interpretation and
enforcement of its order.  *Dynaquest*, 242 F.3d at 1071.

marks omitted).  Individual as well as organizational plaintiffs must satisfy this requirement.  *White Tail Park*, 413 F.3d at 458.  Both the Official Defendants and Individual Defendants challenge whether THS has standing to bring claims on its own behalf as well as claims on behalf of Humanist Navy Service Members.[5]  (Official Defs.' Mem. in Supp. at 18-28.)  The Court addresses each in turn.

### a. THS's Standing to Bring Claims on its Own Behalf

An organizational plaintiff may establish standing to bring suit on its own behalf when it seeks redress for a distinct injury suffered by the organization itself.  *White Tail Park*, 413 F.3d at 458.  Like an individual plaintiff, an organizational plaintiff must provide evidence to support the conclusion that:

> (1) "the plaintiff . . . suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

---

[5] The Individual Defendants incorporate by reference the arguments of the Official Defendants.  (Individual Defs.' Mem. in Supp. at 8.)

Defendants argue THS lacks standing because it has failed to demonstrate it suffered a cognizable injury. (Official Defs.' Mem. in Supp. at 19.)  Defendants maintain that because Heap was deemed not qualified by the CARE Board, the AFCB never had an opportunity to consider THS's application to be an endorsing organization.  (*Id.* at 19-20.)  THS alleges three possible injuries.  First, THS alleges that the AFCB's acceptance of its application on July 3, 2013 before Dr. Heap appeared before the CARE Board violated DoD policy.  Second, THS alleges that it failed to obtain recognition as a qualified endorser because Defendants denied Dr. Heap, its candidate, who in turn was denied because he was endorsed by THS.  (Pls.' Opp'n at 16.)  Stated differently, THS alleges it failed to obtain recognition as a qualified endorser because the Navy discriminated against Dr. Heap, thereby establishing a direct injury against it.  (*Id.*)  Finally, THS alleges that it suffered injury from the administrative burden of submitting its application to the AFCB and bringing this lawsuit.  (*Id.* at 20.)

Since THS has never successfully endorsed a candidate for the chaplaincy, it must submit additional documentation and obtain the approval of the AFCB to become a recognized endorser. (Am. Compl. ¶ 49.)  DoDI 1304.28 requires the AFCB to accept the required documents from a first-time ecclesiastical endorser "only when the applicable Military Department" has determined

that the chaplain candidate is otherwise qualified.  (Am. Compl. ¶ 78 (citing DoDI 1304.28 ¶ 6.1.1.3.).)  The AFCB shall notify the Military Departments of religious organizations that have filed the prerequisite documents and whose packets have been found administratively complete.  (DoDI 1304.28 ¶ 6.1.1.3.)  The Military Departments may evaluate chaplain candidates from religious organizations that are submitting the administrative filing requirements for the first time and are pending determination of whether their prospective chaplain is fully qualified.  (*Id.* ¶ 6.1.1.4.)  The Military Departments shall consult with the AFCB to determine if the administrative requirements are pending acceptance in such cases.  (*Id.*)

THS specifically alleges that it was a violation of DoDI 1304.28 for the AFCB to accept THS's "administrative paperwork before the Navy made any determination as to Dr. Heap's candidacy."  (Am. Compl. ¶ 79.)  According to the policy, the AFCB may ensure that a first-time endorser's application is administratively complete and relay that information to the appropriate Military Department. As alleged here, the AFCB did just that – it accepted THS's administrative paperwork.  There was nothing improper, per the terms of the policy, for the AFCB to make sure that THS's application was complete before the CARE Board had determined whether Dr. Heap was qualified to be a

chaplain.  Therefore, THS cannot allege injury based on the administrative acceptance of its paperwork.

Likewise, THS cannot allege injury based on the denial of Dr. Heap's application.  Since the CARE Board never determined that Dr. Heap was qualified, the AFCB never made a decision on THS's application beyond stating that it was complete.  Imputing Dr. Heap's injury to THS is not the kind of concrete injury caused by a defendant's actions that is required by constitutional and prudential considerations.

THS contends it has suffered injury under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  THS argues that *Havens* stands for the proposition that an organization has standing where it "devote[s] significant resources to identifying and counteracting the defendant's discriminatory practice."  (Pls.'s Opp'n at 20.)  In *Havens*, plaintiff, a fair housing non-profit, had alleged that its organizational purpose had been "frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  [It] . . . had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices."  *Id.*  However, the issue in *Havens* was "the scope of standing to sue under the Fair Housing Act of 1968."  *Id.* at 366.  The complaint identified plaintiff as "a nonprofit corporation organized under the laws

of the State of Virginia whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area." *Id.* at 368. Thus, assuming the steering practices had impacted plaintiff's ability to provide counseling and referral services for low-and moderate income residents, the Court found that there "can be no question" that plaintiff suffered injury in fact. *Id.* at 379. It was more than "simply a setback to the organization's abstract social interests" given the plaintiff's organizational mission. *Id.; cf. Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) ("But a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA.").

THS alleges that it will have to submit documentation affirming that it satisfies the administrative requirements necessary to be a qualified religious organization in order to endorse another chaplain candidate in the future. (Pls.' Opp'n at 20 (citing Am. Compl. ¶ 200).) THS further alleges that this procedural requirement will frustrate its organizational mission by impeding its ability to provide Humanist Celebrants to Navy service members. (*Id.* (citing Am. Compl. ¶ 201).) Defendants argue these justifications fail to establish standing because (1) the alleged harm is based on speculation that THS will

attempt to endorse a chaplain candidate in the future; (2) the procedural requirement that THS submit certain administrative documentation to endorse a candidate in the future will not frustrate THS's organizational mission; and (3) the alleged frustration of an organizational mission by itself is too abstract of a purported injury to establish standing.  (Official Defs.' Mem. in Supp. at 20-23.)

"[A]n injury to organizational purpose, without more, does not provide a basis for standing." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 183 (4th Cir. 2013) (citing *Sierra Club* and distinguishing *Havens* as finding organizational injury where "broadly alleged" impairment of an organization's ability to advance its purposes combined with an alleged "consequent drain on the organization's resources.").  Merely alleging that THS has been injured because denying Dr. Heap hurts its mission to "prepare Humanist Celebrants to lead ceremonial observances . . . [and] strengthen Humanist communities" is not enough to create an injury here.  To be sure, reapplying to be an endorsing organization and bringing this lawsuit are costly, but such costs do not cut to the core of the organization's mission like in *Havens. See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("If a defendant's conduct does not conflict directly with an organization's stated goals, it is

entirely speculative whether the defendant's conduct is impeding the organization's activities.  Moreover, in those cases where governmental action is challenged, if the government's conduct does not directly conflict with the organization's mission, the alleged injury to the organization likely will be one that is shared by a large class of citizens and thus insufficient to establish injury in fact.").  Furthermore, as the Navy points out, requiring THS to submit administrative documentation for the next Humanist Navy chaplain applicant will not so frustrate THS's organizational mission such that injury is established in this suit.  (Official Defs.' Mem. in Supp. at 21.)  Accordingly, THS does not have standing to bring claims on its own behalf.

### b. THS's Associational Standing

The standing analysis does not end with consideration of whether THS has organizational standing.  An organizational plaintiff may also have standing to bring claims on behalf of its members.  Known as associational standing, the entity must demonstrate that "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit."  *White Tail Park*, 413 F.3d at 458.  If a single member of the organization has standing to bring the suit, then so, too, does the organization.  *Friends of the*

25

*Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000).

Defendants argue that THS does not have standing to bring claims on behalf of Humanist service members in the Navy who do not have access to a Humanist Navy chaplain. (Official Defs.' Mem. in Supp. at 23.) First, it argues that THS is not a traditional membership organization nor does it qualify as a functional equivalent of one, stating instead that THS is simply an accreditation organization. (*Id.* at 23-24.) Second, even if this Court determined that THS is a functional equivalent of a membership organization, THS's members are Humanist Celebrants, not Humanist congregants. Therefore, THS cannot raise the claims on behalf of Humanist congregants. (*Id.* at 24-25.) Third, THS cannot show that the service member THS identifies as harmed by the Navy's policy, Chief Electronics Technician Douglas Wright ("Wright"), has standing to challenge the lack of a Humanist chaplain in the Navy because a favorable judicial decision will not remedy Wright's lack of access to such a chaplain. (*Id.* at 25.) THS denies all of Defendants' assertions. (Pls.' Opp'n at 22-24.)

The Court turns first to Defendants' contention that THS is not a membership organization or a functional equivalent. "[A]n organization with no formal members can still have associational standing if it is the functional equivalent of a

26

traditional membership organization." *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (citation and internal quotation marks omitted). Functional equivalency is determined if the organization (1) serves a specialized segment of the community; (2) represents individuals that have all the indicia of membership, including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities, and (3) its fortunes are tied closely to those of its constituency. *Id.; see also Hunt*, 432 U.S. at 344-45 (stating that commission had all indicia of traditional membership organizations).

In the Amended Complaint, THS alleges that "it maintains an active membership, including members who are enlisted in the United States Navy." (Am. Compl. ¶ 17.) Elsewhere in the Amended Complaint, THS describes itself as preparing Humanist Celebrants to provide ministry through an accreditation process. (Am. Compl. ¶¶ 142-144, 204.) Beyond these two allegations, THS has provided no details about who the membership is or whether THS truly can be considered a voluntary membership organization or a functional equivalent. This makes it difficult to determine whether it is, in fact, an organization capable of asserting associational standing or whether one of its members has standing to assert the claims at issue here. THS has not alleged any information that would

allow the Court to find that it has the kind of leadership and financial structure that is closely tied to that of its members or that its members exert any control over the direction of the organization.[6]  Therefore, THS does not have associational standing.[7]

### c. Whether THS May Assert Third Party Standing

Additionally, THS argues it has third party standing to sue on behalf of Humanists in the Navy who are not THS members.  (Pls. Opp'n at 23-24.)  "Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation."  *Singleton v. Wulff*, 428 U.S. 106, 113 (1976).  Thus, the general rule is "ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party."  *Id.* at 113-14 (citation and internal quotation marks omitted).  The reasons

---

[6] THS discusses its membership in paragraph 21 of Jason Torpy's ("Torpy") Declaration, which is attached to the Plaintiffs' Opposition.  When considering a motion to dismiss, "[o]rdinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."  *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006).  Torpy's declaration is not a document attached to the complaint nor expressly incorporated therein, and the Court declines to convert this motion to one for summary judgment. Therefore, the Court will not consider Torpy's declaration in ruling on this motion.

[7] In light of this holding, the Court declines to consider the whether Wright has standing to bring claims or whether Wright's purported injury can be redressed through a lawsuit.

for this rule are twofold: it avoids unnecessary litigation, and it is presumed that the holders of the rights at issue usually will be the best proponents of their own rights.  *Id.* at 113-14.

There are two recognized exceptions to the rule against third party standing.  First, if the relationship between the litigant and the person whose right he seeks to assert is close, courts will often allow the litigant to proceed with the suit.  *Id.* ("Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.") (citing *Griswold v. Connecticut*, 381 U.S. 479 (1965) (holding that a licensed physician had standing to assert the privacy rights of the married persons he advised)).  Second, courts look to whether the third party can assert his own right.  "If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent."  *Singleton*, 428 U.S. at 116 (citing *NAACP v. Alabama*, 357 U.S. 449 (1958) (holding NAACP, in resisting a court order that it divulge the names of its members, could assert the First and Fourteenth Amendments rights of those members to remain anonymous)).

Here, THS argues that Humanist service members

29

"'enjoyment of the right' to religious accommodation by Humanist chaplains 'is inextricably bound up with the activity [THS] wishes to pursue,' namely, endorsing Humanist chaplains to serve in the Navy." (Pls.' Opp'n at 24.)  However, neither exception to the rule against third party standing applies to allow THS to bring claims on behalf of Humanist service members who are not members of THS.  First, THS and the service members it names – Petty Offier Todd Kregel ("Kregel") and Commander Antonio McCabe ("McCabe") do not enjoy the kind of close relationship like plaintiffs cited in *Singleton* who were allowed to bring claims on behalf of third parties.  THS and McCabe and Kregel do not enjoy a confidential relationship like that of doctor and patient.  *See Singleton*, 428 U.S. at 115 (citing cases).  Nor could THS be considered an advocate for McCabe and Kregel, as, by THS's own admission, they are not even members of THS.  *See Singelton*, 428 U.S. at 115 (citing *Eisenstadt v. Baird*, 405 U.S. 438, 445-46, as stressing the advocate relationship and impact of the litigation on the third party interests).  Second, THS argues that McCabe and Kregel may be chilled from asserting their rights by the publicity of a court suit and thus might not bring their own lawsuits for fear of retaliation, negative publicity, or hostile treatment from fellow officers and superiors.  (Pls.' Opp'n at 24.)  However, both are publicly named in this suit.  Thus, the Court is not convinced that there

30

are significant obstacles preventing McCabe and Kregel from bringing their own lawsuits challenging the lack of Humanist chaplains in the Navy.  Accordingly, THS does not have standing to assert the rights of third parties.

Ultimately, the Court finds that THS does not have standing under any of the aforementioned theories.  Accordingly, the Court will grant Defendants' motion in this regard.

### 2. Whether THS's Claims are Ripe

Defendants challenge whether THS's claims are ripe. (Official Defs.' Mem. in Supp. at 25.)  Ripeness is a subset of justiciability and is drawn from Article III's limitations on judicial power and prudential reasons for declining to exercise jurisdiction.  *See Miller v.* Brown, 462 F.3d 312, 319 (4th Cir. 2006) (citation omitted) (noting that analyzing ripeness is similar to determining whether a party has standing).  Claims are ripe when "the issue is substantively definitive enough to be fit for judicial decision and whether hardship will result from withholding court consideration." *Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir. 1997); *see also Miller*, 462 F.3d at 318-19 (citation and internal quotation marks omitted) ("The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form.").  Its purpose is to prevent premature adjudication of issues not yet ready for review.  To

31

determine whether a case is ripe, courts balance "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller*, 462 F.3d at 319 (citation and internal quotation marks omitted). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties. *Id.* (citation and internal quotation marks omitted). The burden of proving ripeness falls on the party bringing suit. *Id.* (citing *Renne v. Geary*, 501 U.S. 312, 316 (1991)).

THS claims that the AFCB discriminated against THS by allegedly refusing to recognize THS as a qualified endorser because of its Humanist beliefs. (Am. Compl. ¶ 198.) Defendants argue that the AFCB never considered THS's application to become a qualified endorser because Dr. Heap's application was denied and thus no action was taken on its application. (Official Defs.' Mem. in Supp. at 27.) As noted earlier, the AFCB administratively accepted THS's application. However, nowhere in the complaint is it alleged that the AFCB undertook a merits review of THS's application. According to DoDI 1304.28, such a review could not occur until Dr. Heap had been deemed qualified by the Navy. Since the Navy rejected Dr. Heap's application, the AFCB never had occasion to consider whether THS is a qualified ecclesiastical endorser. Therefore,

THS's claim is not ripe.  *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (stating ripeness "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.").

To summarize, THS does not have organizational standing to bring claims on its own behalf because it has not shown sufficient injury.  Even if the Court were to find such organizational standing, THS's claim still fails on these facts because its claim is not ripe, as the AFCB never adjudicated the merits of its ecclesiastical endorser application.

THS also lacks associational standing.  It has not shown that it is a membership organization or functional equivalent.  Finally, THS lacks third party standing to bring claims on behalf of non-members.  Accordingly, THS will be dismissed from this lawsuit.

**B. Deficiency of Claims**

Defendants challenge whether several of Dr. Heap's claims are legally sufficient.  The Court addresses each in turn.

**1. Religious Freedom Restoration Act**

The Religious Freedom Restoration Act ("RFRA") prohibits "Government from substantially burdening a person's exercise of religion, even if that burden results from a rule of

33

general applicability" unless the Government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a)-(b).  Thus, RFRA allows courts to strike down neutral laws of general applicability when they are a substantial burden to religious exercise and the government cannot meet its burden to show a compelling interest achieved by the least restrictive means.  Here, Defendants challenge whether Dr. Heap's free exercise rights under RFRA have been substantially burdened when the Navy denied Heap's application to the Navy chaplaincy.  (Official Defs.' Mem. in Supp. at 29.)

A substantial burden requires "'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"  *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99-100 (4th Cir. 2013) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).  Under RFRA, Dr. Heap bears the burden of proving that the Navy's policy implicates his religious exercise.  *See Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015).[8]  In *Holt*, the Supreme Court held that a prison regulation that prevented a prisoner form growing a beard in

---

[8] Though *Holt* concerned the Religious Land Use and Institutionalized Persons Act ("RLIUPA"), RLIUPA mirrors RFRA and embodies the same standards.  *Holt*, 135 S. Ct. at 861.

accordance with his Muslim faith burdened his free exercise rights under the Religious Land Use and Institutionalized Persons Act ("RLIUPA"). *Id.* at 862. And in *Burwell v. Hobby Lobby Stores, Inc.*, the Supreme Court held that regulations promulgated under the Patient Protection and Affordable Care Act substantially burdened the religious exercise of three closely-held corporations by mandating that they provide health insurance coverage for contraception, which violated their sincerely held religious beliefs against contraception and abortion. 134 S. Ct. 2751, 2759 (2014).

Here, Dr. Heap has not shown that becoming a Humanist Navy chaplain is dictated by the tenets of Humanism or that by not becoming a Navy chaplain he is somehow in violation of the tenets of Humanism. Rejecting Heap from the Navy chaplaincy does not put substantial pressure on Dr. Heap to modify his behavior and violate his beliefs. Therefore, there has been no substantial burden of Dr. Heap's religious exercise.

Dr. Heap's argument appears to be premised on the belief that Dr. Heap could become a chaplain only if he affiliates with an AFCB-approved religion. (*See* Am. Compl. ¶ 213.) Though the Court must construe the allegations in the complaint as true in ruling on a motion to dismiss, this assertion strikes the Court as wholly speculative, even assuming that the Navy intentionally discriminated against Dr. Heap. If

Dr. Heap did claim to be affiliated with an already established AFCB-approved religion, it is possible the Navy would still reject his application because he did not meet other criteria.

While serving as a Navy chaplain is no doubt important to Dr. Heap, Dr. Heap has not demonstrated that being a Navy chaplain is part of the core belief system of Humanism. (*See* Am. Compl. ¶¶ 129-161.)[9]  Accordingly, Dr. Heap's RFRA claim will be dismissed.[10]

### 2. Free Exercise Claim

The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. amend. I.  However, the Clause does not compel

---

[9] An alternative means of practicing religion is a relevant consideration when considering free exercise claims.  But such "alternative avenues" are not properly considered in analyzing RFRA claims, since the statute provides greater protection than that required by the Constitution.  *See Holt*, 135 S. Ct. at 862 ("Under those cases, the availability of alternative means of practicing religion is a relevant consideration, but RLUIPA provides greater protection. RLUIPA's "substantial burden" inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise.").  Therefore, Official Defendants' arguments concerning alternative avenues of worship are not relevant to determining whether Dr. Heap has stated a claim under RFRA.  (*See* Official Defs.' Mem. in Supp. at 29-30.)

[10] Since there has been no substantial burden on religious exercise, the Court need not apply RFRA's strict scrutiny framework.  *See Goodall by Goodall v. Stafford Cnty. Sch. Bd.*, 60 F.3d 168, 171 (4th Cir. 1995) ("[I]f the [plaintiffs] cannot show that their exercise of religion is substantially burdened by the [government's] policy, the [government] is not required to come forth with proof of its interest.").

Congress to exempt religious practices from a "valid and neutral law of general applicability." *Emp't Div., Dep't of Human Res., Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks omitted). This is so even if such a law "has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "A neutral law of general applicability thus does not violate the Free Exercise Clause." *Liberty University*, 733 F.3d at 99.

Dr. Heap conceded that his free exercise claim does not challenge the regulations promulgated by the Navy as facially discriminatory. (Pls.' Opp'n at 40 n.23.) Nor has Dr. Heap alleged that though the regulations are facially neutral, they were enacted with the specific purpose of excluding Humanists from the Navy chaplaincy. *Id.*; see *Church of the Lukumi Babalu Aye*, 508 U.S. at 540. Dr. Heap's claim that there was a policy of discrimination against Humanists in the Navy chaplaincy is therefore not cognizable under the Free Exercise Clause, and accordingly this claim will be dismissed.

### 3. First Amendment Claim

Official Defendants argue Dr. Heap's freedom of expression claims fail because Defendants have not acted in any way to restrict Dr. Heap's expression and chaplain candidates have no right to be provided with a platform to express their

37

Humanist views as Navy chaplains.  (Official Defs.' Mem. in Supp. at 32.)  Dr. Heap argues the Armed Forces chaplaincy programs, including the Navy, are a forum designated for religious exercise and expression.  (Pls.' Opp'n at 48.) Excluding Dr. Heap from the chaplaincy because he is a Humanist, therefore, amounts to denying Dr. Heap access to a designated public forum because of the viewpoint of his speech in violation of the First Amendment.  (*Id.* at 48-51.)

The Navy Chaplain Corps is comprised of "commissioned Naval officers who possess specialized education, training, and experience to meet the spiritual needs of those who serve in the Navy and their families." *Adair v. England*, 183 F. Supp. 2d 31, 35 (D.D.C. 2002) (citation and internal quotation marks omitted).  The purposes of the Navy chaplaincy include "caring for all service members, facilitating the religious requirements of personnel of all faiths, [and] providing religious organization-specific ministries[.]"  (Am. Compl. ¶ 252); *see also Katcoff v. Marsh*, 755 F.2d 223, 226 (2d Cir. 1985) ("The primary function of the military chaplain is to engage in activities designed to meet the needs of a pluralistic military society.").  The Navy Chaplain Corps was created by statute as "a staff corps of the Navy."  10 U.S.C. § 5142.  Thus, the appropriate conceptualization of the Navy Chaplain Corps is not as a "forum", a place where speech may occur on government

38

property,[11] *see Christian Legal Society v. Martinez*, 561 U.S.
661, 669 n.11 (2010), but rather as a position for employment
with the U.S. government.  On this view, Dr. Heap has no
constitutionally-protected right to be hired to engage in
specific kinds of speech or associative activity.  Therefore,
Plaintiffs' freedom of expression claim must fail.[12]

---

[11] To be clear, in carrying out its mission Navy chaplains engage
in speech and other expressive activity.  But this does not
automatically transform the Navy Chaplain Corps into a
designated or limited public forum under the Supreme Court's
forum analysis.  *See Bryant v. Sec'y of the Army*, 862 F. Supp.
574, 582 (D.D.C. 1994) ("Furthermore, the fact that the
'letters-to-the-editor' column [in military newspapers] is
specifically used for the communication of information and ideas
does not require a finding by the Court that it is necessarily a
public forum.") (citations and internal quotation marks
omitted).

[12] Assuming, *arguendo*, that forum analysis does apply, the
chaplaincy either would be a limited public forum or a non-
public forum.  A limited public forum opens property "limited
to use by certain groups or dedicated solely to the discussion
of certain subjects."  *Christian Legal Society*, 561 U.S. at 669
n.11.  In such a forum, "a governmental entity may impose
restrictions on speech that are reasonable and viewpoint-
neutral."  *Id.*  Here, establishing objective criteria as to
qualifications for chaplain candidates is reasonable.  The
criteria are viewpoint-neutral as they do not single out any
kind of speech for exclusion from the forum, nor is there any
evidence that the Navy excluded Dr. Heap because of any
particular speech or expressive conduct.

 However, it is more likely that the Chaplain Corps
would be considered a nonpublic forum.  In rejecting plaintiff's
contention that Army created a limited public forum in
establishing civilian enterprise newspapers ("CENs") or letters
to the editor feature therein, the district court in *Bryant v.
Secretary of the Army* held that the function of the CENs was to
"further the objectives of the command installation."  *Bryant*,
862 F. Supp. 574, 582 (D.D.C. 1994).  Here, the Chaplain Corps'
purpose is to provide spiritual guidance to Navy service members
in furtherance of the Navy's mission.  Therefore, the Chaplain

The parties dispute whether *Garcetti v. Ceballos* applies to this case.  In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. 410, 421 (2006).  Defendants argue that since the speech of a current employee is not protected by the First Amendment when the speech owes its existence to the employee's official duties, it follows that an applicant for employment does not have freedoms of speech or association rights to be hired to engage in the speech of his choice.  (Official Defs.' Mem. in Supp. at 34.)  Dr. Heap argues that the Fourth Circuit has held that *Garcetti* does not apply to speech that is a special concern of the First Amendment, even when it is part of the speaker's official duties to speak on the subject.  *See Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563-64 (4th Cir.

---

Corps is best understood as a non-public forum.  *Cf. Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1042 (5th Cir. 1982) ("In the cases in which a public facility has been deemed a public forum the speakers have been found to have a right of access because they were attempting to use the facility in a manner fully consistent with the pattern of usual activity and the general invitation extended.").  "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purposes of the forum and all the surrounding circumstances." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985).  As noted earlier, the chaplain candidate qualifications are reasonable in light of the purpose of the Chaplain Corps.

2011) (noting that *Garcetti* left open the question of whether it applied to teaching and scholarship and declining to apply *Garcetti* in a case involving a professor's challenge to denial of tenure).  Where, as here, the speech concerns a core First Amendment concern - the free exercise of religion - Dr. Heap argues *Garcetti* should not apply.  (Pls.' Opp'n at 49-50 (citing *Brown v. Polk Cnty., Iowa*, 61 F.3d 650, 658 (8th Cir. 1995) (en banc) (holding that religious speech of county employee was at the core of the First Amendment and therefore county employee had a right to speak on the topic without reprisal from employer under *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968))).)

Assuming (as both parties do) that a job candidate for public employment is properly considered an employee for First Amendment purposes, *Garcetti* applies here.  As Official Defendants note, chaplains speak on religious matters only as part of their official military duties.  It is impossible to separate a chaplain's official duties from speech on religion, and adopting a rule that would remove religious speech of Navy chaplains from the Navy's control would eviscerate *Garcetti*. Accordingly, Dr. Heap has no First Amendment protections as an applicant for the chaplaincy.

To the extent that Dr. Heap's claim is that he was retaliated against because of his speech, the claim still fails. While Dr. Heap has shown that he engaged in a protected

41

activity, speech, and that he suffered adverse action from Defendants, namely, the denial of his application, he cannot show a causal link between the two. *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). Stated differently, Dr. Heap cannot point to any particular speech or conduct that was the impetus for denying Dr. Heap's application. Therefore, Dr. Heap has not sufficiently stated a speech retaliation claim.

The Court also rejects Dr. Heap's contention that denying Dr. Heap access to the Chaplain Corps operates as a prior restraint. First, as a practical matter, accepting such an argument could mean that every disappointed applicant for a federal, state, or local job could argue that the refusal to hire suppressed the applicant's future speech as an employee. This cannot be countenanced. Second, as a matter of law, rejecting someone from a job does not qualify as a prior restraint on speech as that term is understood. "The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis in original) (citation and internal quotation marks omitted). Here, Dr. Heap has not been forbidden from expressing his Humanist views merely because his application for the chaplaincy was denied. Rather, Dr. Heap simply cannot express his Humanist views as a Navy

42

chaplain.  Such an outcome does not operate as a complete ban on expression sufficient to warrant the label of prior restraint.

For similar reasons, the Court rejects Dr. Heap's claim that Dr. Heap has a right to associate with others as a Navy chaplain.  Dr. Heap has made no showing that he is prevented from associating with other Humanists or with Humanists in the Navy.  Dr. Heap is merely prevented from associating with others as a chaplain in the Navy.  *See City of Dallas v. Stanglin*, 490 U.S. 19, 20-21 (1989) (rejecting associational challenge to ordinance that limited ability of adults to gain access to teenage dance halls).  Nor has Dr. Heap pointed to anything about the policy as written that singles out Humanists and punishes Dr. Heap for being a member.  *See Elfbrandt v. Russell*, 384 U.S. 11, 18 (1966) (declaring unconstitutional a state's loyalty oath and law that prohibited anyone from holding office if they were a member of a group like the Communist party).  Therefore, Dr. Heap's associational claims also fail.

### 4. No Religious Test Clause Claim

Official Defendants argue Dr. Heap has failed to state a claim under the No Religious Test Clause of Article VI of the Constitution.  Dr. Heap contends that the ecclesiastical endorsement requirements of DoDI 1304.28, facially and as applied to Dr. Heap, conditions employment in a federal office

43

on a declaration of affiliation with a religious organization and gives preferential treatment to religious organizations that have been approved by the AFCB.  (Pls.' Opp'n at 51-52.)

Article VI of the Constitution provides "no religious test shall ever be required as a qualification to any office or public trust under the United States."  In *Torcaso v. Watkins*, the Supreme Court struck down a provision of the Maryland constitution which mandated a belief in the existence of God in order to hold a public office.  367 U.S. 488, 489-90 (1961). "We repeat and again affirm that neither a State nor the Federal Government can constitutionally force a person to profess a belief or disbelief in any religion."  *Id.* at 495 (internal quotation marks omitted).

As noted, the purpose of the Chaplain Corps is to aid in the spiritual ministry of service members.  The chaplaincy program itself does not run afoul of the Establishment Clause. *See Katcoff*, 755 F.2d at 231-32 ("Since the program meets the requirement of voluntariness by leaving the practice of religion solely to the individual soldier, who is free to worship or not as he chooses without fear of any discipline or stigma, it might be viewed as not proscribed by the Establishment Clause. Indeed, if the Army prevented soldiers from worshipping in their own communities by removing them to areas where religious leaders of their persuasion and facilities were not available it

44

could be accused of violating the Establishment Clause unless it provided them with a chaplaincy since its conduct would amount to inhibiting religion."). The chaplaincy program itself has withstood constitutional challenge, and it follows that ensuring that chaplains can do the job they were hired to do within that program is also constitutionally sound.

The Statement of Ecclesiastical Endorsement asks the endorsing organization (through a qualified agent) to verify that the candidate is credentialed and qualified for an appointment within the military chaplaincy. (*See* Statement of Ecclesiastical Endorsement, http://www.dtic.mil/whs/directives/forms/eforms/dd2088.pdf.)[13] Requiring chaplain candidates to be endorsed by an ecclesiastical organization does not run afoul of the No Religious Test Clause. Without such an endorsement, the Navy would have to entangle itself in the difficult decision of deciding whether a particular candidate was qualified to provide ministry to his or her identified faith group. On the other hand, requiring such an endorsement leaves it to the ecclesiastical organization itself to determine whether a

---

[13]   Because Form 2088 is referenced in the Amended Complaint and is integral to it, it is properly before the Court in considering the motion to dismiss. *See Witthohn*, 164 F. App'x at 396.

particular candidate fits the mold of its faith tradition. Therefore, the policy does not run afoul of the clause.

Furthermore, the policy generally and as applied here did not require Dr. Heap to profess his belief in any particular group. While an ecclesiastical organization may condition its endorsement on a belief in the tenets of that particular religion, the form itself did not require Dr. Heap to declare his belief in any religion or the ecclesiastical organization to verify such a belief. It simply asks whether, in the opinion of the ecclesiastical organization, the candidate is fit to carry out the spiritual mission of that particular faith. Therefore, Plaintiffs' claim under the No Religious Test Clause fails.

Dr. Heap also claims that the requirement of an endorsing organization gives preferential treatment to religious organizations that have been approved by the AFCB and that this preferential treatment runs afoul of the clause. (Pls.' Opp'n at 52.) This argument strikes the Court as an equal protection claim. Nevertheless, this contention would not be sufficient to state a claim under the No Religious Test Clause. While affiliation with an ecclesiastical organization already approved by the AFCB would make a chaplain candidate's application process easier, nowhere is it required that a chaplain candidate *must* affiliate with one of these approved organizations in order to become a chaplain. Therefore, Dr. Heap has failed to state a

46

claim under the No Religious Test clause, and as such the claim will be dismissed.

### C. Official Defendants' Motion for Summary Judgment on Equal Protection/Substantive Due Process and Establishment Clause Claims

The Official Defendants have moved for summary judgment on the Equal Protection/Substantive Due Process and Establishment Clause claims. The Official Defendants argue there is no basis to infer that there is an unwritten policy of discrimination against Humanists based on the decision not to select one Humanist chaplain for discrimination. (Official Defs.' Mem. in Supp. at 37.)

In general, summary judgment should only be granted "after adequate time for discovery." *See Celotex Corp.*, 477 U.S. at 322. "Summary judgment before discovery forces the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp.*, *Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014). For this reason, when a party lacks material facts necessary to combat a summary judgment motion, he may file an "affidavit or declaration that, for specified reasons, [the party] cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). In response, the district court may defer consideration of the summary judgment motion, deny the motion, or "issue any other appropriate order." *Id.*

A Rule 56(d) motion must be granted "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Anderson*, 477 U.S. at 250 n.5).  Furthermore, such motions are "broadly favored and should be liberally granted" in order to protect non-moving parties from premature summary judgment motions. *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013).  The Court will deny the motion for summary judgment on these claims as premature.[14]  Nothing precludes Official Defendants from re-filing for summary judgment after the close of discovery.

### D. Individual Defendants' Motion to Dismiss

The Individual Defendants have moved to dismiss the claims against them.  First, they argue that Dr. Heap's *Bivens* claim fails because special factors counselling hesitation foreclose the creation of the remedy here.  (Individual Defs.' Mem. in Supp. [Dkt. 40] at 10-24.)  Should the Court recognize a *Bivens* remedy, the Individual Defendants maintain they are entitled to qualified immunity.  (*Id.* at 24-35.)

---

[14] The parties are advised that this is not an invitation to conduct expansive or unnecessary discovery.

## 1. *Bivens* Remedy

The only viable claim remaining against the Individual Defendants is the claim for relief under *Bivens*, as the Court dismissed the RFRA claim as legally insufficient because there was no substantial burden to religious practice.[15] Dr. Heap seeks a damage award from the Individual Defendants in their individual capacities for Dr. Heap's constitutional rights.  In *Bivens v. Six Unnamed Agents of Federal Bureau of Narcotics*, the Supreme Court held that "violation of [the Fourth Amendment] by a federal agent acting under color of his authority gives rise to a cause of action for damages" against that agent individually, despite the absence of any federal statute creating liability.  403 U.S. 388, 389 (1971).  The Court explained that even without explicit congressional authorization for a monetary remedy at law, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury."  *Id.* at 397.  Though couched in seemingly broad terms, the Court "place an important qualifier on the availability of an implied right of action against a government

---

[15] Even if the RFRA claim could be understood to have adequately alleged a substantial burden to religion, Individual Defendants are entitled to qualified immunity for the reasons discussed in Section III.D.2, *infra*.  In so holding, the Court assumes, without deciding, that RFRA authorizes damages suits against officers in their individual capacities.

49

official, foreshadowing the extremely narrow reach established in post-*Bivens* cases." *Cioca v. Rumsfeld*, 720 F.3d 505, 508 (4th Cir. 2013). The Court limited a *Bivens* remedy by stating that "[*Bivens*] involves no special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396. As the Court explained in *Bush v. Lucas*, "[t]he special factors counselling hesitation in the creation of a new remedy relate[] to the question of who should decide whether such a remedy should be provided," rather than "the merits of the particular remedy that was sought." 462 U.S. 367, 380 (1983).

The Fourth Circuit has recently considered the basis and application of *Bivens* in the military setting in *Lebron v. Rumsfeld* and *Cioca v. Rumsfeld*. In *Lebron*, the Fourth Circuit held that "special factors counseled hesitation in implying causes of action for enemy combatants held in military detention." *Lebron*, 670 F.3d 540, 548 (4th Cir. 2012). Thus, the Fourth Circuit upheld the district court's denial of a *Bivens* remedy for Jose Padilla ("Padilla"), who sued the Secretary of Defense and a number of former high-level civilian policy-makers at DoD for legal and equitable relief stemming from his military detention as an enemy combatant. *Id.* at 543. In *Cioca*, the Fourth Circuit upheld this Court's dismissal of a complaint brought by twenty-eight current and former members of

the United States Armed Forces, alleging that the acts and omissions of two former Secretaries of Defense in their official and individual capacities contributed to a military culture of tolerance for sexual crimes perpetrated against the plaintiffs. *Cioca*, 720 F.3d at 506.  The Fourth Circuit recognized the Supreme Court's strict limits on a *Bivens* proceeding exist in part because "'the Supreme Court has long counselled restraint in implying new remedies at law.'" *Cioca*, 720 F.3d at 509 (quoting *Lebron*, 670 F.3d at 547.)  "Such restraint counsels that we review a plaintiff's "invitation to imply a *Bivens* action . . . with skepticism." *Id.* (quoting *Lebron*, 670 F.3d at 548).

Abstention from creating a new *Bivens* remedy "is, at its essence, a function of the separation of powers under the Constitution which delegates authority over military affairs to Congress and to the President as Commander in Chief.  It contemplates no comparable role for the judiciary." *Cioca*, 720 F.3d at 509 (citing *Lebron*, 670 F.3d at 548); *see also Chappell*, 462 U.S. at 301 (stating the "Constitution contemplated that the Legislative Branch has plenary control over rights, duties, and responsibilities in the framework of the military establishment, including regulations, procedures, and remedies.").

As a consequence of the Constitution's specific delineation of the powers allotted among the branches of

government in military affairs, "whenever the Supreme Court has considered a *Bivens* case involving the military, it has concluded that "'the insistence . . . with which the Constitution confers authority over the Army, Navy, and militia upon the political branches . . . counsels hesitation in our creation of damages remedies in this field.'" *Cioca*, 720 F.3d at 509-10 (quoting *United States v. Stanley*, 483 U.S. 669, 682 (1987)). "Put simply, '[a *Bivens* remedy] would be plainly inconsistent with Congress' authority' in military affairs." *Id.* at 510 (quoting *Chappell*, 462 U.S. at 304).

In the more than forty years since deciding *Bivens*, the Supreme Court has only twice recognized a new implied monetary remedy against federal officials, and it has never done so in the military context. *Id.* Thus, it is "clear that an expansion of a *Bivens*-based cause of action . . . is the exception, not the rule." *Id.* Against this backdrop, this Court declines to create a *Bivens* remedy to allow Plaintiffs to recover damages against individual Naval officers.

Dr. Heap argues that the military context is not a special factor counseling hesitation here because Dr. Heap was not in the military at the time his application was rejected. (Pls.' Opp'n at 54.) Instead, Plaintiffs urge the Court to follow the "incident to service" test developed in *Feres v. United States*, 340 U.S. 135 (1950). (*Id.* at 54-55.) *Feres* held

52

that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146. Thus, the incident to service test, as it has become known, does not permit damages for injuries to service members arising out of or in the course of activity incident to military service.

In *Chappell*, the Supreme Court drew on *Feres* in finding a *Bivens* remedy unavailable for plaintiffs, enlisted sailors, who alleged that certain Naval officers engaged in racial discrimination against them. "Here, as in *Feres*, we must be concerned with the disruption of the peculiar and special relationship of the soldier to his superiors that might result if the soldier were allowed to hale his superiors into court." 462 U.S. at 304 (citation and internal quotation marks omitted). Four years later, in *Stanley*, the Supreme Court reaffirmed its holding in *Chappell* in denying a *Bivens* remedy for a former service member who alleged he was the involuntary victim of Army LSD experiments during his military service. *Stanley*, 483 U.S. at 671-72. The *Stanley* Court emphasized the importance of the "incident to service" test insofar as it minimized the "degree of disruption" that a judicial inquiry would create:

> A test for liability that depends on the extent to which particular suits would call into question military discipline and

53

> decisionmaking would itself require judicial
> inquiry into, and hence intrusion upon,
> military matters.  Whether a case implicates
> those concerns would often be problematic,
> raising the prospect of compelled
> depositions and trial testimony by military
> officers concerning the details of their
> military commands.  Even putting aside the
> risk of erroneous judicial conclusions
> (which would becloud military
> decisionmaking), the mere process of
> arriving at correct conclusions would
> disrupt the military regime.  The "incident
> to service" test, by contrast, provides a
> line that is relatively clear and that can
> be discerned with less extensive inquiry
> into military matters.

*Id.* at 682-83.

Important distinctions must be made between the
instant case and *Feres*.  First, judicial second-guessing an
individual Naval officer's decision to accept or reject Dr.
Heap's application is the very type of intrusion into military
decisionmaking that *Stanley* feared.  *Cf. Jackson v. Tate*, 648
F.3d 729, 730 (9th Cir. 2011) (holding *Feres* does not apply to
bar plaintiff's *Bivens* remedy on claim that National Guard
recruiters forged his signature to fraudulently reenlist him).
Second, and importantly, the Fourth Circuit has rejected the
formalistic separation between military and non-military
plaintiffs where there are serious concerns about
administrability of claims.  In *Lebron*, Padilla argued that
*Stanley* and *Chappell* did not apply to him because he was a
civilian, not a member of the armed forces.  *Lebron*, 670 F.3d at

554.  The Fourth Circuit rejected this argument.  "[Padilla's argument] misconceives the nature of the special factors analysis.  The source of hesitation is the nature of the suit and the consequences flowing from it, *not just the identity of the plaintiff*."  *Id.* (emphasis added).  Permitting a *Bivens* remedy here would force the Court "to pass judgment on the merits of the [Individual] Defendants' military decisions, which the Supreme Court has concluded is not within the realm of [the] judicial branch function."  *Cioca*, 720 F.3d at 515.

The Fourth Circuit has considered whether a candidate for military employment may bring a *Bivens* claim when the application was rejected.  In *Middlebrooks v. Leavitt*, the plaintiff applied to nursing positions at the National Institutes of Health ("NIH") and sought to be hired as a member of the Public Health Services Commissioned Corps ("PHSCC"), one of the seven uniformed services of the military.  525 F.3d 341, 342 (4th Cir. 2008).  The Fourth Circuit remanded for a determination of whether her application was better characterized as an application to NIH or an application for the PHSCC.  *Id.* at 348-49.  "[S]hould the district court determine that Middlebrooks' application is best characterized as one to the PHSCC, then, because we believe that the statutory scheme evinces congressional intent to align the PHSCC with the armed forces, and members of the armed forces would lack a *Bivens*

55

remedy for discrimination claims arising out of military employment, Middlebrooks also would have no *Bivens* remedy against NIH officials." *Id.* at 350. Applying *Middlebrooks*, Dr. Heap has no *Bivens* remedy, even as an applicant to the Navy.[16]

Individual Defendants also raise three other "special factors counselling hesitation" – the First Amendment, the Administrative Procedure Act ("APA"), and the context of federal employment. Turning first to the First Amendment, the Supreme Court has never held that *Bivens* extends to the full range of First Amendment claims. *See Reichle v. Howard*, 132 S. Ct. 2088, 2093 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.").[17] In *Ashcroft v. Iqbal*, the Court recognized that it had never found an implied damages remedy under the Free Exercise Clause. 556 U.S. 662, 675 (2009). However, the Court assumed, without deciding, that such a claim was actionable because petitioners did not make that argument on appeal and it was not relevant to determining the ultimate issue

---

[16] This does not meant that this Court cannot determine whether there have been constitutional violations. As the Supreme Court noted in *Stanley*, suits to halt or prevent constitutional violations are appropriate, as "[s]uch suits . . . [seek] traditional forms of relief, and [do] not ask the Court to imply a new kind of cause of action." *Stanley*, U.S. at 683 (citation and internal quotation marks omitted).

[17] In the context of speech claims, *Bivens* remedies are sometimes viable, depending on the facts. *See Hartman v. Moore*, 547 U.S. 250, 252, 256 (2006) (finding *Bivens* remedy where officials induced a prosecution in retaliation for speech but finding that lack of probable cause must be pled and proven).

in the case.  *Id.* at 666, 675 (holding pleadings insufficient to state a claim for relief).

Dr. Heap cites to several cases where district courts have found a *Bivens* remedy available for Establishment Clause and Free Exercise claims.  *See Am. Humanist Ass'n v. United States*, No. 3:14-cv-00565-HA, 2014 WL 5500495, at *7 (D. Or. Oct. 30, 2014); *but see Turkmen v. Ashcroft*, 915 F.Supp.2d 314 (E.D.N.Y. 2013) (finding a *Bivens* remedy for free exercise claims against Bureau of Prisons officials), *rev'd sub nom. Turkmen v. Hasty*,  --- F.3d ---, Nos. 13-981, 13-999, 13-1002, 13-1003, 13-1662,  2015 WL 3756331, at *12-13 (2d Cir. June 17, 2015).  As the Second Circuit recognized in *Turkmen*, "Plaintiffs' free exercise claim would require extending *Bivens* to a new context, a move we decline to make absent guidance from the Supreme Court."  *See also Iqbal*, 556 U.S. at 675 ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or category of defendants.") (citations and internal quotation marks omitted).  Given the strong presumption against creation of a new *Bivens* remedy, absent specific guidance to the contrary, the Court declines to create a new *Bivens* remedy for violations of the Establishment Clause.

Turning to the federal employment context, Individual Defendants argue that the exemption of both applicants and

57

members of the uniformed armed services from Title VII
implicitly forecloses a *Bivens* remedy because such exclusion was
a deliberate act by Congress to exclude a damages remedy against
an official in his or her individual capacity.  (Individual
Defs.' Mem. in Supp. at 18.)  Title VII outlaws discrimination
in employment based on race and waives sovereign immunity with
respect to claims for "personnel actions affecting employees or
applicants for employment . . . in military departments . . .
[and] in executive agencies . . . ."  42 U.S.C. § 2000e-16(a).
Numerous appellate courts, including the Fourth Circuit, have
concluded that uniformed members of the armed services do not
constitute "employees . . . in military departments" and so do
not fall within the scope of sovereign immunity contained in §
2000e-16(a).  *Middlebrooks*, 525 F.3d at 344 (citing *Randall v.
United States*, 95 F.3d 339, 343 (4th Cir. 1996) (holding that
"Congress intended [in § 2000e-16] to include only civilian
employees of the military departments, and not uniformed service
members, within the reach of Title VII.")).  Courts have also
concluded that Congress did not intended § 2000e-16(a)'s waiver
of immunity to encompass applicants for enlistment in the
uniformed armed services and therefore have held that applicants
may not bring Title VII claims.  *Middlebrooks*, 525 F.3d at 344
(citation omitted).

58

As the Fourth Circuit has noted, the legislative history of § 2000e-16(a) suggests that, in passing the amendment to Title VII that added this subsection, Congress intended § 2000e-16 to reach only federal employees in the civil service and competitive service who were, at that time, under the authority of the Civil Service Commission. *Id.* at 346-47. The uniformed services, including the Navy, are explicitly exempted from the operation of the civil service laws. 5 U.S.C. § 2101. Thus, the military's exclusion from Title VII's coverage can be read to be Congressional disapproval of a money damages remedy against individual military officers. Therefore, the exclusion of applicants and members of the Armed Forces from Title VII cautions this Court against creating a *Bivens* remedy here. *See Zimbelman v. Savage*, 228 F.3d 367, 370 (4th Cir. 2000) (declining to find a *Bivens* remedy for civilian Air Force employees who were excluded from the Civil Service Reform Act ("CSRA"), noting that such exclusion did not release the plaintiffs from the CSRA's exclusive remedial framework, and citing cases from Ninth, Tenth, Eleventh and D.C. Circuits rejecting efforts of federal employees who lack a CSRA remedy to bring a *Bivens* action).

Dr. Heap relies on *Davis v. Passman* for the proposition that the Individual Defendants' argument – the exclusion of the military from Title VII's protection implicitly

forecloses *Bivens* relief – has been explicitly rejected.
Plaintiff Shirley Davis was a deputy administrative assistant to
Congressman Otto Passman and alleged that she suffered
discrimination on the basis of her sex.  442 U.S. 228, 230-31
(1979).  In finding a damages remedy appropriate, the Supreme
Court relied in part on the fact that there was no explicit
congressional declaration that persons in Davis's position may
not recover damages; in amending Title VII, Congress failed to
extend the statute's protection to congressional employees like
Davis.  *Id.* at 246-47.  But such exclusion did not mean that
other forms of relief were inappropriate, as the silence was not
proof of the "clearly discernible will of Congress" to preclude
any form of relief.  *Id.*

     *Davis*, however, is distinguishable.  First, the *Davis*
court recognized that a suit against a congressman for
putatively unconstitutional actions taken in the course of his
official conduct did raise special concerns counselling
hesitation.  *Id.* at 246.  However, such concerns were
coextensive with the protections afforded by the Speech and
Debate Clause of the Constitution.  *Id.*  As Passman's actions
were not shielded by the Speech and Debate Clause, monetary
relief should not be precluded either.  *Id.*  To hold otherwise
would grant members of Congress more immunity than the
Constitution intended.  *Stanley*, 483 U.S. at 685 ("That is to

say, the Framers addressed the special concerns in that field through an immunity provision - and had they believed further protection was necessary they would have expanded that immunity provision.  It would therefore have distorted their plan to achieve the same effect as more expansive immunity by the device of denying a cause of action for injuries caused by Members of Congress where the constitutionally prescribed immunity does not apply.").

Second, subsequent cases have recognized *Davis*'s limited reach.  In *Bush v. Lucas*, the Supreme Court declined to create a *Bivens* remedy for federal employees whose First Amendment rights were violated by their superiors.  In so holding, the Court assumed that the civil service remedies were not as effective as an individual damages remedy and did not fully compensate plaintiffs for harm suffered.  462 U.S. 367, 372 (1983).  The Court also assumed that Congress had neither expressly authorized nor expressly precluded creation of a *Bivens* remedy.  *Id.* at 372-73.  Though courts have the power to grant relief that is not expressly authorized by statute, "such power is to be exercised in the light of relevant policy determinations made by Congress."  *Id.* at 373.  Thus, the Court declined to "create a new substantive legal liability without legislative aid and as at the common law because we are convinced that Congress is in a better position to decide

whether or not the public interest would be served by creating it." *Id.* at 390 (citation and internal quotation marks omitted); *see also Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988) (stating where Congress has not seen fit to include a damages remedy in an elaborate remedial scheme, such a remedy is unavailable). Taken together, *Bush* and *Chilicky* caution this Court to be wary of creating *Bivens* remedies where Congress has already legislated in that field yet was silent about a particular factual scenario. *See Zimbelman*, 228 F.3d at 370 ("But as *Bush* and *Chilicky* make clear, a *Bivens* remedy is inappropriate where the 'special factor' of federal employment exists."). Given that there are other opportunities for potential relief, namely, a declaratory judgment stating that the Navy and DoD's current practices are unconstitutional, this Court declines to take the extraordinary step of remedying Dr. Heap's alleged harms through a damages judgment.[18] *See Guardado*

---

[18] Individual Defendants also argue that the Administrative Procedure Act ("APA") is a special factor counselling hesitation of the creation of a *Bivens* remedy. (Individual Defs.' Mem. in Supp. at 20-22.) As the district court noted in *Navab-Safavi*, "[t]he question here is whether the APA is a congressional comprehensive system for purposes of applying special factors analysis." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 70 (D.D.C. 2009) (citing *Spagnola v. Mathis*, 859 F.2d 223, 228 (D.C. Cir. 1998) (en banc)). Because the APA created no substantive rights but rather created procedural mechanisms for enforcing such substantive rights, "[i]t therefore cannot be said that the APA's solely procedural provisions represent an 'elaborate' or 'careful' congressional judgment about the type of relief that should be available for

*v. United States*, 744 F. Supp. 2d 482, 490 (E.D. Va. 2010)

("There is no 'automatic entitlement' to a *Bivens* damages

remedy, however.") (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550

(2007)); *cf. Navab-Safavi v. Broad. Bd. of Governors*, 650 F.

Supp. 2d 40, 73-74 (D.D.C. 2009) (noting that there was no

specific statute addressing the quasi-employment relationship

between federal entities and personal services contractors like

the plaintiff and stating "the only viable relief" for plaintiff

would be backward-looking damages claims).

### 2. Qualified Immunity

In the alternative, Individual Defendants state that

they are entitled to qualified immunity.  First, they argue Dr.

Heap has failed to establish that any of the Individual

Defendants' conduct violated any constitutional rights.

(Individual Defs.' Mem. in Supp. at 25.)  Second, Individual

Defendants argue that at the time Dr. Heap's application was

rejected, it was not clearly established that Humanism in

general, or the Humanism Dr. Heap and THS practice, are religion

within the meaning of the First Amendment.  (*Id.* at 31.)

---

specific substantive quasi-employment claims akin to those
governed by the CSRA."  *Id.* at 72.  There is no controlling
guidance from the Fourth Circuit on this question.  Therefore,
while the Court declines to find that the APA is a "special
factor" precluding *Bivens* relief, it is skeptical that such an
argument would be successful in light of the *Navab-Safavi*'s
reasoning on the issue.

Qualified immunity is available where a government official performing discretionary functions "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine balances holding public officials accountable for abuses of power with protecting them from harassment, distraction, and liability in performing their public duties. *Guardado*, 744 F. Supp. 2d at 490 (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).  Questions of qualified immunity are resolved through a two-step inquiry: (1) whether the facts alleged make out a violation of a constitutional right and (2) whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 212-13 (2001)).

The Court turns first to whether Dr. Heap has alleged violations of any constitutional rights.  "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676; *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) ("[*Bivens*] liability is personal, based upon each defendant's own constitutional violations.").  In order to state such a claim against an individual defendant, Dr. Heap "must plead sufficient factual matter to show that [each of the defendants acted] . . . not for a neutral . . .

64

reason but for the purpose of discriminating [against him] on account of race, religion, or national origin." *Iqbal*, 556 U.S. at 676.

Dr. Heap alleges that Defendants Kibben, Stendahl, Gard, Horn, Rutherford, Baily, Page and Wright withheld recognition of THS as a qualified ecclesiastical endorser of chaplaincy candidates because of THS's Humanist beliefs.  (Am. Compl. ¶¶ 29-30, 33-38.)  As noted earlier, THS lacks standing to assert a claim for relief for denial of its application.  Dr. Heap makes no allegations that any of these defendants personally took any action on his application to be a chaplain. Therefore, Dr. Heap's allegations do not establish that these defendants engaged in any religious discrimination against him.[19]

As to the remaining three individual defendants, Dr. Heap alleges that Defendants Moran, Andrews, and Tidd made a determination to deny his application to the Navy chaplaincy because of Dr. Heap's Humanist beliefs.  (Am. Compl. ¶¶ 21, 22,

---

[19] Dr. Heap alleges that Defendant Kibben, as Navy Chief of Chaplains, denied his application to the chaplaincy for discriminatory reasons.  (Am. Compl. ¶¶ 23, 33.)  Rear Admiral Kibben assumed her position as Navy Chief of Chaplains on August 1, 2014.  (*Id.* ¶ 23.)  Therefore, she was not Chief of Chaplains at the time Dr. Heap's application was before the CARE Board and had no authority to approve or disapprove any recommendation by the CARE Board as to Dr. Heap's application.  Secretary of the Navy Instruction ("SECNAVINST") 5351.1 ¶ 5.c.  Therefore, any comments she may have made about Humanism, *see* Am. Compl. ¶ 8, are not relevant to determining whether she personally discriminated against Dr. Heap's application.

24.)  Beyond pointing to isolated statements of some of these

Individual Defendants,[20] Dr. Heap makes no showing that

Defendants Tidd, Moran, and Andrews were motivated by any

personal animus toward Humanism in denying his application.  In

fact, Dr. Heap's allegations state that these three Individual

Defendants denied his application because of the Navy's "policy

and practice" of discrimination against Humanists.  (Am. Compl.

¶¶ 21, 22, 24.)  As noted, whatever alleged animus that the Navy

or other persons had toward Humanism cannot be imputed to these

Individual Defendants.  *See Iqbal*, 556 U.S. at 676.  Therefore,

allegations about the Navy's policies surrounding lay leaders,

Congressional reaction over Dr. Heap's application, or

---

[20] In ¶ 91 of the Amended Complaint, Dr. Heap alleges that a
subordinate officer wrote to Rear Admiral Tidd, telling Rear
Admiral Tidd he had "received a little intelligence on the
humanist so called [sic] applicant to our Corps."  According to
Dr. Heap, rather than reprimanding the subordinate for "his
obvious bias" against Dr. Heap by calling him a "humanist so
called applicant," Rear Admiral Tidd thanked the officer for his
work.  As noted in the Amended Complaint, the officer reported
he was unable to find evidence that Dr. Heap had been ordained a
minister of the Disciples of Christ; however, Dr. Heap had never
claimed to be an ordained minister of that denomination.

        Additionally, in ¶ 64, Dr. Heap alleges that public
comments by Rear Admiral Tidd reveal that "a belief in a god is
not merely an attribute of some religious views in the Navy
Chaplain Corps, but . . . a *prerequisite* for service as a Navy
Chaplain."  (emphasis in original)  However, Dr. Heap makes no
allegation linking that public comment to the denial of his
application beyond the conclusion that because Dr. Heap does not
profess a belief in a god, and Rear Admiral Tidd's comments
seemed to indicate such a belief was required to be a Navy
chaplain, then Dr. Heap's application must have been denied
because of his lack of a belief in a god.

statements made by an unnamed Navy officer not part of this lawsuit are not sufficient to state a constitutional violation against these Individual Defendants.

Dr. Heap also fails to circumstantially allege some kind of personal animus on the part of Defendants Tidd, Moran, and Andrews.  Dr. Heap alleges that the Lt. DeGraeve told Dr. Heap that "he would attempt to fast-track the application so Dr. Heap could appear before a [CARE Board] the following month, in July 2013, or August 2013 at the latest."  (Am. Compl. ¶ 75.) Dr. Heap argues that this is proof of discriminatory intent, since the Navy first learned he was a Humanist after this conversation and he was not invited to attend a CARE Board in the summer of 2013.  Additionally, Dr. Heap argues that when he finally was invited to the CARE Board, the board only filled three of four available spots.  (Am. Compl. ¶ 99.)  And in the three months that followed his appearance in front of the board, the Navy accepted two non-Humanist candidates who had "similar qualifications" under the applicable criteria.  (Am. Compl. ¶ 106.)  This is not enough to state a plausible claim of discrimination against Tidd, Moran, and Andrews as individuals.[21] As the Individual Defendants note, there are no allegations

---

[21] The Court takes no position at this time as to whether these allegations are sufficient to state claims under the Establishment or Equal Protection clauses as to the Official Defendants.

about Dr. Heap's interview with the CARE Board other than it occurred.  (*See* Am. Compl. ¶ 95.)  Dr. Heap does not allege that there was any conversation about Humanism or his Humanist beliefs during his interview.  He makes no allegation that anyone associated with the chaplaincy application process made any anti-Humanist comments or displayed any bias toward Humanism.  Thus, Dr. Heap has failed to survive the first prong of the qualified immunity analysis as he has not sufficiently alleged constitutional violations.

As to whether Individual Defendants violated any clearly established rights, Dr. Heap cites to a lone footnote in the Supreme Court's *Torcaso* decision in which the court declares "Secular Humanism" as a religion.  Thus, Dr. Heap contends that Humanism is a religion as that term is legally defined and cites case law discussing that footnote.  (Pls.' Opp'n at 65-66.)  In the alternative, Dr. Heap argues that even if the Court were to disagree, holding instead that Humanism does not fall within the legally prescribed definition of religion, the Individual Defendants were on notice that their conduct violated clearly established rights because the Establishment Clause requires that the government treat religious belief and non-belief equally.  (*Id.* at 70.)

To guide the analysis of whether a right is clearly established, the Fourth Circuit has stated that the Court may

68

"rely upon cases of controlling authority in the jurisdiction in question, or a 'consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'"  *Rogers v. Pendleton*, 249 F.3d 279, 287-88 (4th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

> While a consensus of cases of persuasive authority may clearly establish a right for qualified immunity purposes, the inverse is also true: if there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes.

*Id.* at 287-88.

In *Torcaso*, the Supreme Court struck down part of the Maryland constitution requiring notaries to take an oath affirming a belief in God.  "Neither [the federal or state government] can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs."  *Torcaso*, 367 U.S. at 495.  To this statement, which signified that "religion" did not necessarily entail a belief in God, the Court appended a footnote.  That footnote lists "religions in this country which do not teach what would

generally be considered a belief in the existence of God," among them, Secular Humanism.  *Id.* at 495 n.11.

The Fourth Circuit has not interpreted this footnote nor considered whether Humanism is a religion within the First Amendment.[22]  In *Kalka v. Hawk*, the D.C. Circuit held that prison officials did not violate clearly established rights when they refused to let a prisoner form Humanist groups within the prison's religious services program.  215 F.3d 90, 91 (D.C. Cir. 2000).  In finding that there was no precedent declaring Humanism to be a religion, the D.C. Circuit rejected a broad reading of the *Torcaso* footnote.  "The Court's statement in *Torcaso* does not stand for the proposition that humanism [sic], no matter in what form and no matter how practiced, amounts to a religion under the First Amendment.  The Court offered no test

_____

[22] Dr. Heap argues Humanism is a religion under Fourth Circuit case law, citing *Dettmer v. Landon* in support.  In *Dettmar*, the Fourth Circuit concluded Wicca is a religion under the First Amendment based on several factors like adherence to doctrines that concern ultimate questions of human life and doctrinal teachings parallel to those of more conventional religions.  799 F.2d 929, 931-32 (4th Cir. 1986).  Dr. Heap argues that like Wicca, Humanism meets these factors, and therefore it is clearly established that Humanism is a religion for First Amendment purposes.  While Humanism may satisfy the factors laid out in *Dettmer*, the Fourth Circuit did not hold that Humanism was a religion in that case nor did it even mention Humanism in its holding.  *See McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999) ("The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.").  Therefore, *Dettmer* does not clearly establish that Humanism is a religion for First Amendment purposes.

for determining what system of beliefs qualified as a 'religion' under the First Amendment."  *Id.* at 99; *see also McGinley v. Houston*, 361 F.3d 1328, 1332 (11th Cir. 2004) ("Moreover, neither the Supreme Court nor this court has determined that secular humanism [sic] is a religion for purposes of the establishment clause.") (citation and internal quotation marks omitted).

     In contrast, the Seventh Circuit has held that Humanism is entitled to protection under the Establishment Clause.  *Ctr. for Inquiry Inc. v. Marion Circuit Court Clerk*, 758 F.3d 869, 873-75 (7th Cir. 2014).  The Seventh Circuit placed greater weight on the Supreme Court's footnote in *Torcaso* and implied that Humanism was a secular belief system that holds the same place in adherents' lives as traditional religion.  *Id.* at 873 ("And although both the text and note 11 in *Torcaso* might be characterized as dictum, we held in *Kaufman v. McCaughtry*, 419 F.3d 678 (7th Cir. 2005), that, when making accommodations in prisons, states must treat atheism as favorably as theistic religion.  What is true of atheism is equally true of humanism, and as true in daily life as in prison.").  The Seventh Circuit reversed the lower court's holding that Indiana's marriage solemnization law, which allowed only certain categories of persons or entities to solemnize marriages, did not violate the Establishment Clause of the First Amendment.  In its opinion,

the district court declined to read *Kaufman* and *Torcaso* as
controlling as to the status of Humanism under the First
Amendment.  *Ctr. for Inquiry, Inc. v. Clerk, Marion Circuit
Court*, No. 1:12-CV-00623-SEB, 2012 WL 5997721, at *7 (S.D. Ind.
Nov. 30, 2012) ("We disagree with Plaintiffs' summation of First
Amendment jurisprudence for purposes of resolving the issues
before us.  As a preliminary matter, we find inapposite
Plaintiffs' avowal that, 'for this purpose[,] [plaintiff] must
be considered to be analogous to a religion[.]'"); *cf. Am.
Humanist Ass'n*, 63 F. Supp. 3d at 1283 (stating that Humanism is
a religion for Establishment Clause purposes while noting that
Ninth Circuit case law had suggested, but not affirmatively
decided, the same).

         To paraphrase the Supreme Court in *Wilson*, if judges
disagree on a constitutional question, it is unfair to subject
federal officials to money damages for picking the losing side
of the controversy.  526 U.S. at 618.  While many lower courts
have read the footnote in *Torcaso* as controlling on the question
of whether Humanism is a religion,[23] the interpretation of one

---

[23] *Newdow v. U.S. Cong.*, 313 F.3d 500, 504 n.2 (9th Cir. 2002);
*Chess v. Widmar*, 635 F.2d 1310, 1318 n.10 (8th Cir. 1990);
*Greater Houston Chapter of the ACLU v. Eckels*, 589 F. Supp. 222,
239 n.20 (S.D. Tex. 1984); *Crockett v. Sorenson*, 568 F. Supp.
1422, 1425 (W.D. Va. 1983).  Dr. Heap cites *Howard v. United
States*, 864 F. Supp. 1019, 1022 (D. Colo. 1994) as a case in
support of his argument that Humanism is recognized as a
religion under the First Amendment.  However, the inmate in

footnote in a Supreme Court case is not the type of definitive pronouncement that places the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).  And though it may be the case that going forward Humanism is a religion for First Amendment purposes, such a conclusion could not be said to be well established at the time of the events in question here.

Dr. Heap argues that even if it is not well-established that Humanism is a religion for First Amendment purposes, case law clearly establishes that federal officials cannot discriminate between belief and non-belief.  In support, Dr. Heap cites *United States v. Seeger*, 380 U.S. 163, 165-66 (1965), and *Welsh v. United States*, 398 U.S. 333 (1970), for the proposition that belief in divinity is not a required element of "religion."  (Pls.' Opp'n at 65.)  As Dr. Heap notes, *Seeger* and *Welsh* involved interpretation of a draft-exemption statute rather than the First Amendment.  The Supreme Court interpreted the statutory language "in relation to a Supreme Being" to include belief "which occupies in the life of its possessor a place parallel to that filled by the God" of other traditional religions, but to exclude "essentially political, sociological,

---

*Howard* was a self-proclaimed Satanist who believed in a "humanist ethical system."  *Id.* at 1020.  As the Court believes the practices of the inmate in *Howard* and Dr. Heap are distinct, it does not read *Howard* to stand for establishing Humanism as practiced here as a religion.

or philosophical views." *Seeger*, 380 U.S. at 176.  Assuming

that *Seeger* does apply, it was not clearly established at the

time of the events in question that Humanism as practiced by Dr.

Heap meets that definition.  While Dr. Heap states that Humanism

"is a secular moral system equivalent to religion," he cites no

legal authority that has pronounced that statement.  (Pls.'

Opp'n at 70.)  While the Court does not deny that Humanism could

indeed be a secular moral system equivalent to religion, the

inquiry at this stage is whether that proposition was widely

accepted by courts such that a reasonable officer would be on

notice that Humanism stands on equal footing to religious

belief.  Whether Humanism is protected under the Constitution

either as a religion or as an equivalent belief system was not

"clearly established."  Therefore, Individual Defendants are

entitled to qualified immunity.[24]

---

[24] To the extent that Counts One and Seven seek equitable relief against the Individual Defendants, such relief is inappropriate. "Qualified immunity prevents an award of back or front pay against the officers in their individual capacities." *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 452 n.10 (4th Cir. 2004).  The remaining equitable relief sought can only be awarded against the Individual Defendants in their official capacities.  *Id.; see also Dugan v. Rank*, 372 U.S. 609, 620 (1963) ("The general rule is that a suit is against the sovereign if . . . the effect of the judgment would be to restrain the Government from acting, or to compel it to act.") (citation and internal quotation marks omitted).

### IV. Conclusion

For the foregoing reasons, the Court will grant the Individual Defendants' Motion to Dismiss and will grant in part and deny in part the Official Defendants' Motion to Dismiss. Since THS has no organizational or associational standing and its claim is not ripe, it will be dismissed from the case.  The Individual Defendants will also be dismissed from the case because the Court declines to create a new *Bivens* remedy, or, in the alternative, the Individual Defendants are entitled to qualified immunity should such a remedy exist.  The Court will dismiss the RFRA, Free Exercise, No Religious Test, and First Amendment claims (Counts One, Three, Five, and Six).  The Official Defendants' motion for summary judgment on the Establishment Clause and Equal Protection and Substantive Due Process claims (Counts Two and Four) will be denied.  An appropriate order shall issue.

|                        | /s/                                  |
|------------------------|--------------------------------------|
| July 1, 2015           | James C. Cacheris                    |
| Alexandria, Virginia   | UNITED STATES DISTRICT COURT JUDGE   |